John D. Cline (State Bar No. 237759)
cline@johndclinelaw.com
LAW OFFICE OF JOHN D. CLINE
50 California Street, Suite 1500
San Francisco, CA  94111
Telephone:   (415) 662-2260
Facsimile:    (415) 662-2263

Patrick W. Blegen (pro hac vice)
pblegen@blegengarvey.com
BLEGEN & GARVEY
53 West Jackson Blvd., Suite 1424
Chicago, IL  60604
Telephone:   (312) 957-0100
Facsimile:    (312) 957-0111

Attorneys for Defendant
TAHAWWUR RANA

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-CV-07309-DSF (JC) |
| Plaintiff, | |
| v. | **OPPOSITION OF TAHAWWUR RANA TO GOVERNMENT'S REQUEST FOR EXTRADITION** |
| TAHAWWUR RANA, | |
| Defendant. | |

**DEFENDANT'S OPPOSITION TO EXTRADITION**

Tahawwur Rana, through undersigned counsel, submits this opposition to the government's request to extradite him to India.  Rana's extradition is barred (1) under Article 6 of the United States-India extradition treaty ["the Treaty"] because he has previously been acquitted of the offenses for which extradition is sought, and (2) under Article 9 of the Treaty because the government has not established probable cause to believe that Rana committed the alleged offenses.

This opposition is based on the attached memorandum of points and authorities, the attached expert report of Paul Garlick QC, the files and records of this case, and any oral argument or evidence that the Court may allow.

Dated:  February 1, 2021                    Respectfully submitted,


                                             /s/
                                            _____
                                            John D. Cline


                                             /s/
                                            _____
                                            Patrick W. Blegen


                                            Attorneys for Defendant
                                            TAHAWWUR RANA

DEFENDANT'S OPPOSITION TO
EXTRADITION

1

**TABLE OF CONTENTS**

2

**PAGE**

3

4  BACKGROUND...................................................................................................1

5  ARGUMENT......................................................................................................3

6      I.    ARTICLE 6 OF THE UNITED STATES-INDIA
            EXTRADITION TREATY BARS EXTRADITION.........................3
7
8            A.    *Blockburger* Does Not Apply in Determining Whether
                  Two Conspiracies Charged in Successive Prosecutions
                  Are the Same Offense for Double Jeopardy Purposes...............4
9
10           B.    The Treaty Language Demonstrates That the Term
                  "Offense" in Article 6 Refers to the Underlying Conduct........10
11
             C.    In Headley's Plea Agreement, the Government Interpreted
                  "Offense" in Article 6 to Refer to Conduct. ...........................12
12
13           D.    International Law and Indian Law Support Interpreting
                  "Offense" in Article 6 on the Basis of Conduct Rather
14                Than Elements................................................................14

15     II.   THE GOVERNMENT HAS NOT ESTABLISHED
            PROBABLE CAUSE TO BELIEVE THAT RANA
16          COMMITTED THE INDIAN OFFENSES .......................................15

    CONCLUSION.................................................................................................22
17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S OPPOSITION TO
                                                                EXTRADITION**

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashe v. Swenson*,
  397 U.S. 436 (1970)..................................................................6

*Barapind v. Enomoto*,
  400 F.3d 744 (9th Cir. 2005) (en banc) .......................................15

*Blockburger v. United States*,
  284 U.S. 299 (1932)...........................................................4, 5, 6

*Brown v. Ohio*,
  432 U.S. 161 (1977)..................................................................9

*Clarey v. Gregg*,
  138 F.3d764 (9th Cir. 1998) ....................................................10

*Cherokee Nation v. Nash*,
  267 F. Supp. 3d 86 (D.D.C. 2017) ............................................10

*Elcock v. United States*,
  80 F. Supp. 2d 70 (E.D.N.Y. 2000) ............................................4

*Franks v. Delaware*,
  438 U.S. 154 (1978)................................................................21

*Gon v. Holder*,
  774 F.3d 207 (4th Cir. 2014) .....................................................4

*Hosaka v. United Airlines*,
  305 F.3d 989 (9th Cir. 2002) ...................................................10

*Illinois v. Gates*,
  462 U.S. 213 (1983)................................................................15

*In re Ribaudo*,
  2004 U.S. Dist. LEXIS 1456 (S.D.N.Y. Jan. 30, 2004)................15

*Medellin v. Texas*,
  552 U.S. 491 (2008)................................................................10

*Mirchandani v. United States*,
  836 F.2d 1223 (9th Cir. 1988) .................................................15

*Pinkerton v. United States*,
  328 U.S. 640 (1946)..................................................................8

*Powerex Corp. v. Reliant Energy Services*,
  551 U.S. 224 (2007)................................................................10

**DEFENDANT'S OPPOSITION TO EXTRADITION**

1
2

# TABLE OF AUTHORITIES
## (continued)

Page

3
*Sindona v. Grant,*
    619 F.2d 167 (2d Cir. 1980)................................................................. 6, 7
4

*Sorensen v. Secretary of the Treasury,*
5
    475 U.S. 851 (1986) ........................................................................... 10

6
*United States v. Arlt,*
    252 F.3d 1032 (9th Cir. 2001) (en banc) ..................................... 5, 6
7

*United States v. Bernal-Obeso,*
8
    989 F.2d 331 (9th Cir. 1993) .............................................................. 16

9
*United States v. Dixon,*
    509 U.S. 688 (1993)....................................................................... 6, 7, 9
10

*United States v. El-Mezain,*
11
    664 F.3d 467 (5th Cir. 2011) ............................................................... 5

12
*United States v. Estrada,*
    320 F.3d 173 (2d Cir. 2003)................................................................ 5
13

*United States v. Goff,*
14
    400 Fed. Appx. 1 (6th Cir. 2010) ...................................................... 5

15
*United States v. Jensen,*
    425 F.3d 698 (9th Cir. 2005) ............................................................. 15
16

*United States v. Johnston,*
17
    789 F.3d 934 (9th Cir. 2015) .............................................................. 9

18
*United States v. Kimbrew,*
    406 F.3d 1149 (9th Cir. 2005) ........................................................... 5
19

*United States v. Larkin,*
20
    605 F.2d 1360  (5th Cir. 1979) .......................................................... 9

21
*United States v. Marable,*
    578 F.2d 151 (5th Cir. 1978) .............................................................. 5
22

*United States v. Moncivais,*
23
    213 F. Supp. 2d 704 (S.D. Tex. 2001) .............................................. 5

24
*United States v. Montgomery,*
    150 F.3d 983 (9th Cir. 1998) .............................................................. 5
25

*United States v. Nielsen,*
26
    371 F.3d 574 (9th Cir. 2004) ............................................................. 15

27
*United States v. Rabhan,*
    628 F.3d 200 (5th Cir. 2010) .............................................................. 5
28

- iii -

**DEFENDANT'S OPPOSITION TO
EXTRADITION**

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

3

*United States v. Rosenberg*,
    888 F.2d 1406 (D.C. Cir. 1989) .......................................................................9

4

*United States v. Smith*,
    424 F.3d 992 (9th Cir. 2005) ...........................................................................6

5

6

*United States v. Stoddard*,
    111 F.3d 1450 (9th Cir. 1997) .........................................................................6

7

*United States v. Ziskin*,
    360 F.3d 934 (9th Cir. 2003) ...........................................................................5

8

9

*Wilson v. Czerniak*,
    355 F.3d 1151 (9th Cir. 2004) .........................................................................9

10

*Wright v. Henkel*,
    190 U.S. 40 (1903) .........................................................................................12

11

12

13

**Constitution and Statutes**

U.S. Const. Amend. V .............................................................................1, 7, 8, 9

14

18 U.S.C. § 1956 ....................................................................................................6

15

21 U.S.C. § 846 ......................................................................................................6

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT'S OPPOSITION TO
EXTRADITION**

1

## MEMORANDUM IN SUPPORT

This is the rarest of cases: the government seeks to extradite Tahawwur Rana to India to face the death penalty based on alleged criminal conduct for which an American jury acquitted him. The government seeks to accomplish this inequitable result by reading the non bis in idem, or double jeopardy, provision of the extradition treaty contrary to its text, to international and Indian law, to the interpretation the government gave that provision in its plea agreement with Rana's alleged co-conspirator, David Headley, and even to United States double jeopardy principles. Further, the government relies for its required showing of probable cause on the very witness--Headley--whose testimony the American jury rejected. The Court should dismiss the extradition complaint and deny the request for extradition.

## BACKGROUND

Rana was previously prosecuted in the United States District Court for the Northern District of Illinois. The second superseding indictment ("SSI") charged him in three counts. Count 9 charged him with conspiring to provide material support to terrorism in India. SSI at 16.[1] The alleged conspiracy began "in or about late 2005" and continued "through on or about October 3, 2009." SSI at 16, ¶ 2. Rana's alleged co-conspirators included David Headley, Sajid Mir, Abu Qahafa, Mazhar Iqbal, and Major Iqbal. The centerpiece of the alleged conspiracy was the attack conducted by Lashkar e Tayyiba ("Lashkar") on various locations in Mumbai in November 2008, resulting in the death of 164 persons. SSI at 11, ¶ 29.[2]

---

[1] The SSI has previously been filed in this matter as Doc. 16-2. The government's bill of particulars in the Illinois case is Doc. 16-3. The verdict form in that case is Doc. 16-4. The sentencing transcript is Doc. 16-5.

[2] Count 9 incorporates by reference paragraphs 3 through 33 of Count 1. SSI at 17, ¶ 3. Those paragraphs allege conduct that mirrors the allegations in the Indian extradition request.

**DEFENDANT'S OPPOSITION TO EXTRADITION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The alleged material support included "personnel, tangible property, lodging, training, expert advice and assistance, communication equipment, weapons, explosives, transportation, money and false documentation and identification."  SSI at 16, ¶ 2.  A bill of particulars identified the "false documentation" to include "co-defendant Headley's application for an Indian visa, containing false information." Government's Bill of Particulars at 3.  In a second bill of particulars, the government identified Rana's "expert advice and assistance" as:

> (1) Rana providing his immigration expertise to assist in obtaining a business visa for co-defendant Headley to travel to, and work in, India; (2) Rana providing his immigration business expertise to establish and seek the necessary approval to operate an immigration business in Mumbai, India, for the purpose of providing a cover to co-defendant Headley; and (3) Rana providing his immigration and immigration business expertise to maintain and run an immigration business in Mumbai, India, for the purpose of effectuating the cover.

Government's Second Bill of Particulars at 3 (attached as Exhibit A).

Count 11 charged Rana with conspiracy to provide material support to terrorism in Denmark.  SSI at 30.  That count is not relevant here.  Count 12 charged Rana with providing material support to Lashkar, both in India and in Denmark.  SSI at 32.

The government relied at trial primarily on Headley's testimony.  The jury acquitted Rana on Count 9 (conspiracy to provide material support to terrorism in India) and convicted him on Count 11 (conspiracy to provide material support to terrorism in Denmark).  The jury also convicted Rana on Count 12 (providing material support to Lashkar), but it did not find that death resulted from his conduct. In light of the verdicts on Counts 9 and 11, the Illinois district court interpreted this to mean that the jury found Rana guilty on Count 12 of providing material support to Lashkar in Denmark but not in connection with the Mumbai massacre in India. Sentencing Tr. at 35 ("THE COURT:  They specifically found that Rana did not cause any deaths, which eliminates the Mumbai massacre from the case, it seems to me.").

**DEFENDANT'S OPPOSITION TO EXTRADITION**

On January 7, 2013, the Illinois court sentenced Rana to 168 months in prison. On June 9, 2020, the court granted Rana's motion for compassionate release and ordered him released immediately.  Doc. 16-7.

On June 10, 2020, this Court signed a provisional arrest warrant with a view to extraditing Rana to India to face charges there.  Doc. 1.  Rana was taken immediately into custody on the warrant and transferred from FCI Terminal Island (where he was serving his sentence) to the Metropolitan Detention Center, where he now resides.

The Indian charges for which the government seeks extradition consist of conspiracy to commit various offenses, including to wage war, to murder, to commit two forms of forgery, and to commit a terrorist act (Charge 1); waging war (Charge 2); conspiracy to wage war (Charge 3); murder (Charge 4); committing a terrorist act (Charge 5); and conspiracy to commit a terrorist act (Charge 6).  Doc. 67 at 25-26 (summarizing charges).[3]  As discussed in more detail below, the Indian charges rest on exactly the same conduct alleged in Count 9 of the Illinois case.  Indeed, the government relies for its probable cause showing on testimony--particularly Headley's testimony--from the Illinois case and on emails, recordings, and other exhibits introduced in that case.

## ARGUMENT

## I.  ARTICLE 6 OF THE UNITED STATES-INDIA EXTRADITION TREATY BARS EXTRADITION.

Article 6 of the Treaty--captioned "Prior Prosecution"--provides that "[e]xtradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested." The central question is the meaning of the phrase "the offense for which extradition has been requested."  The government (Doc. 67 at 39-40) maintains that the offense

---

[3] The government does not seek extradition on objects 2, 7, and 8 of the Charge 1 conspiracy or on Charge 7.  Doc. 67 at 26.  We do not discuss those charges further.

DEFENDANT'S OPPOSITION TO
EXTRADITION

for which the extraditee was prosecuted in the requested state is not "the offense for which extradition has been requested" unless the two offenses satisfy the test in *Blockburger v. United States*, 284 U.S. 299 (1932)--that is, the offenses are not the same if each requires proof of a fact the other does not or, put differently, if each has an element the other does not.  *See id*. at 304.  That is wrong, as we demonstrate below.  Contrary to the assumption that underlies the government's argument, United States courts generally do not apply *Blockburger* in the context of successive conspiracy prosecutions.  And that test plainly does not apply to the interpretation of Article 6, in light of the language of the Treaty, the government's own interpretation of Article 6 in Headley's plea agreement, and principles of international and Indian law.  Instead, the court must compare the conduct underlying the Illinois charges and the Indian charges.  Because the conduct alleged in the two sets of charges is identical, Article 6 bars extradition.

### A.   ***Blockburger* Does Not Apply in Determining Whether Two Conspiracies Charged in Successive Prosecutions Are the Same Offense for Double Jeopardy Purposes.**

Before turning to the Treaty, we pause to address the unspoken (but central) premise of the government's argument:  that under this country's double jeopardy jurisprudence, *Blockburger* controls the "same offense" determination.

The government overlooks an important point: *Blockburger* generally does not apply when--as here--conspiracy offenses are tried in separate, successive proceedings.[4]   When determining whether two conspiracies charged in separate proceedings constitute the same offense for double jeopardy purposes, federal courts apply a multifactor test that focuses on the underlying conduct.  In the Ninth Circuit,

---

[4] Neither of the cases most often cited for application of *Blockburger* to non bis in idem provisions in extradition treaties involved a determination whether two conspiracy charges constituted the same offense.  *See Gon v. Holder*, 774 F.3d 207, 212 (4th Cir. 2014) (U.S. charges included conspiracy; Mexican charges did not); *Elcock v. United States*, 80 F. Supp. 2d 70, 83-85 (E.D.N.Y. 2000) (neither U.S. nor German prosecutions charged conspiracy).

**DEFENDANT'S OPPOSITION TO EXTRADITION**

those factors include "'(1) the differences in the periods of time covered by the alleged conspiracies; (2) the places where the conspiracies were alleged to occur; (3) the persons charged as coconspirators; (4) the overt acts alleged to have been committed; and (5) the statutes alleged to have been violated.'" *United States v. Ziskin*, 360 F.3d 934, 944 (9th Cir. 2003) (quoting *United States v. Montgomery*, 150 F.3d 983, 990 (9th Cir. 1998)).   Other Circuits use similar tests.   In the Fifth Circuit, for example, the court considers these factors: "'(1) time, (2) persons acting as co-conspirators, (3) the statutory offenses charged in the indictments, (4) the overt acts charged by the government or any other description of the offense charged which indicates the nature and scope of the activity which the government sought to punish in each case, and (5) places where the events alleged as part of the conspiracy took place.'" *United States v. Rabhan*, 628 F.3d 200, 205 (5th Cir. 2010) (quoting *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978)); *see, e.g., United States v. Estrada*, 320 F.3d 173, 181 (2d Cir. 2003) (applying eight-factor test).

Where two conspiracies are tried together, so the sole issue is multiple punishment, the Ninth Circuit applies this multifactor test only to charges involving the same conspiracy statute.   *See United States v. Arlt*, 252 F.3d 1032, 1037-38 (9th Cir. 2001) (en banc); *United States v. Kimbrew*, 406 F.3d 1149, 1151-52 (9th Cir. 2005).   But where, as here, conspiracies are tried in separate proceedings, courts generally apply the multifactor test to any two conspiracy charges, regardless of the statute under which each is brought.   *See, e.g., United States v. El-Mezain*, 664 F.3d 467, 548 (5th Cir. 2011) (applying multifactor test where one conspiracy charged in second case was not charged in first case; court notes that the conspiracy statutes were "the same or similar"); *United States v. Goff*, 400 Fed. Appx. 1, 7 (6th Cir. 2010) (applying multifactor test where second case charged money laundering and marijuana conspiracies not charged in first case); *United States v. Moncivais*, 213 F. Supp. 2d 704, 707, 709 (S.D. Tex. 2001) (applying multifactor test to successive

**DEFENDANT'S OPPOSITION TO EXTRADITION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

prosecutions and determining that drug conspiracy under 21 U.S.C. § 846 and money laundering conspiracy under 18 U.S.C. § 1956 are the same offense for double jeopardy purposes).[5]

To the extent Article 6 reflects United States double jeopardy law, the multifactor standard--and not the mechanical *Blockburger* "same elements" test-- reflects the dominant approach to the "same offense" determination in successive conspiracy prosecutions.   The widespread adoption of the multifactor approach refutes the government's critique of *Sindona v. Grant*, 619 F.2d 167 (2d Cir. 1980), at least in the conspiracy context.   In *Sindona*, the Second Circuit rejected the *Blockburger* test in construing the non bis in idem provision of the United States-Italy extradition treaty in favor of a standard focused on the underlying conduct.   The court rested its holding largely on international practice.   It observed that adopting *Blockburger* "would . . . be a crabbed and wholly inappropriate reading of [the non bis in idem provision].   Foreign countries could hardly be expected to be aware of *Blockburger*; moreover . . . in construing a double jeopardy clause in a treaty, embodying an ancient and widely recognized principle of civilized conduct, a court should not deem itself bound by a quiddity of the law of the requested party."   *Id*. at 178.

The government criticizes *Sindona* for relying in part on Justice Brennan's concurrence in *Ashe v. Swenson*, 397 U.S. 436, 453-54 (1970), in which he urged adoption of a "same transaction" standard rather than the *Blockburger* "same elements" test.   *See Sindona*, 619 F.2d at 178-79.   The government notes that in *United States v. Dixon*, 509 U.S. 688 (1993), the Supreme Court rejected a "same

---

[5] It is not clear how the Ninth Circuit would analyze conspiracy charges under different conspiracy statutes brought (as here) in successive prosecutions. In a successive prosecution case decided after *Arlt*, the court considered the "statutes violated" merely as one factor in the multifactor analysis. *United States v. Smith*, 424 F.3d 992, 1002 (9th Cir. 2005); *see United States v. Stoddard*, 111 F.3d 1450, 1456-57 (9th Cir. 1997) (same).

**DEFENDANT'S OPPOSITION TO EXTRADITION**

offense" standard focused on the underlying conduct, and it suggests that *Dixon* undermines *Sindona*'s rationale.   Doc. 26 at 19-20.   But *Dixon* did not involve successive conspiracy prosecutions.   In that context, as discussed, federal courts apply a multifactor approach that focuses on the underlying conduct.   Whatever the merit of the government's critique of *Sindona* in cases involving successive prosecutions for substantive offenses, that decision remains persuasive in the context of successive conspiracy prosecutions.

Under the multifactor test, Count 9 of the Illinois case is the same offense as the Indian charges.   Count 9 alleges a conspiracy to provide material support to terrorism in India.   The six Indian charges include three conspiracies--Charge 1, a conspiracy that includes as objects waging war, murder, two forms of forgery, and committing a terrorist act; Charge 3, conspiracy to wage war; and Charge 6, conspiracy to commit a terrorist act.   Doc. 67 at 25-26.   Applying the multifactor approach to the Illinois conspiracy on one hand and the three Indian conspiracies on the other, it is clear that they charge the same offense.   The conspiracies involve the same time period (from 2005 through 2009); the same places (Mumbai, Pakistan, Chicago); the same alleged co-conspirators (Rana, Headley, Major Iqbal, and the others named in the Illinois SSI); and the same overt acts (for example, Headley's surveillance using Rana's business as cover; allegedly false documents to establish and maintain the cover; the Mumbai attack; and later surveillance in India of Chabad houses and National Defense College in anticipation of other potential attacks).   The statutory offenses differ, of course, because Rana was charged in Illinois under United States law and in India under Indian law, but they are closely related--all arise from the same facts, and all address aspects of what is alleged to be a single plan.

A related analysis controls the three substantive charges in India--waging war (Charge 2), murder (Charge 4), and committing a terrorist act (Charge 5).   Ordinarily, under United States double jeopardy law a conspiracy and a substantive offense are

**DEFENDANT'S OPPOSITION TO EXTRADITION**

not the same offense.  Here, however, according to the opinion of the Indian prosecutor serving as the government's expert on criminal law (Doc. 66-7), the substantive charges rest on the theory (akin to the *Pinkerton* theory under United States law) that a conspirator is responsible for reasonably foreseeable substantive offenses committed by a co-conspirator in furtherance of the conspiracy.  *See, e.g.,* Doc. 66-7 at 8, ¶ 15.2 ("Conspiracy in Indian law is not only a substantive offence but also serves as the basis for holding one person liable for the crimes of others.  To put it differently, one who enters into a conspiratorial relationship, is liable for every foreseeable crime committed by every other member of the conspiracy."); *id.* at 13, ¶ 15.5(n) ("Conspiracy is not only a substantive crime, it also serves as a basis for holding one person liable for the crimes of others in cases where application of the usual doctrines of complicity would not render that person liable.  Thus, one who enters into a conspiratorial relationship is liable for every reasonably foreseeable crime committed by every other member of the conspiracy in furtherance of its objectives, whether or not he knew of the crimes or aided in their commission."); *id.* at 13-14, ¶¶ 15.5(o)-(r), (t) (same); *id.* at 17, ¶ 15.7 ("It is, therefore, submitted that Rana is liable not only for the distinct offence under [various Indian conspiracy provisions], but also for the acts of all other conspirators which have been committed in the course of the conspiracy in terms of Section 10 of the Indian Evidence Act, 1872."); *id.* at 22, ¶ 17.2 (discussing murder charge; "[i]t is submitted that, as pointed out above, one who enters into a conspiratorial relationship, is liable for every foreseeable crime committed by every other member of the conspiracy").

To prove Rana liable for the substantive crimes, therefore, the Indian prosecutor must establish (1) that he participated in a conspiracy, (2) that in furtherance of the conspiracy a co-conspirator committed the substantive crime, and (3) that the commission of the substantive crime was reasonably foreseeable to Rana. That makes the conspiracy a lesser-included offense of the substantive crime--that is,

**DEFENDANT'S OPPOSITION TO EXTRADITION**

1
2
3
4

to prove the substantive crime, the prosecutor must prove the conspiracy plus two additional elements. *See, e.g., United States v. Rosenberg*, 888 F.2d 1406, 1412-14 (D.C. Cir. 1989); *United States v. Larkin*, 605 F.2d 1360, 1366-68 (5th Cir. 1979) (dicta), *modified on other grounds on rehearing*, 611 F.2d 585 (5th Cir. 1980).

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Under settled law, the Fifth Amendment double jeopardy clause prohibits successive prosecutions for lesser-included and greater offenses, because they are considered the same offense. *See, e.g., Brown v. Ohio*, 432 U.S. 161, 168-70 (1977); *United States v. Johnston*, 789 F.3d 934, 937 (9th Cir. 2015); *Wilson v. Czerniak*, 355 F.3d 1151, 1154-55 (9th Cir. 2004). In other words, just as the Count 9 conspiracy is the same offense as the three charged Indian conspiracies under the approach United States courts generally take to successive conspiracy prosecutions, it is also the same offense as the three charged Indian substantive offenses, because it is a lesser-included offense of those substantive offenses. And because it is a lesser-included offense of the substantive offenses, double jeopardy bars a successive prosecution for those offenses. *See, e.g., Rosenberg*, 888 F.2d at 1413 (government sought to prosecute defendants for substantive bombing offense on *Pinkerton* theory following conviction for conspiracy to bomb; court holds that "[t]he conspiracy of which the [defendants] have been convicted in their earlier trials is functionally a lesser-included offense of the substantive bombing offense, and the subsequent prosecution is barred") (citation omitted); *cf. Dixon*, 509 U.S. at 697-98 (release order prohibited violations of law; defendant committed drug offense while on release; conviction for criminal contempt based on violation of release order barred later prosecution for drug offense, because the drug offense was "a species of lesser-included offense").

25
26
27
28

This analysis undermines the government's implication that application of United States double jeopardy principles would permit the Indian prosecution to proceed. To the extent Article 6 of the Treaty incorporates those principles, it

**DEFENDANT'S OPPOSITION TO EXTRADITION**

prohibits Rana's extradition, because Count 9 of the Illinois case is the same offense for double jeopardy purposes as the Indian charges. As we discuss below, the Treaty's language, the government's interpretation of Article 6 in Headley's plea agreement, and contemporary practice under international and Indian law confirm that extradition is barred.

### B. The Treaty Language Demonstrates That the Term "Offense" in Article 6 Refers to the Underlying Conduct.

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008); *see, e.g., Hosaka v. United Airlines*, 305 F.3d 989, 994 (9th Cir. 2002) (same). A basic principle of textual interpretation is decisive here: that "identical words used in different parts of the same act are intended to have the same meaning." *Sorensen v. Secretary of the Treasury*, 475 U.S. 851, 860 (1986) (quotation omitted); *see, e.g., Powerex Corp. v. Reliant Energy Services*, 551 U.S. 224, 232 (2007) (same); *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 120 (D.D.C. 2017) (same; construing treaty); *cf. Hosaka*, 305 F.3d at 995 ("It is a sound principle of treaty construction that where the drafters used two different words it implies that the drafters of the Convention understood the words to mean something different, for they otherwise logically would have used the same word in each article.") (quotation and ellipses omitted).

The key word here is "offense" in the phrase "the offense for which extradition is requested" in Article 6(1). That same word--"offense"--appears repeatedly in Article 2 of the Treaty, captioned "Extraditable Offenses." Article 2(1)--which embodies the principle of dual criminality--provides that "[a]n offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty, including imprisonment, for a period of more than one year or by a more severe penalty." There is an obvious parallel between the phrase

**DEFENDANT'S OPPOSITION TO EXTRADITION**

"extraditable offense" in Article 2(1) and the phrase "the offense for which extradition is requested" in Article 6(1).

What, then, does "offense" mean in Article 2(1)?  The government answers this question in its memorandum:  "'The primary focus of dual criminality has always been on the conduct charged; the elements of the analogous offenses need not be identical.'"  Doc. 67 at 23 (quoting *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998)).  In other words, "offense" in Article 2(1) refers to the underlying conduct, not to the elements of the crimes being compared.  Under settled rules of interpretation, the word "offense" must be given the same meaning in Article 6(1); there too the inquiry turns on the conduct underlying the previous charge and the charge for which extradition is sought, not on the elements of the crimes involved in the two prosecutions.

The government's position boils down to this:  it wants the Court to interpret "offense" in Article 2(1) to mean "conduct," and it wants the identical term in Article 6(1) to mean "elements."  The government does not even acknowledge this contradiction, much less try to justify it textually.  The only scrap of text on which it might rely is this from Article 2(3)(a):  "For the purposes of this Article, an offense shall be an extraditable offense . . . whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology."  But this provision merely speaks to the label attached to the offense; it does not purport to address the "conduct" versus "elements" distinction, and it certainly does not suggest that the term "offense" in Article 6 should receive a radically different meaning than the identical term in Article 2.

The text of the Treaty shows that the term "offense" refers to conduct rather than elements.  Using the "conduct" test, rather than the "elements" test that the government urges, it is indisputable that "the offense[s] for which extradition is

- 11 –

requested" are the same as the offense charged in Count 9 of the Illinois case.  Article 6 thus bars extradition.

### C.   In Headley's Plea Agreement, the Government Interpreted "Offense" in Article 6 to Refer to Conduct.

In Headley's plea agreement (Doc. 16-6), the government interpreted "offense" in Article 6 to refer to conduct.  That interpretation further undermines its claim here that "offense" refers to "elements" and not to conduct.

In a section of the Headley plea agreement titled "Extradition," the government agreed that "[p]ursuant to Article 6 of [the Treaty], defendant shall not be extradited to the Republic of India . . . for any offenses for which he has been convicted in accordance with this plea."  Doc. 16-6 at 20, ¶ 9.  The extradition section adds that if Headley pleads guilty to a series of offenses, "then the defendant shall not be extradited to the Republic of India . . . for the foregoing offenses, *including conduct within the scope of those offenses for which he has been convicted in accordance with this plea*, so long as he fully discloses all material facts concerning his role with respect to these offenses and abides by all other aspects of this agreement."  *Id.* (emphasis added).  As the emphasized language makes clear, in the Headley agreement the government interprets Article 6 to bar extradition for Indian charges based on the underlying conduct to which Headley pled guilty, and not merely for charges that happen to have the same elements as the statutes to which he pled.

The government maintains that Rana seeks to "avail himself of the benefits afforded to Headley through his negotiated plea."  Doc. 67 at 43.  This assertion implies that the government interpreted Article 6 to apply to conduct, rather than elements, as a benefit to Headley in return for his cooperation.  As the government has emphasized repeatedly, however, the Treaty imposes "obligations," not discretionary choices that can be plea-bargained away.  Doc. 67 at 2; *see, e.g.,* Doc. 5 at 4 ("[W]hen a foreign government makes a proper request pursuant to a valid

extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended.") (citing *Wright v. Henkel*, 190 U.S. 40, 62 (1903)); *id*. at 5 ("When, as here, a requesting country meets the conditions of the Treaty, the United States has an overriding interest in complying with its treaty obligations to deliver the fugitive. It is imperative that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States.") (quotation and citations omitted). Article 1 of the Treaty--titled "Obligation to Extradite"--makes this duty explicit. It provides that "[t]he Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty," persons whom the requesting state have formally accused of an extraditable offense.[6]

The United States thus has an obligation to honor its extradition treaty with India, whether the potential extraditee is Rana or Headley. Nothing in the Treaty, or in any other provision of law, permits the United States to evade that obligation in return for the extraditee's cooperation. As the government's pleadings in this case make clear, it is fully aware of its obligations under the Treaty and is determined to fulfill them. The Court should not lightly assume (as the government appears to suggest) that the government circumvented its treaty obligation to India through a sham interpretation of Article 6 as part of its deal with Headley. The government's conclusion in Headley's plea agreement that Article 6 defines offenses in terms of

---

[6] India presumably could have agreed to forgo Headley's extradition in return for his assistance to the United States, but there is no indication in the record that it did so. In fact, the opinion of the Indian prosecutor serving as the government's expert states: "The present opinion is specific to the extradition request in respect of fugitive Tahawwur Hussain Rana. This opinion may not be construed in any manner to indicate that the various extradition requests pending with different sovereign nations in respect of the above-mentioned case which includes the case in respect of Accused No. 1, David Coleman Headley, is either being given up or not being pursued vigorously." Doc. 66-7 at 1, ¶ 3.

**DEFENDANT'S OPPOSITION TO EXTRADITION**

conduct rather than elements and thus bars Headley's extradition must be taken as its good-faith interpretation of the Treaty's terms.

### D. International Law and Indian Law Support Interpreting "Offense" in Article 6 on the Basis of Conduct Rather Than Elements.

Review of international law and Indian law further shows that Article 6 intends "offense" to be defined in terms of conduct rather than elements. Attached as Exhibit B is the expert report of Mr. Paul Garlick QC. Mr. Garlick, an English barrister, has practiced in the field of international criminal law and extradition for more than 35 years. He has represented both the United States and India in extradition matters. Based on the extensive analysis of international law in his report, Mr. Garlick opines that "in accordance with the rules applicable to the interpretation of extradition treaties, Article 6 should be interpreted as meaning prosecuted by the requested state for the same conduct." Exhibit B at 4, ¶ 5. Turning to Indian law, Mr. Garlick declares that "the intention of the Government of India when negotiating the terms of The Treaty must have been that the word 'offense' in Article 6 of The Treaty should be interpreted as referring to the underlying conduct, rather than the elements of the alleged extradition offense." *Id*. at 34, ¶ 73. Mr. Garlick concludes: "For all the reasons stated above, it is my opinion that as a matter of international extradition law, the word 'offense' in Article 6 of The Treaty refers to the conduct underlying the alleged extradition crimes in the request for extradition and not to the elements of the alleged extradition crimes." *Id*. at 35, ¶ 74. This conclusion--consistent with the Second Circuit's conclusion in *Sindona*--further undermines the government's reliance on *Blockburger*.

* * * *

The preceding analysis demonstrates that Article 6 requires a comparison of the conduct underlying the crime for which the extraditee has previously been prosecuted in the Requested State and the crime with which the Requesting State has

DEFENDANT'S OPPOSITION TO EXTRADITION

1
2
3
4

charged him.  Here, the conduct underlying Count 9 of the Illinois case is identical to the conduct alleged in the six Indian charges.  Accordingly, Article 6 bars Rana's extradition.

## II.   THE GOVERNMENT HAS NOT ESTABLISHED PROBABLE CAUSE TO BELIEVE THAT RANA COMMITTED THE INDIAN OFFENSES.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Extradition must be denied for a second reason:  the government has failed to establish probable cause to believe that Rana committed the crimes charged in India.

Article 9(3)(c) of the Treaty provides that a request for extradition must be supported by "such information as would justify the committal for trial of the person if the offense had been committed in the Requested State."  In other words, the Requesting State must provide information sufficient to establish probable cause to believe that the extraditee committed the offenses for which extradition is sought.  *See Barapind v. Enomoto*, 400 F.3d 744, 747 (9th Cir. 2005) (per curiam) (en banc) (interpreting Article 9 of the Treaty).  Probable cause requires "evidence warranting the finding that there [is] a reasonable ground to believe the accused guilty."  *Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir. 1988) (quotation omitted).  The Court makes the probable cause determination based on the "'totality of the circumstances.'"  *In re Ribaudo*, 2004 U.S. Dist. LEXIS 1456, at *14 (S.D.N.Y. Jan. 30, 2004) (quoting *Illinois v. Gates*, 462 U.S. 213, 238-40 (1983)).  As the Supreme Court made clear in *Gates*, among those "circumstances" is the "veracity" of the persons supplying information on which the court relies.  *Gates*, 462 U.S. at 238; *see id*. at 240 (courts making probable cause determinations are "free to exact such assurances as they deem necessary" that the information on which they rely "has been obtained in a reliable way by an honest or credible person"); *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (probable cause to arrest depends on totality of circumstances, "including the veracity, basis of knowledge and reliability of the information provided by informants"); *United States v. Nielsen*, 371 F.3d 574,

**DEFENDANT'S OPPOSITION TO EXTRADITION**

580 (9th Cir. 2004) ("The totality of the circumstances supporting the issuance of a warrant is based upon, among other things, an informant's veracity and reliability, and the basis of the informant's knowledge.").

The government relies for its probable cause showing almost entirely on Headley's direct-examination testimony and other evidence from the Illinois trial, at which Rana was acquitted on India-related charges.  Doc. 67 at 32-37.[7]  The government's theory has two essential pillars: (1) that Headley told Rana he was working with Lashkar, including in preparation for the Mumbai attack; and (2) that Rana furthered Headley's efforts on Lashkar's behalf by, for example, opening the Mumbai office of Immigrant Law Center to provide cover for Headley's surveillance of potential attack sites and helping Headley obtain a business visa for India through the submission of false documents.

The first pillar of the government's theory depends entirely on Headley's testimony (and thus on his veracity).  No document or witness corroborates Headley's claim to have told Rana about his activities on Lashkar's behalf.  Headley, of course, is a highly rewarded felon and serial cooperator whose testimony about India the Illinois jury rejected.  He is the kind of witness Judge Stephen S. Trott--a former prosecutor--warned against:  "By definition, criminal informants are cut from untrustworthy cloth and must be managed and carefully watched by the government and the courts to prevent them from falsely accusing the innocent, from manufacturing evidence against those under suspicion of crime, and from lying under oath in the courtroom."  *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  Headley did all of things of which Judge Trott warned, and more.[8]  He makes

---

[7] The transcripts of Headley's trial testimony appear in Docs. 66-10 (pages 56-299), 66-11 (pages 300-579), 66-12 (pages 580-878), and 66-13 (pages 879-1189). We cite his testimony by transcript page.  The government has placed almost the entire trial transcript in the extradition record.

[8] A complete catalogue of Headley's perfidy would require many pages.  As a two-time DEA cooperator in heroin prosecutions, he knew that to get favorable

**DEFENDANT'S OPPOSITION TO EXTRADITION**

an extraordinarily weak foundation for the government's probable cause showing on the first pillar of its theory.

The government's second pillar--that Rana took steps to assist Headley-- likewise rests almost exclusively on Headley's testimony.  As we discuss below, several aspects of this theory are demonstrably incorrect.

**The Mumbai Office Did No Business:**  At the heart of the prosecution's theory that Rana sought to aid Headley's efforts on Lashkar's behalf is its assertion that the Mumbai office of Immigrant Law Center was a sham that did no business. According to the prosecution theory, the office served solely as cover for Headley's surveillance activities.

The evidence tells a different story.  The Mumbai office had a physical office location.  It had a secretary.  It placed advertisements in Indian media.  It had clients. *See* Bharucha Statement, PW-13 (Doc. 66-9 at 113-19).  Headley did not provide

---

treatment he had to give the government something valuable, meaning an arrest of someone other than himself.  T. 1051-64.  Headley lied to federal agents, judges, and presumably prosecutors in relation to these cases.  After his first heroin sentence (reduced because of his cooperation), he went back to dealing heroin despite promising that he would not.  T. 1096-97.  He disregarded the agents' instructions regarding his dealings with targets and traveled to Pakistan without permission.  T. 1048, 1125.  After his second heroin conviction, he used his status as a DEA cooperator to deflect government scrutiny of his activities with Lashkar and his statements supporting jihad.  T. 665-66.  Headley maintained multiple wives, and he routinely lied to them, particularly about the other's existence.  He falsely swore oaths, to the Qur'an and otherwise, that he had given up the other wife.  T. 817-18, 1126-27.  As the trial in Illinois approached, Headley engaged in further deceits. After promising to tell the government the truth and not withhold information, he repeatedly broke that promise.  T. 1087-88.  While cooperating with the government, he was allowed to make phone calls to some of his family members.  During one call he passed a message that his brother Hamza in Pakistan, whom Headley had implicated in terrorist activities, should change his phone number.  T. 1102-03.  In another call he falsely claimed that the FBI had granted one of his business associates permission to send him money.  T. 1108-10.  The list of Headley's deceits goes on and on; Rana was merely one of many victims.

- 17 –

immigration counseling, but that was not his job.  He was a salesman; he brought in clients and referred them to Rana and Rana's partner, attorney Raymond Sanders, for immigration advice.  T. 158-59, 182, 690-95.  The Mumbai office, in short, was a real office that (through Rana and Sanders) provided real services to real clients.[9]

In fact, Rana had wanted to open an immigration office in India for years.  A Canadian immigration lawyer, David Morris, who had worked for Rana, testified to this at the Illinois trial.  T. 1395-1403 (Doc. 66-14 at 110-18).  Rana sent Morris to India in 1997 to conduct seminars and develop business.  Morris and Rana had discussed the opening of an office in India on multiple occasions.  T. 1402.  The defense admitted exhibits (DX Morris Group, attached as Exhibit C) showing newspaper ads taken out in Indian newspapers to drum up attendees for Morris' seminars.  Headley knew that Rana had wanted to open an office in India.  T. 687-88.  Headley preyed on that longstanding desire to further his terrorist agenda and-- as discussed below--to steal more than $25,000 given to him by various conspirators in Pakistan to fund the office.  Headley had his own businesses in the United States and Dubai and could have used one of them as a front in Mumbai.  He also could have gone to Mumbai as a tourist to conduct his surveillance.  But by using Rana's Mumbai office and lying to him about it, he was able to get paid by the Pakistanis (without their knowledge) to do what he wanted.

**The Pakistan Intelligence Service (ISI) Paid for the Mumbai Office:**  A key part of Headley's claim that the Mumbai office served as cover, and that Rana knew it, was his testimony that the Pakistani intelligence service (ISI) paid the office expenses.  This was shown at trial to be false.

Headley testified that he told Rana an immigration office could be opened in Mumbai and that Major Iqbal, one of Headley's handlers in Pakistan and an active

---

[9] The witness statements attached to the extradition request include statements from clients who visited the Mumbai office of Immigrant Law Center.  *E.g.*, Doc. 66-9 at 111-12, 120-29.

DEFENDANT'S OPPOSITION TO
EXTRADITION

member of Pakistan's ISI, would pay for the office. As part of this explanation, Headley testified that he told Rana that Major Iqbal had given Headley $25,000 to fund the office. T. 688-90. Rana would not have to pay anything for the office, which Headley testified was a "win-win" for Rana. Rana would get a free office in Mumbai (which he had wanted for years) and would also get to fulfill his "patriotic duty" to Pakistan. T. 689.

In fact, Rana was paying for the office in Mumbai, and Headley was simply pocketing the money from his handlers in Pakistan. This reality is best demonstrated by a March 13, 2007 email between Headley and Rana that was admitted at trial as GX 03/13/07 DH/TR (attached as Exhibit D). For several years before the opening of the Mumbai office, Rana had been holding a significant amount of Headley's money. Headley did not consider this a loan, but it was money Rana owed to Headley, and over the years Headley routinely directed Rana to send him portions of the money or to pay various bills on Headley's behalf. T. 63-64. Because Rana was supposedly getting an office for free, Headley claimed at trial that when Rana sent money to Mumbai for the office, that money did not demonstrate that Rana was paying for the office but was actually Headley's money that Rana was holding. T. 159-60. 162-63. 174.

As GX 03/13/07 DH/TR makes clear, however, Rana's debt to Headley was going *up* when Headley paid for a Mumbai office expense, meaning Rana was paying for the office. As Headley remarked in the email, "Since I am bringing the $2,500 for the office so you will then owe me $18500 instead of $16000 previously." When confronted with the obvious question this email raised--that is, why Rana's debt to Headley would go up over an office expense if Rana was not paying for the office-- Headley had no explanation. He first stated, "I can't answer. I don't know." He then stated, "I said I have to look at this a little." He ended with, "It's not clear to me. It's ambiguous." T. 698-700.

The reality is not ambiguous at all.  Headley lied to Rana about his true plans in Mumbai.  He then brazenly lied to his handler in Pakistan--telling Major Iqbal he was using the $25,000 to pay for the office when in fact Rana was paying for it--to con the Pakistanis out of thousands of dollars.

**The Mumbai Office Closed Around the Time of the Attack:**  The government maintains that the closing of the Mumbai office around the time of the attack in November 2008 shows that the office was a sham that served only as cover for Headley.  The evidence showed, however, that the office lease was expiring, and Rana was looking for less expensive ways to maintain a business presence in Mumbai.  He suggested other locations, or having the secretary work from home, and she chose to work from home.  T. 793-94, 803-05.  Moreover, when Rana visited Mumbai in November 2008, he placed advertisements announcing that he would be conducting immigration seminars on his visit--an action that only makes sense if he intended to keep the Mumbai business going.  Doc. 66-9 at 115-16.

**The Warning in Dubai:**  Headley testified that when Rana was en route to Mumbai for his November 2008 visit, he sent "Pasha"--an alleged Pakistani co-conspirator--to Dubai to warn Rana to stay away.  The warning itself suggests that Rana was unaware of Headley's plans.  No warning would be necessary if Rana were in on the plot.  And, despite the alleged warning, Rana and his wife traveled on from Dubai to Mumbai, something he surely would not have done if he had known what Headley and Lashkar were planning.

**Headley's False Visa Applications:**  Headley submitted applications for visas to travel to India.  The applications contained false information; for example, Headley's name, his father's name, and his father's place of birth were all misstated.  Headley testified that Rana checked the applications to see if there were any mistakes.  Based on this testimony, the government insists that Rana knew the applications were incorrect and conspired with Headley to submit the false applications to the Indian

**DEFENDANT'S OPPOSITION TO EXTRADITION**

1
2
3
4
5
6
7
8
9

government.  But there is no corroboration for Headley's claim that Rana reviewed the visa applications.  As the defense pointed out at the Illinois trial, it is unlikely that Rana checked them for accuracy.  Headley got the company name wrong in his very first visa application, using the wrong business name--"First World Immigration" instead of "Immigrant Law Center."  D-2/3 (Doc. 66-9 at 66).  This was a significant error that Rana surely would have caught if he had reviewed the application, since the letter from Raymond Sanders accompanying the visa application (D-2/6, Doc. 66-9 at 69) made clear that Immigrant Law Center was opening the branch office on Mumbai, not First World Immigration.

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

These specifics underscore the central point:  the government's probable cause showing rests on Headley's uncorroborated and at times demonstrably false testimony.  The Illinois jury rejected that testimony.  The government nonetheless insists that the Court must accept Headley's testimony at face value, without any inquiry concerning his credibility.  *E.g.*, Doc. 67 at 18-20.  But Article 9(3)(c) requires the government to produce "such information as would justify the committal for trial of the person if the offense had been committed in the Requested State."  If the Court were determining under Fed. R. Crim. P. 5.1 whether Rana could be committed for trial in a United States court, it would surely take into account that the government's probable cause showing rested on the uncorroborated testimony of a demonstrated liar--testimony that an American jury had already rejected.  As the Supreme Court put the point in the Fourth Amendment context, it would be an "unthinkable imposition" upon a court's duty to "determine independently whether there is probable cause" if a warrant affidavit "revealed after the fact to contain a deliberately or recklessly false statement, were to stand beyond impeachment."  *Franks v. Delaware*, 438 U.S. 154, 165 (1978).[10]  It would be no less of an

27
28

[10] The issue here is not whether Rana has the right in this extradition proceeding to introduce evidence of his own impeaching Headley's credibility.  All of the impeaching evidence he cites is part of the extradition record already or--in the

DEFENDANT'S OPPOSITION TO
EXTRADITION

"unthinkable imposition" on this Court's duty to "determine independently" whether probable cause supports Rana's extradition if the Court had to swallow uncritically Headley's false testimony.  Probable cause may not be a stringent standard, but it requires something more than the say-so of a twice-convicted drug dealer and con man who has repeatedly and admittedly lied to judges, prosecutors, federal agents, his own family, and anyone else necessary to get what he wanted--particularly because what he wanted here was of utmost importance to him:  to avoid a death sentence in the United States and his own extradition to India, where he would surely face execution.

## CONCLUSION

For the foregoing reasons, the Court should decline to certify Rana for extradition.

Dated:  February 1, 2021                    Respectfully submitted,


                                            /s/
                                            John D. Cline


                                            /s/
                                            Patrick W. Blegen


                                            Attorneys for Defendant
                                            TAHAWWUR RANA

_____

case of Exhibits C and D--exhibits that were admitted into evidence in the Illinois trial.

- 22 –

**DEFENDANT'S OPPOSITION TO EXTRADITION**