TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
JOHN J. LULEJIAN (Cal. Bar No. 186783)
Assistant United States Attorney
        1200 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-0721
        Facsimile: (213) 894-0141
        E-mail:    John.Lulejian@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,              No. 2:20-CV-07309-DSF (JC)

            Plaintiff,                 UNITED STATES' REPLY IN SUPPORT OF
                                       ITS REQUEST FOR CERTIFICATION OF
            v.                         EXTRADITION; DECLARATION OF
                                       JOHN J. LULEJIAN; EXHIBITS
TAHAWWUR HUSSAIN RANA,
                                       [18 U.S.C. § 3184]
            A Fugitive from the
            Government of the          Hearing Date: April 22, 2021
            Republic of India.         Hearing Time: 1:30 p.m.
                                       Location:     Courtroom of the
                                                     Honorable Jacqueline
                                                     Chooljian

                                       (OVER-LENGTH BRIEF PERMITTED BY
                                        ORDER DATED 12/17/2020)

1    Plaintiff United States of America, by and through its counsel

2 of record, the Acting United States Attorney for the Central District

3 of California and Assistant United States Attorney John J. Lulejian,

4 hereby files its Reply in Support of its Request for Certification of

5 Extradition.

6    This reply is based upon the attached memorandum of points and

7 authorities, the attached declaration and exhibits, the files and

8 records in this case, including those which are under seal, and such

9 further evidence and argument as the Court may permit.

10 Dated: March 22, 2021          Respectfully submitted,

11                                TRACY L. WILKISON
                                  Acting United States Attorney
12
                                  CHRISTOPHER D. GRIGG
13                                Assistant United States Attorney
                                  Chief, National Security Division
14

15                                 */s/ John J. Lulejian*
                                  JOHN J. LULEJIAN
16                                Assistant United States Attorney

17                                Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA
18

19

20

21

22

23

24

25

26

27

28

2

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                            <u>PAGE</u>

TABLE OF AUTHORITIES.............................................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.....................................................................1

II.   ARGUMENT.........................................................................3

      A.    RANA's Extradition is Not Barred by Article 6 of the
            Treaty......................................................................4

            1.    The Court Should Apply the *Blockburger* Elements-
                  Based Test to Determine Whether RANA Has Been
                  Tried for the Same Offenses for which His
                  Extradition is Sought................................................4

                  a.    The Plain Meaning of Article 6 Directs the
                        Application of the Blockburger Elements-
                        Based Test..................................................6

                  b.    The Technical Analysis of the Treaty Further
                        Supports the Application of an Elements-
                        Based Test..................................................9

                  c.    The Indian Prosecutor Agrees that the Treaty
                        Requires an Elements-Based Test...................11

                  d.    Controlling Canons of Construction Direct
                        that Article 6 Should Be Interpreted in
                        Favor of Permitting Extradition................13

            2.    Extradition is Not Barred Under the *Blockburger*
                  Elements-Based Test................................................14

            3.    The Claims Advanced by RANA and His Expert Are
                  Meritless.........................................................15

                  a.    RANA's Attempt to Substitute a Multifactor
                        Test for the Blockburger Elements-Based Test
                        Fails........................................................15

                  b.    RANA's Reliance on Article 2 of the Treaty
                        Is Misplaced................................................20

                  c.    Rana's Reliance on Headley's Plea Agreement
                        Is Misplaced................................................25

                  d.    RANA's Reliance on International Law and
                        Indian National Law Is Misplaced...............28

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                           PAGE

       (A)   International Law Does Not Mandate a
          Conduct-Based Test........................28

       (B)   Indian National Law Does Not Mandate a
          Conduct-Based Test........................32

  B.   The Extradition Request Contains Sufficient Evidence
     of Probable Cause for Each Offense......................33

    1.   Legal Standard for Probable Cause in Extradition
       Cases...........................................33

    2.   The Evidence Supports Findings of Probable Cause
       that RANA Committed the Charged Offenses...........35

      a.   RANA's Attacks on Headley's Credibility
         Exceed the Scope of this Proceeding and Do
         Not Obliterate Probable Cause..................36

      b.   RANA's Critiques of the Supporting Evidence
         Do Not Obliterate Probable Cause..............41

       (A)   Evidence Relating to the Mumbai Office
          of RANA's Business Supports a Finding
          of Probable Cause........................41

       (B)   RANA's Trip to India After Being Warned
          of the Attacks Does Not Preclude a
          Finding of Probable Cause................43

       (C)   RANA's Claim that He Did Not Review
          Headley's Visa Application Is
          Unsupported by the Evidence..............43

III. CONCLUSION.................................................44

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

<u>FEDERAL CASES</u>

<u>Ahmad v. Wigen</u>,
       726 F. Supp. 389 (E.D.N.Y. 1989).............................. 34

<u>Ahmad v. Wigen</u>,
       910 F.2d 1063 (2d Cir. 1990)............................. 32, 34

<u>Albernaz v. United States</u>,
       450 U.S. 333 (1981)....................................... 8, 16

<u>Arias-Leiva v. Warden</u>,
       928 F.3d 1281 (11th Cir. 2019)........................... 11, 12

<u>Arnold v. United States</u>,
       336 F.2d 347 (9th Cir. 1964)................................. 20

<u>Austin v. Healey</u>,
       5 F.3d 589 (2d Cir. 1993)................................... 34

<u>Barapind v. Enomoto</u>,
       400 F.3d 744 (9th Cir. 2005) ............................... 36

<u>Basic v. Steck</u>,
       819 F.3d 897 (6th Cir. 2016)................................ 32

<u>Bingham v. Bradley</u>,
       241 U.S. 511 (1916)......................................... 44

<u>Blockburger v. United States</u>,
       284 U.S. 299 (1932)..................................... <u>passim</u>

<u>Borunda v. Richmond</u>,
       885 F.2d 1384 (9th Cir. 1988)............................... 40

<u>Bruce v. Terhune</u>,
       376 F.3d 950 (9th Cir. 2004)................................ 38

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Clarey v. Gregg,
    138 F.3d 764 (9th Cir. 1998)................................. 21

Collins v. Loisel,
    262 U.S. 426 (1923).......................................... 19

Collins v. Loisel,
    259 U.S. 309 (1928)................................. 21, 34, 38

Cucuzzella v. Keliikoa,
    638 F.2d 105 (9th Cir. 1981)................................ 14

Desautels v. United States,
    782 F. Supp. 942 (D. Vt. 1991)............................. 34

Dowling v. United States,
    493 U.S. 342 (1990)......................................... 40

El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng,
    525 U.S. 155 (1999).......................................... 5

Elcock v. United States,
    80 F. Supp. 2d 70 (E.D.N.Y. 2000)...................... passim

Emami v. U.S. Dist. Court for N. Dist.,
    834 F.2d 1444 (9th Cir. 1987)........................... 32, 33

Estakhrian v. Obenstine,
    320 F.R.D. 63 (C.D. Cal. 2017)............................. 14

Factor v. Laubenheimer,
    290 U.S. 276 (1933)..................................... passim

Fireman's Fund Ins. Co. v. Stites,
    258 F.3d 1016 (9th Cir. 2001)............................. 40

Gamble v. United States,
    139 S. Ct. 1960 (2019)..................................... 19

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

Gomez v. County of Los Angeles,

    No. 09-cv-02457, 2011 WL 13269747

    (C.D. Cal. 2011)........................................ 40, 41

Grin v. Shine,

    187 U.S. 181 (1902).................................... 13, 32

In re Assarsson,

    635 F.2d 1237 (7th Cir. 1980).......................... 32, 33

In re Extradition of Acevedo,

    No. 16-1766, 2017 WL 3491749

    (C.D. Cal. Aug. 11, 2017).............................. 37, 38

In re Extradition of Atta,

    706 F. Supp. 1032 (E.D.N.Y. 1989)......................... 34

In re Extradition of Cheung,

    968 F. Supp. 791 (D. Conn. 1997).......................... 34

In re Extradition of Coleman,

    473 F. Supp. 2d 713 (N.D. W. Va. 2007).................... 19

In re Extradition of Lara Gutierrez,

    No. 16-cv-05061, 2017 WL 8231237

    (C.D. Cal. Feb. 22, 2017).............................. 37, 38

In re Extradition of Lukes,

    No. 2:02-MC-23-FTM, 2003 WL 23892681,

    (M.D. Fla. May 8, 2003) .................................. 34

In re Extradition of Marzook,

    924 F. Supp. 565 (2d Cir. 1996)........................... 34

In re Extradition of Powell,

    4 F. Supp. 2d 945 (S.D. Cal. 1998) ....................... 18

v

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

In re Extradition of Solis,

    402 F. Supp. 2d 1128 (C.D. Cal. 2005)........................ 34

Kolovrat v. Oregon,

    366 U.S. 187 (1961)...................................... 6, 11

Koskotas v. Roche,

    931 F.2d 169 (1st Cir. 1991)................................ 32

Lopez-Smith v. Hood,

    121 F.3d 1322 (9th Cir. 1997)............................... 27

Man-Seok Choe v. Torres,

    525 F.3d 733 (9th Cir. 2008)............................ 36, 38

Manta v. Chertoff,

    518 F.3d 1134 (9th Cir. 2008)................................ 3

Martinez v. United States,

    828 F.3d 451 (6th Cir. 2016)........................ 14, 19, 32

Medellin v. Texas,

    552 U.S. 491 (2008)......................................... 5

Mirchandani v. United States,

    836 F.2d 1223 (9th Cir. 1988)............................... 35

Nationale Industrielle Aérospatiale v. U.S. Dist. Court,

    482 U.S. 522 (1987)........................................ 32

Noeller v. Wojdylo,

    922 F.3d 797 (7th Cir. 2019)............................ 36, 38

Ornelas v. Ruiz,

    161 U.S. 502 (1896)........................................ 34

Patterson v. Wagner,

    785 F.3d 1277 (9th Cir. 2015)............................ 5, 10

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                        PAGE

Quinn v. Robinson,

    783 F.2d 776 (9th Cir. 1986)........................... 3, 34, 36

Sainez v. Venables,

    588 F.3d 713 (9th Cir. 2009)............................... 18, 32

Santos v. Thomas,

    830 F.3d 987 (9th Cir. 2016) (en banc)................... 36, 38

Shapiro v. Ferrandina,

    478 F.2d 894 (2d Cir. 1973)............................... 36, 38

Sindona v. Grant,

    619 F.2d 167 (2d Cir. 1980).................................. 8

Skaftouros v. United States,

    667 F.3d 144 (2d Cir. 2011).................................. 32

Sumitomo Shoji Am., Inc. v Avagliano,

    457 U.S. 176 (1982)..................................... 6, 9, 11

United States ex rel. Sakaguchi v. Kaulukukui,

    520 F.2d 726 (9th Cir. 1975)................................. 35

United States v. Arlt,

    252 F.3d 1032 (9th Cir. 2001)................................ 16

United States v. Dixon,

    509 U.S. 688 (1993)........................................... 8

United States v. El-Mezain,

    664 F.3d 467 (5th Cir. 2011)................................. 16

United States v. Goff,

    400 Fed. Appx. 1 (6th Cir. 2010)............................. 16

United States v. Knotek,

    925 F.3d 1118 (9th Cir. 2019)............................. 9, 22

vii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

United States v. Li,
    206 F.3d 56 (1st Cir. 2000)................................... 6

United States v. Luong,
    393 F.3d 913 (9th Cir. 2004)......................... 8, 16, 17

United States v. Moncivais,
    213 F. Supp. 2d 704 (S.D. Tex. 2001)........................ 16

United States v. Montgomery,
    150 F.3d 983 (9th Cir. 1998)................................ 16

United States v. One Assortment of 89 Firearms,
    465 U.S. 354 (1984)......................................... 40

United States v. Overton,
    573 F.3d 679 (9th Cir. 2009)................................. 7

United States v. Putra,
    78 F.3d 1386 (9th Cir. 1996)................................ 39

United States v. Smith,
    424 F.3d 992 (9th Cir. 2005)................................ 16

United States v. Saccoccia,
    18 F.3d 795 (9th Cir. 1994)................................. 21

United States v. Soto-Barraza,
    947 F.3d 1111 (9th Cir. 2020).............................. 22

United States v. Watts,
    519 U.S. 148 (1997)..................................... 39, 40

Valentine v. United States ex rel. Neidecker,
    299 U.S. 5 (1936).......................................... 13

Ye Gon v. Holt,
    774 F.3d 207 (4th Cir. 2014)........................... 6, 8, 23

viii

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

<u>Zanazanian v. United States</u>,

    729 F.2d 624 (9th Cir. 1984)................................... 3


<u>STATE CASES</u>

<u>People v. Young</u>,

    105 P.3d 487 (Cal. 2005)..................................... 38


<u>STATUTES</u>

18 U.S.C. § 956(a)(1).......................................... 15

18 U.S.C. § 1951(a)............................................ 17

18 U.S.C. § 1962(c)............................................ 17

18 U.S.C. § 1962(d)............................................ 17

18 U.S.C. § 2332f(a)(2)........................................ 15

18 U.S.C. § 3184........................................... 13, 27

18 U.S.C. § 3186............................................... 27

18 U.S.C. §§ 2339A......................................... 14, 39


<u>LEGISLATIVE AUTHORITY</u>

<u>Extradition Treaties with Argentina, Austria,</u>

    <u>Barbados, Cyprus, France, India, Luxembourg,</u>

    <u>Mexico, Poland, Spain, Trinidad & Tobago,</u>

    <u>Zimbabwe, Antigua & Barbuda, Dominica,</u>

    <u>Grenada, St. Kitts & Nevis, St. Lucia,</u>

    <u>And St. Vincent & The Grenadines</u>,

    S. Exec. Rep. No. 105-23, 105th Cong.,

    2d Sess. (1998)........................................ <u>passim</u>

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

TREATIES

Treaty Between the United States and Czechoslovakia for the
    Extradition of Fugitives from Justice, U.S.-Czech.,
    July 2, 1925, 44 Stat. 2367, as amended by Supplementary
    Extradition Treaty Between the United States of America
    and Czechoslovakia, U.S.-Czech., Apr. 29, 1935,
    49 Stat. 3253, and Second Supplementary Treaty on
    Extradition Between the United States of America and the
    Czech Republic, U.S.-Czech., May 16, 2006,
    S. Treaty Doc. No. 109-14 (2006)........................... 22

Extradition Treaty Between the Government of the
    United States of America and the Government of the
    Republic of India, U.S.-India, June 25, 1997,
    S. Treaty Doc. No. 105-30 (1997)....................... passim

Extradition Treaty Between the Government of the
    United States of America and the Government of the
    Republic of Italy, U.S.-Italy, Oct. 13, 1983, 35 U.S.T.
    3023, as amended by Instrument as contemplated by Article
    3(2) of the Agreement on Extradition Between the
    United States of America and the European Union signed
    25 June 2003, as to the application of the Extradition
    Treaty Between the Government of the United States of
    America and the Government of the Italian Republic
    signed 13 October 1983, U.S.-Italy, May 3, 2006,
    S. Treaty Doc. No. 109-14 (2006)........................ 7, 22

x

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

Extradition Treaty Between the United States of America
    and the United Mexican States, U.S.-Mex., May 4, 1978,
    31 U.S.T. 5059, <u>as amended by</u> Protocol to the Extradition
    Treaty Between the United States of America and the United
    Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997,
    S. Treaty Doc. No. 105-46 (1998)............................. 23

Extradition Treaty Between the Government of the United States
    of America and the Government of the United Kingdom of
    Great Britain and Northern Ireland, U.S.-U.K., Mar. 31,
    2003, S. Treaty Doc. No. 108-23 (2004), <u>as amended by</u>
    Instrument as contemplated by Article 3(2) of the
    Agreement on Extradition Between the United States of
    America and the European Union signed 25 June 2003,
    as to the application of the Extradition Treaty
    Between the Government of the United States of America
    and the Government of the United Kingdom of Great Britain
    and Northern Ireland signed 31 March 2003, U.S.-U.K.,
    Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006).......... <u>passim</u>

FOREIGN CASES

<u>Norris v. United States</u>,
    [2008] UKHL 16....................................... 29, 31

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

FOREIGN STATUTES

Indian Pen. Code § 120A ......................................... 1

Indian Pen. Code § 120B ......................................... 1, 15

Indian Pen. Code § 121 .......................................... 1, 15

Indian Pen. Code § 121A ......................................... 1, 15

Indian Pen. Code § 300 .......................................... 1

Indian Pen. Code § 302 .......................................... 1

Indian Pen. Code § 415 .......................................... 1

Indian Pen. Code § 463 .......................................... 1, 15

Indian Pen. Code § 468 .......................................... 1

Indian Pen. Code § 470 .......................................... 1

Indian Pen. Code § 471 .......................................... 1, 15

Unlawful Activities (Prevention) Act § 15 ....................... 1

Unlawful Activities (Prevention) Act § 16 ....................... 1, 15

Unlawful Activities (Prevention) Act § 18 ....................... 1, 15

Unlawful Activities (Prevention) Act § 20 ....................... 1

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3

    Fugitive TAHAWWUR HUSSAIN RANA ("RANA" or "the fugitive") is

4   wanted in India to stand trial for offenses related to his role in

5   the 2008 terrorist attacks in Mumbai, India, that resulted in the

6   death of 166 people, the injury of 239 people, and the damage to

7   property in excess of $1.5 billion USD.[1]  (See Dkt. 66.)  Pursuant to

8   the Extradition Treaty Between the Government of the United States of

9   America and the Government of the Republic of India, U.S.-India, June

10  25, 1997, S. Treaty Doc. No. 105-30 (1997) (the "Treaty" or "U.S.-

11  India Treaty"),[2] the government of the Republic of India ("India")

12  has requested the formal extradition of RANA, and the United States

13  has initiated this extradition proceeding.  (See id.)

14      For the reasons stated in the government's opening brief, the

15  five criteria warranting certification of extradition are satisfied

16  in this case.  (See Dkt. 67 at 34-50.)  Namely, the Court has both

17  personal and subject matter jurisdiction, there is an extradition

18  treaty between the United States and India that is in full force and

19  effect, the crimes for which RANA's extradition is sought are covered

20

21      [1] India charges RANA with a conspiracy, in violation of Indian
    Penal Code ("IPC") § 120B (Charge 1),  whose objects include waging
22  war (Object 1), murder (Object 3), forgery for the purposes of
    cheating (Object 4), use of a forged document or electronic record
23  (Object 5), and committing a terrorist act (Object 6).  (See Dkt. 66-
    2 at 12-15; 66-7 at 47-52; 67 at 25.)  India also charges RANA with
24  the substantive crimes of waging war, in violation of IPC § 121
    (Charge 2); conspiracy to wage war, in violation of IPC § 121A
25  (Charge 3); murder, in violation of IPC § 302 (Charge 4); committing
    a terrorist act, in violation of Unlawful Activities (Prevention) Act
26  ("UAPA") § 16 (Charge 5); and conspiracy to commit a terrorist act,
    in violation of UAPA § 18 (Charge 6).  (See Dkt. 66-2 at 12-15; 66-7
27  at 18-21, 27-28, 47-51; 67 at 25-26.)

28      [2] A copy of the U.S.-India Treaty is filed with the Court at
    Docket No. 66-1.

1   by the terms of that Treaty, and India's extradition request contains

2   evidence to establish probable cause that the individual appearing in

3   court is the fugitive who committed the offense for which extradition

4   is requested.

5       RANA's challenges under Article 6 of the Treaty, the Prior

6   Prosecution or <u>non bis in idem</u> ("<u>non bis</u>") clause, and to the

7   probable cause requirement are without merit.

8       <u>First</u>, even though the language and controlling interpretations

9   of Article 6 of the Treaty call for a comparison of elements to

10  determine whether RANA's extradition is sought for the same offense

11  for which he was acquitted in the Northern District of Illinois, RANA

12  insists that the Court use a conduct-based test and find that his

13  extradition is barred.  However, the plain language of Article 6, the

14  technical analysis of Article 6, and canons of treaty interpretation

15  support the application of the elements-based test articulated in

16  <u>Blockburger v. United States</u>, 284 U.S. 299 (1932).  It is not

17  disputed that, under the <u>Blockburger</u> elements-based test, the

18  offenses for which India seeks RANA's extradition are not the same

19  offenses with which he was charged in the United States.  The

20  application of the <u>Blockburger</u> elements-based test is supported by

21  both domestic and international law, as well as the Supreme Court's

22  mandate that extradition treaties be interpreted liberally in favor

23  of extradition.  Therefore, the Court should find that RANA's

24  extradition is not barred under Article 6 of the Treaty.

25      <u>Second</u>, although there is ample evidence that RANA aided and

26  abetted the Mumbai attacks, RANA claims that he should not be

27  extradited because probable cause is lacking.  RANA's claim is based

28  on an improper attempt to attack the credibility of a key witness

1   against him.  This goes beyond the scope of this extradition

2   proceeding because it would require the Court to make factual

3   findings and weigh evidence, which is a role that is reserved for the

4   foreign court.  Additionally, none of the evidence upon which RANA

5   relies obliterates probable cause or otherwise undermines the ample

6   evidence provided in support of India's criminal charges.

7        Accordingly, the United States respectfully requests that,

8   following the April 22, 2021, extradition hearing, the Court certify

9   India's request for RANA's extradition for the Secretary of State's

10  surrender decision.

11  **II.  ARGUMENT**

12       In this case, RANA does not challenge several of the criteria

13  the Court must find to certify his extradition, including that:

14  (1) the extradition magistrate has jurisdiction to conduct

15  extradition proceedings; (2) the extradition magistrate has

16  jurisdiction over him; and (3) an extradition treaty between the

17  United States and India is in full force and effect.  See Manta v.

18  Chertoff, 518 F.3d 1134, 1140 (9th Cir. 2008); Quinn v. Robinson, 783

19  F.2d 776, 783, 790 (9th Cir. 1986); Zanazanian v. United States, 729

20  F.2d 624, 625-26 (9th Cir. 1984).  RANA also does not contest that he

21  is the person who India alleges committed the charged crimes.

22  Instead, RANA challenges only whether Article 6 of the Treaty bars

23  his extradition and whether probable cause exists to believe that he

24  committed the offenses for which India requests his extradition. [3]

25

26       [3] Even though RANA addresses Article 2 of the Treaty, the dual
    criminality clause, in his discussion of the non bis clause, he does
27  not assert that his extradition would be barred under that article.
    While the legal analysis of dual criminality and non bis clauses may
28  overlap, they are two distinct legal concepts and bases for
    challenging extradition.

1    Accordingly, the United States will address only these challenges to
2    RANA's extraditability.

3        **A.   RANA's Extradition is Not Barred by Article 6 of the Treaty**

4            RANA's claim that he cannot be extradited to India because of
5    his prior prosecution in the United States is based on an incorrect
6    interpretation of Article 6 of the Treaty.  As set forth below,
7    RANA's attempt to read into Article 6 a conduct-based test, instead
8    of the <u>Blockburger</u> elements-based test, fails.  His claim ignores the
9    plain language of the Treaty, the technical analysis of the Treaty's
10   individual provisions prepared by the Executive Branch agencies that
11   negotiated the Treaty, and the Supreme Court's mandate that
12   extradition treaties be interpreted in favor of extradition.
13   Further, contrary to RANA's claim, applying the <u>Blockburger</u> elements-
14   based test in this case is consistent with other provisions of the
15   Treaty, the plea agreement of alleged co-conspirator David Coleman
16   Headley ("Headley"), international law, and Indian national law.
17   Finally, RANA's alternative claim--that a multifactor test governing
18   certain conspiracy prosecutions under U.S. double-jeopardy law should
19   apply to this case--conflicts with controlling case law and
20   overstates the role of U.S. double jeopardy-law in extradition
21   proceedings.  The Court should therefore reject RANA's claim that his
22   extradition is barred under Article 6 of the Treaty.

23        1.   <u>The Court Should Apply the *Blockburger* Elements-Based</u>
24            <u>Test to Determine Whether RANA Has Been Tried for the</u>
             <u>Same Offenses for which His Extradition is Sought</u>

25        "Although double jeopardy is a widely accepted principle of
26   justice with its roots in Roman law, there is no international
27   consensus on its precise meaning or the general rules governing its
28   application to particular cases."  <u>Elcock v. United States</u>, 80 F.

4

1  Supp. 2d 70, 79 (E.D.N.Y. 2000) (citations omitted).  In the absence

2  of any such consensus, the non bis clause contained in Article 6 of

3  the U.S.-Indian Treaty is controlling on this issue and does not bar

4  RANA's extradition.

5       Article 6(1) of the Treaty provides:

6       Extradition shall not be granted when the person sought has
        been convicted or acquitted in the Requested State for the
7       offense for which extradition is requested.

8       In determining the meaning of this provision, the Court should

9  employ the analytical framework set out by the Supreme Court: When

10  analyzing a treaty, a court must start with its text.  See Medellin

11  v. Texas, 552 U.S. 491, 506-07 (2008); see also Vienna Convention on

12  the Law of Treaties ("VCLT"), art. 31(1), May 23, 1969, 1155 U.N.T.S.

13  331 ("A treaty shall be interpreted in good faith in accordance with

14  the ordinary meaning . . . given to the terms of the treaty in their

15  context and in light of its object and purpose.").  The Court's

16  interpretation of the text should be made with the goal of furthering

17  the Treaty's purpose--surrendering fugitives in this case.  See

18  Factor v. Laubenheimer, 290 U.S. 276, 293-94 (1933); see also VCLT,

19  art. 31(1).

20       In addition to the text of the Treaty, a court also may consult

21  additional sources to aid in its interpretation thereof, including

22  "the negotiating and drafting history of the treaty."  Medellin, 552

23  U.S. at 507; see Patterson v. Wagner, 785 F.3d 1277, 1281-82 (9th

24  Cir. 2015); Elcock, 80 F. Supp. 2d at 80; see also VCLT, art. 32

25  (providing that, to resolve ambiguities, "[r]ecourse may be had to

26  supplementary means of interpretation, including the preparatory work

27  of the treaty and the circumstances of its conclusion").  As set

28  forth herein, this material may be found in the technical analysis

5

1  contained within the Senate Executive Report that accompanies a

2  treaty.  Given that the technical analysis represents the Executive

3  Branch's understanding and interpretation of a treaty, courts

4  generally afford it great weight.  <u>See</u> <u>Sumitomo Shoji Am., Inc. v</u>

5  <u>Avagliano</u>, 457 U.S. 176, 184-85 & n.10 (1982); <u>Kolovrat v. Oregon</u>,

6  366 U.S. 187, 194 (1961); <u>El Al Israel Airlines, Ltd. v. Tsui Yuan</u>

7  <u>Tseng</u>, 525 U.S. 155, 168 (1999); <u>United States v. Li</u>, 206 F.3d 56, 63

8  (1st Cir. 2000).

9      Here, these principles lead to one conclusion: The text of

10  Article 6, along with the technical analysis of that provision, the

11  Indian prosecutor's consistent understanding of the Treaty, and case

12  law governing the means by which extradition treaties are interpreted

13  all direct the Court to apply the <u>Blockburger</u> elements-based test to

14  determine whether RANA's extradition is barred under the Treaty.

15              *a.  The Plain Meaning of Article 6 Directs the*
                    *Application of the <u>Blockburger</u> Elements-Based*
16                  *Test*

17      A plain reading of the term "offense" in Article 6 unambiguously

18  refers to the crime itself, not the underlying conduct.  While the

19  Treaty itself does not define "offense," the generally understood

20  definition of "offense" is "[a] violation of the law," <u>Black's Law</u>

21  <u>Dictionary</u> 1300 (11th ed. 2019), in other words, the legal definition

22  of the crime, <u>e.g.</u>, <u>Ye Gon v. Holt</u>, 774 F.3d 207, 215 (4th Cir. 2014)

23  ("The most natural reading of 'offense,' as distinct from 'acts,' is

24  that 'offense' refers to the definition of the crime itself.").

25      Had the parties to the Treaty intended Article 6 to cover

26  conduct that had been prosecuted in the Requested State, and not

27  simply the same offenses, they could have so specified.  Indeed,

28  treaty partners know how to draft <u>non bis</u> provisions that bar

                                    6

extradition based on conduct when they so intend.  For example, in the extradition treaty between the United States and Italy ("U.S.-Italy Treaty"),[4] the <u>non bis</u> provision does not include the term "offense," but instead refers to "acts":

> Extradition shall not be granted when the person sought has been convicted, acquitted or pardoned, or has served the sentence imposed, by the Requested Party for the <u>same acts</u> for which extradition is requested.[5]

(emphasis added).  The use of this language demonstrates that when the United States and its treaty partner intend to expand the bar on extradition to apply to "conduct" or "acts," they do so by using the necessary language to the <u>non bis</u> article of the treaty.  Because the United States and India chose to use the term "offense" instead of "acts" or "conduct," interpreting Article 6 to refer to anything other than the legal definition of the crimes is improper.

To compare whether two "offenses" are the same, courts start with the familiar test set forth in <u>Blockburger</u>, under which a court examines whether the two sets of offenses contain an element that the other does not.  <u>See</u> <u>United States v. Overton</u>, 573 F.3d 679, 691 (9th Cir. 2009) ("The Supreme Court set forth a generally applicable test

---

[4] Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Italy, U.S.-Italy, Oct. 13, 1983, 35 U.S.T. 3023, <u>as amended by</u> Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the Italian Republic signed 13 October 1983, U.S.-Italy, May 3, 2006, S. Treaty Doc. No. 109-14 (2006), art. VI.  (A copy of this treaty is attached to the Declaration of John J. Lulejian, dated 03/22/2021 ("Lulejian Decl."), as Exhibit C.)

[5] A similar provision is provided in the extradition treaty between the United States and the United Kingdom, upon which RANA's expert relies.  (<u>See</u> Dkt. 77-2 at 15.)  A detailed analysis of the relevant provisions of this treaty is set forth below in Section II(A)(3)(d)(A).

1   in Blockburger . . . to determine whether two statutory provisions

2   prohibit the same offense."). This is particularly true when the

3   offenses at issue are based on separate statutes, as is the case in

4   extradition matters. See, e.g., Albernaz v. United States, 450 U.S.

5   333, 344 n.3 (1981) ("It is well settled that a single transaction

6   can give rise to distinct offenses under separate statutes without

7   violating the Double Jeopardy Clause"); cf. United States v. Luong,

8   393 F.3d 913 (9th Cir. 2004) (recognizing that Blockburger may not be

9   sufficient test to evaluate whether multiple charges brought under

10  same statute constitute same offense for double-jeopardy purposes).

11      As the United States has previously explained (see Dkt. 26 at

12  26-27), this Court should follow the other courts that have concluded

13  the Blockburger elements-based test is the appropriate framework to

14  analyze non bis questions in extradition cases when the relevant non

15  bis clause refers to "offenses." See Ye Gon, 774 F.3d at 207;

16  Elcock, 80 F. Supp. 2d at 83; but see Sindona v. Grant, 619 F.2d 177

17  (2d Cir. 1980) (applying conduct-based test to similarly worded non

18  bis provision).[6] Specifically, for the reasons previously presented,

19  the analysis of the Fourth's Circuit's decision in Ye Gon, 774 F.3d

20  at 215, is instructive.[7]

21      Accordingly, the plain meaning of the use of the term "offense"

22  in Article 6 weighs in favor of using Blockburger's elements-based

23

24      [6] As the United States has previously discussed (Dkt. 26 at 27-
    28), the fundamental premise upon which Sindona was based has since

25  been rejected by the Supreme Court in United States v. Dixon, 509
    U.S. 688 (1993). RANA does not dispute this, except to the extent
    that Dixon did not address consecutive conspiracy prosecutions. (See

26  Dkt. 77 at 6-7.) Discussion of RANA's claim regarding successive
    conspiracy prosecutions is provided below in Section II(A)(5).

27
        [7] Like Article 6 of the U.S.-India Treaty, the non bis clause of

28  the treaty at issue in Ye Gon "direct[ed] the parties to examine 'the
    offense' for which extradition is requested."  774 F.3d at 215.

test to evaluate whether RANA was prosecuted in the United States for

the same offenses for which India seeks his extradition.

    b.   *The Technical Analysis of the Treaty Further*
         *Supports the Application of an Elements-Based*
         *Test*

    The technical analysis of the Treaty provided by the Executive

Branch to the U.S. Senate is likewise compelling evidence that an

elements-based test should apply to Article 6.  In advance of the

Treaty's ratification, the U.S. Department of State and the

U.S. Department of Justice, the agencies charged with negotiating the

United States' extradition treaty with India, prepared and submitted

a technical analysis of the Treaty's individual provisions for

consideration by Congress (the "Senate Report").[8]  (<u>See</u> Dkt. 26-5.)

The Senate Report explicitly states that the technical analysis of

the Treaty "was prepared by the Office of International Affairs,

United States Department of Justice, and the Office of the Legal

Adviser, United States Department of State, <u>based upon the</u>

<u>negotiating notes</u>."  (<u>Id.</u> at 12 (emphasis added).)  Thus, the

Treaty's technical analysis carries significant weight because it was

drafted by the agencies that negotiated the terms of the Treaty and

are charged, generally, with negotiating the United States'

extradition treaties.  <u>E.g.</u>, <u>Sumitomo Shoji Am.</u>, 457 U.S. at 184-85;

<u>see also, e.g.</u>, <u>United States v. Knotek</u>, 925 F.3d 1118, 1128 (9th

Cir. 2019) (relying on relevant Senate report as evidence of treaty

_____

    [8] <u>Extradition Treaties with Argentina, Austria, Barbados,</u>
<u>Cyprus, France, India, Luxembourg, Mexico, Poland, Spain, Trinidad &</u>
<u>Tobago, Zimbabwe, Antigua & Barbuda, Dominica, Grenada, St. Kitts &</u>
<u>Nevis, St. Lucia, And St. Vincent & The Grenadines</u>, S. Exec. Rep. No.
105-23, 105th Cong., 2d Sess. 108 (1998).  (A copy of the relevant
portions of the Senate Report is filed with the Court at Docket No.
26-5.)

partners' intent behind making revisions to extradition treaty);
Patterson, 785 F.3d at 1282 (relying on relevant Senate report for
guidance on how to interpret lapse-of-time provision in extradition
treaty).

The Executive Branch's technical analysis of the Treaty provides
that Article 6 "applies only when the person sought has been
convicted or acquitted in the Requested State of exactly the same
crime that is charged in the Requesting State." (Dkt. 26-5 at 16
(emphasis added).) This technical analysis further expressly
emphasizes that "[i]t is not enough that the same facts were
involved." (Id.) More specifically, it confirms that Article 6
"will not preclude extradition in situations in which the fugitive is
charged with different offenses in both countries arising out of the
same basic transaction."[9] (Id.) Thus, when read in conjunction with
the plain language of Article 6, the Executive Branch's technical
analysis of the Treaty confirms that Article 6 applies only when the
fugitive is sought for extradition for the exact same offense, not
just the same conduct, for which he was prosecuted in the Requested
State. As noted above in Section II(A)(1), courts apply the
Blockburger elements-based test when determining whether two offenses
are the same for purposes of non bis clauses in extradition treaties.

---

[9] By way of example, the Executive Branch's technical analysis
provides the following:

> [I]f the person is accused by one Contracting State of
> illegally smuggling narcotics into the country, and is
> charged in the other Contracting State of unlawfully
> exporting the same shipment of drugs, an acquittal or
> conviction in one Contracting State would not insulate the
> person from extradition because different crimes are
> involved.

(Dkt. 26-5 at 16.)

10

RANA's attempt, through his expert, Paul Garlick QC, to circumvent the Senate Report fails.  (See Dkt. 77-2 at 13.)  RANA asserts that the Senate Report lacks persuasive value because the report is not part of the Treaty itself.  However, this assertion ignores the explicit language in the Senate Report that the technical analysis was provided by the Executive Branch agencies that directly participated in this Treaty's negotiations.  (See Dkt. 26-5 at 12.) Mr. Garlick also ignores the controlling case law holding that the negotiating agencies' understanding of the Treaty terms is entitled to "great weight."  See, e.g., Sumitomo Shoji Am., 457 U.S. at 184-85.  Moreover, his assertion is internally inconsistent because, in the two paragraphs immediately preceding his claim that seeks to undermine the Senate Report's interpretation of Article 6, he urges the Court to consider the Senate Report's interpretation of Article 2 to better understand the treaty partners' intent in negotiating the Treaty.  (See Dkt. 77-2 at 12-13.)  Accordingly, Mr. Garlick's rejection of the Senate Report's interpretation of Article 6 is unpersuasive and without merit.

> c.   *The Indian Prosecutor Agrees that the Treaty Requires an Elements-Based Test*

The Supreme Court has explained, "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight."  Kolovrat, 366 U.S. at 194.  This is especially true if both partners to the applicable treaty agree on its interpretation.  See, e.g., id. (giving deference to interpretation of treaty provision as set forth in diplomatic notes exchanged between responsible agencies of United States and

Yugoslavia); cf. Arias-Leiva v. Warden, 928 F.3d 1281 (11th Cir. 2019) (holding that U.S.-Colombia extradition treaty was in full force and effect because, inter alia, both United States and Colombia understand it to be in effect).

Here, the United States' position on Article 6, as reflected in the Treaty's technical analysis, is consistent with the interpretation of the Indian Special Public Prosecutor, Senior Advocate Dayan Krishnan, whose views are contained in his attached supplementary legal memorandum that is being submitted by the Government of India through the diplomatic channel.[10]  (See Lulejian Decl. ¶ 2, Ex. A.)  Mr. Krishnan explains that Indian constitutional law on double jeopardy would be instructive when interpreting Article 6 of the Treaty.  (See id. at 4.)  According to Mr. Krishnan, Indian constitutional law on double jeopardy, like American constitutional law, determines whether two offenses are the same by first examining whether the two offenses carry the same elements. (Id. at 6 (stating that, contrary to Mr. Garlick's claim, "the Supreme Court of India has adopted the 'elements test' as against the 'conduct test'" to determine whether two offenses are same under Indian constitution).)

---

[10] Mr. Krishnan has practiced law in India for 28 years, has been appointed Special Public Prosecutor in several extradition cases and high-profile cases in India, and has expertise in international extradition law and practice.  (See Lulejian Decl., ¶ 2, Ex. A at 2, 35-36.)

The United States understands that India is sending through diplomatic channels Mr. Krishnan's supplementary opinion as a supplement to its extradition request.  (See id., ¶ 2.)  Following its receipt, the United States will lodge that original copy of this document with the Court.

1    This mutual understanding is additional persuasive evidence that

2    Article 6 requires an elements-based analysis to determine whether a

3    prior prosecution bars extradition.

4              d.   *Controlling Canons of Construction Direct that*
                    *Article 6 Should Be Interpreted in Favor of*
5                   *Permitting Extradition*

6    Even if the Court finds that Article 6 is somehow ambiguous,

7    notwithstanding the plain language of the Treaty and the technical

8    analysis to the Treaty, it should interpret Article 6 in a manner

9    that permits RANA's extradition to India.

10   It is well-settled that "[extradition] treaties should be . . .

11   interpreted with a view to fulfil our just obligations to other

12   powers." <u>Grin v. Shine</u>, 187 U.S. 181, 184 (1902).  Thus, in

13   fulfilling its function under 18 U.S.C. § 3184, a court should

14   liberally construe the applicable extradition treaty to affect its

15   purpose, namely, the surrender of fugitives to the requesting

16   country.  As the Supreme Court articulated in <u>Factor v. Laubenheimer</u>,

17   "if a treaty fairly admits of two constructions, one restricting the

18   rights which may be claimed under it, and the other enlarging it, the

19   more liberal construction is to be preferred."  290 U.S. at 293-94;

20   <u>see also, e.g.</u>, <u>Valentine v. United States ex rel. Neidecker</u>, 299

21   U.S. 5, 10 (1936) ("It is a familiar rule that the obligations of

22   treaties should be liberally construed so as to give effect to the

23   apparent intention of the parties.") (internal citations omitted).

24   That is, the obligation to surrender a fugitive to be tried for

25   alleged offenses "should be construed more liberally than a criminal

26   statute or the technical requirements of criminal procedure."

27   <u>Factor</u>, 290 U.S. at 298.  Accordingly, <u>Factor</u> demands that

28   ambiguities in an extradition treaty be construed in favor of

1   surrendering a fugitive to the requesting country.  See, e.g.,

2   Martinez v. United States, 828 F.3d 451, 463 (6th Cir. 2016) (en

3   banc) (citing cases); Cucuzzella v. Keliikoa, 638 F.2d 105, 107 n.3

4   (9th Cir. 1981) (noting the principle that "treaties should be

5   construed to enlarge the rights of the parties").

6       Accordingly, even if the Court were to find that Article 6 were

7   ambiguous, the Court should hold that Article 6 only bars RANA's

8   extradition if India seeks his extradition for the exact same

9   offenses for which he was tried in the United States, even though

10  some Indian offenses may be based on the same conduct.

11              2.   Extradition is Not Barred Under the *Blockburger*
12                   Elements-Based Test

13      RANA's claim rests on the incorrect premise that the Blockburger

14  elements-based test does not apply in this matter, and he does not

15  offer an alternative should the Court apply Blockburger.  Any such

16  assertion should be deemed waived for failing to raise it in the

17  opening brief.  E.g., Estakhrian v. Obenstine, 320 F.R.D. 63, 91

18  (C.D. Cal. 2017) (internal citations omitted).

19      Even if it were not waived, it would fail.  As discussed in the

20  government's extradition memorandum (Dkt. 67 at 52-53), the charges

21  on which RANA was tried in the United States contain separate and

22  distinct elements from the criminal charges for which India seeks

23  RANA's extradition.[11]  (See Dkt. 42 at 19-22.)  Specifically, none of

24  the Indian charges require proof that RANA provided material support

25

26  ───────────────

27      [11] RANA was charged in the United States with, inter alia,
    conspiracy to provide material support to terrorism in India and
    providing material support to Lashkar-e Tayyiba ("LeT"), a U.S.-
28  designated terrorist organization based in Pakistan, in violation of
    18 U.S.C. §§ 2339A and 2339B.  (See Dkt. 16-2.)

                                    14

to terrorist acts or a terrorist group, as was required under the U.S. statutes.  Additionally, the U.S. charges did not require proof of the elements of the Indian offenses, including conspiracy to commit murder, conspiracy to wage war, conspiracy to commit forgery, conspiracy to use a forged document, conspiracy to commit a terrorist act, and the respective underlying substantive offenses with which RANA is charged.  See IPC §§ 120B, 121, 121A, 302, 468, 471; UAPA §§ 16, 18.  Notably, RANA, unlike his co-conspirators, was not charged in the United States with any of the substantive, underlying offenses relating to his provision of material support to terrorism, including conspiracy to bomb public places in India under 18 U.S.C. § 2332f(a)(2) and conspiracy to murder and maim in India under 18 U.S.C. § 956(a)(1).  (See Dkt. 16-2 at 2-15.)  As such, the government was not required to prove the elements of those offenses at RANA's U.S. trial.[12]  (See id.).  Thus, RANA is unable to demonstrate that his extradition is barred under Article 6 of the Treaty.

> 3.  The Claims Advanced by RANA and His Expert Are Meritless

> > a.  *RANA's Attempt to Substitute a Multifactor Test for the Blockburger Elements-Based Test Fails*

RANA claims that, even to the extent Blockburger applies to non bis clauses in extradition treaties, it does not apply to his case because, according to him, a multifactor test governs successive

---

[12] The United States does not concede that RANA's extradition would be barred if he had been charged under 18 U.S.C. § 2332f(a)(2) and 18 U.S.C. § 956(a)(1).  Rather, the United States merely notes that the material support charges with which RANA was charged in the United States are even more attenuated from the offenses for which India seeks his extradition than the substantive charges brought against RANA's co-conspirators.

conspiracy prosecutions for constitutional double-jeopardy purposes. (See Dkt. 77 at 12.)  RANA's claim is wrong for several reasons.

First, even assuming U.S. double-jeopardy law doctrine applies to the non bis provisions, the premise of RANA's claim is incorrect because he fails to recognize controlling precedent.  Specifically, Ninth Circuit case law in the double-jeopardy context directs that, when two separate statutes are at issue, the courts apply the Blockburger elements-based test to determine whether the defendant is being impermissibly tried or sentenced for the same offense twice. See, e.g., Albernaz, 450 U.S. at  344 n.3 (1981); Luong, 393 F.3d at 913; United States v. Arlt, 252 F.3d 1032, 1037-38 (9th Cir. 2001) (en banc); cf. United States v. Smith, 424 F.3d 992, 1000 (9th Cir. 2005) (citing Luong, 393 F.3d at 916) (noting that court applies multifactor test, instead of Blockburger, when multiple conspiracy counts are charged under same statute); United States v. Montgomery, 150 F.3d 983, 990 (9th Cir. 1998) (same).

Relying on three out-of-circuit cases, RANA contends that courts apply a multifactor test, instead of the Blockburger elements-based test, for "any two conspiracy charges, regardless of the statute under which each is brought," when they are tried in separate proceedings.  (Dkt. 77 at 11 (citing United States v. El-Mezain, 664 F.3d 467, 548 (5th Cir. 2011); United States v. Goff, 400 Fed. App'x 1, 7 (6th Cir. 2010); United States v. Moncivais, 213 F. Supp. 2d 704, 707, 709 (S.D. Tex. 2001).)  RANA relies on these out-of-circuit cases because, according to him, "it is not clear how the Ninth Circuit would analyze conspiracy charges under different conspiracy statutes brought (as here) in successive prosecutions."  (Id. at 12 n.5.)  However, the Ninth Circuit already has addressed successive

conspiracy prosecutions brought under different conspiracy statutes and decided the issue in a manner that undercuts RANA's claim.

In Luong, the Ninth Circuit addressed whether "conviction (or acquittal) on RICO conspiracy and substantive charges bars subsequent prosecution for a predicate act when the predicate act is itself a conspiracy." 393 F.3d at 914. In that case, a defendant had been convicted of a RICO conspiracy charge in violation of 18 U.S.C. § 1962(d) and acquitted of a related substantive RICO charge under 18 U.S.C. § 1962(c). Luong, 393 F.3d at 914-15. The United States subsequently brought charges against the defendant and others in another district for, inter alia, conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and the defendant moved to dismiss the charge on the double-jeopardy grounds alleging that the original charges already included the Hobbs Act robbery. Id. at 915.

To resolve the matter, the Ninth Circuit applied Blockburger and held that, even though the charges in both districts were based on the same criminal, conspiratorial scheme, double jeopardy did not bar the subsequent prosecution because it was brought under a different conspiracy statute that carried different elements than the first conspiracy prosecution. Id. at 916. The court acknowledged that it applies RANA's preferred multifactor test to successive conspiracy charges but only where the charges are brought under the same conspiracy statute and Blockburger therefore "provided insufficient protection" against double jeopardy concerns. Id. (internal citations omitted). Accordingly, RANA's claim that a multifactor test should apply to the conspiracy offenses, instead of the

17

1    Blockburger elements-based test, is foreclosed by the Ninth Circuit's
2    decision in Luong.[13]

3        Second, even if RANA's understanding of double-jeopardy law were
4    correct, it does not apply to this extradition proceeding.
5    Specifically, the entirety of U.S. double-jeopardy doctrine is not
6    incorporated into Article 6 of the Treaty.[14]   RANA even alludes to
7    this in his brief.   (See Dkt. 77 at 12 ("To the extent that Article 6
8    reflects United States double jeopardy law . . ."), 15 ("To the
9    extent Article 6 of the Treaty incorporates [United States double
10   jeopardy] principles . . .").)   Instead, a case rooted in double-
11   jeopardy law, Blockburger, merely provides the framework to determine
12   whether two offenses are the same for purposes of non bis clauses in
13   extradition treaties.

14       This approach comports with the longstanding principle that
15   extradition proceedings are not criminal proceedings in which the
16   fugitive is entitled to the same rights available during criminal
17   proceedings.   See, e.g., Sainez v. Venables, 588 F.3d 713, 718 (9th
18   Cir. 2009).   Specifically, "the Fifth Amendment guarantee against
19   double jeopardy does not apply to extradition . . ."   In re
20   Extradition of Powell, 4 F. Supp. 2d 945, 951 (S.D. Cal. 1998)

21       [13] RANA's claim that India's substantive offenses likewise fail
22   because they are lesser included offenses of India's conspiracy
     offenses is also based on an incorrect premise.   (See Dkt. 77 at 15.)
23   As discussed in Mr. Krishnan's Supplementary Opinion, the substantive
     offenses are separate and distinct from the conspiracy offenses and
24   are not considered lesser included offenses.   (See Lulejian Decl.
     ¶ 2, Ex. A at 30-34.)
25
         [14] RANA misstates the United States' argument when he asserts
26   that it is based on the "application of United States double jeopardy
     principles."   (Dkt. 77 at 15.)   Rather, as explained above in Section
27   II(A)(1), the plain language and the parties' understanding and
     interpretation of Article 6 govern the Court's analysis, and the
28   Blockburger elements-based test is merely the mechanism by which that
     Treaty provision is implemented.

                                    18

1   (citing Collins v. Loisel, 262 U.S. 426, 429 (1923)).  Moreover, the

2   constitutional protection against double jeopardy only applies to

3   successive prosecutions by the same sovereign, which is not the case

4   in this extradition proceeding.  See Gamble v. United States, 139 S.

5   Ct. 1960 (2019); see also In re Extradition of Coleman, 473 F. Supp.

6   2d 713, 717 (N.D. W. Va. 2007); Elcock, 80 F. Supp. 2d at 75.

7          Treating the Blockburger elements-based test as the framework to

8   analyze non bis clauses in extradition treaties, also is consistent

9   with the expectations of the negotiating treaty partners.  It is

10  illogical to assume that India would have agreed to an interpretation

11  of Article 6 that relies on the entirety of complex and evolving U.S.

12  constitutional double-jeopardy doctrine.  Cf. Martinez, 828 F.3d at

13  464 (declining to incorporate complex U.S. constitutional speedy

14  trial law into extradition treaty because not clear what treaty

15  partners intended).  Instead, it is more plausible that the parties

16  agreed to a general test to determine whether offenses are the same

17  for purposes of Article 6.  That test is an elements-based test, as

18  reflected in the Senate Report and Mr. Krishnan's Supplementary

19  Opinion.  (See Dkt. 26-5 at 16; Lulejian Decl., ¶ 2, Ex. A at 6-7.)

20  Therefore, RANA has failed to demonstrate that U.S. double-jeopardy

21  law, beyond the application of the test set forth in Blockburger,

22  should apply to this extradition matter.

23         Third, even if U.S. double-jeopardy doctrine applied to this

24  case, RANA's proposal for the use of a multifactor test in conspiracy

25  cases would create an unreasonable and inappropriate interpretation

26  of Article 6.  RANA does not appear to dispute that Blockburger

27  generally applies to evaluate non bis questions in the extradition

28  context, but he is essentially asking the Court to carve out a

                                    19

separate and distinct test for conspiracy cases.  RANA does not point
to any Treaty language that would support this approach, nor does he
cite to any source that would demonstrate the Treaty partners' intent
to use different tests based on the nature of the crimes being sought
for extradition.  Indeed, no such support exists.  Moreover, RANA has
not presented any reasons why the <u>Blockburger</u> elements-based test
would otherwise be an unworkable test for <u>non bis</u> analyses in
extradition cases.[15]

Accordingly, the Court should reject RANA's attempt to apply a
multifactor test, instead of the elements-based test set forth in
<u>Blockburger</u>, to determine whether RANA's extradition is barred under
Article 6 of the Treaty.

> ### b.   *RANA's Reliance on Article 2 of the Treaty Is Misplaced*

RANA's assertion that Article 6 demands a conduct-based test to
be consistent with Article 2, the Treaty's dual-criminality
provision, is based on an erroneous understanding of treaty
interpretation and construction.  (<u>See</u> Dkt. 77 at 16-17.)  Indeed,
RANA mistakenly, and repeatedly, conflates the concepts of dual
criminality and <u>non bis</u>.  As explained below, a <u>non bis</u> clause in an
extradition treaty does not automatically warrant a conduct-based

---

[15] However, even if the multifactor test applied to this case,
RANA's claim would still fail. <u>See</u> <u>Arnold v. United States</u>, 336 F.2d
347, 349-50 (9th Cir. 1964) (setting forth five-factor test).  Among
other things, the overt acts with which he is charged in India differ
from the overt acts with which he was charged in the United States.
In particular, the United States Attorney's Office for the Northern
District of Illinois ("USAO-NDIL") charged RANA with conspiracy to
provide material support to terrorism in India, not conspiracy to
commit the underlying acts of terrorism themselves with which he is
charged in India.  (<u>See</u> Dkt. 16-2 at 17-18.)  Additionally, RANA's
extradition is sought based on charges brought in a separate
sovereign.

1   test simply because a conduct-based test is used to interpret a dual-

2   criminality provision elsewhere in the Treaty.  Instead, the language

3   of the particular <u>non bis</u> clause at issue controls, and here, the <u>non</u>

4   <u>bis</u> clause calls for an elements-based test.

5      Bilateral extradition treaties are subject to unique canons of

6   construction to ensure they can fulfill their intended purpose.  <u>See,</u>

7   <u>e.g.</u>, <u>Factor</u>, 290 U.S. at 276.  One canon of construction is that,

8   when the treaty, like the one at issue here, defines an "extraditable

9   offense" based on dual criminality--a crime that is punishable in

10  both countries by a specified minimum punishment--courts look to

11  whether the conduct underlying the Requesting State's charge would be

12  punishable by a sufficient penalty in the Requested State had the

13  conduct been committed there.  <u>E.g.</u>, <u>Collins v. Loisel</u>, 259 U.S. 309,

14  312, 42 S. Ct. 469, 470-71 (1922) ("The law does not require that the

15  name by which the crime is described in the two countries shall be

16  the same; nor that the scope of the liability shall be coextensive,

17  or, in other respects, the same in the two countries. It is enough if

18  the particular act charged is criminal in both jurisdictions.");

19  <u>Clarey v. Gregg</u>, 138 F.3d 764, 765 (9th Cir. 1998) ("'Dual

20  criminality requires that an accused be extradited only if the

21  alleged criminal conduct is considered criminal under the laws of

22  both the surrendering and requesting nations.'" (quoting <u>United</u>

23  <u>States v. Saccoccia</u>, 18 F.3d 795, 800 n. 6 (9th Cir.1994)).This

24  requirement dates back almost 100 years to when the Supreme Court

25  issued its decision in <u>Collins</u>, and it remains the undisputed

26

27

28

standard for interpreting dual-criminality provisions today.[16]   See,
e.g., United States v. Soto-Barraza, 947 F.3d 1111, 1117 (9th Cir.
2020) (applying conduct-based test to dual-criminality provision).
With this backdrop, it is therefore no surprise that the parties
agree that Article 2 of the U.S.-India extradition treaty contains a
dual-criminality provision that is subject to a conduct-based test.
(See Dkt. 77 at 16-17; see also Dkt. 26-5 at 5.)

Unlike a dual-criminality provision, however, a non bis
provision is not subject to the same type of historical, consistent
interpretation.  Indeed, "there is no international consensus on its
precise meaning or the general rules governing its application to
particular cases."  Elcock, 80 F. Supp. 2d at 79.  This is manifested
by the variety of approaches that parties have taken in drafting non
bis clauses.  By way of example, Article VI of the U.S.-Italy Treaty,
as mentioned previously, bars extradition if the fugitive has been
prosecuted in the Requested States for the same "acts" for which
extradition is sought.  On the other hand, Article 6 of the
United States' extradition treaty with Mexico, which was at issue in

---

[16] It is common understanding that a conduct-based test applies
to a dual-criminality provision even when the specific treaty
language does not specify that the underlying acts or conduct govern.
See, e.g., Knotek, 925 F.3d at 1131 (applying conduct-based test
where dual-criminality provision in applicable extradition treaty
with Czech Republic renders offense extraditable if "it is punishable
under the laws of the Requesting and Requested States by deprivation
of liberty for a maximum period of more than one year or by a more
severe penalty").  The extradition treat at issue in Knotek is the
Treaty Between the United States and Czechoslovakia for the
Extradition of Fugitives from Justice, U.S.-Czech., July 2, 1925, 44
Stat. 2367, as amended by Supplementary Extradition Treaty Between
the United States of America and Czechoslovakia, U.S.-Czech., Apr.
29, 1935, 49 Stat. 3253, and Second Supplementary Treaty on
Extradition Between the United States of America and the Czech
Republic, U.S.-Czech., May 16, 2006, S. Treaty Doc. No. 109-14
(2006).  (A copy of this treaty is attached to the Lulejian Decl. as
Exhibit D.)

Ye Gon, 774 F.3d 207, mirrors the language of Article 6 in the U.S.-India Treaty and refers only to "offenses," not "acts" or "conduct."[17] More still, some extradition treaties, like the United States' extradition treaty with the United Kingdom upon which RANA's expert relies, uses a hybrid approach where sometimes "offenses" govern and sometimes "acts" govern depending on where the prior prosecution took place.[18]

Because there is not universal consensus on how to determine whether a prior prosecution bars a fugitive's extradition, there is not, nor can there be, a general rule that the presence of a dual-criminality provision in a treaty automatically requires a conduct-based analysis for non bis questions.  RANA's suggestion to the contrary is therefore incorrect.  (See Dkt. 77 at 16-17.)  Instead, the analysis employed is dependent on the language of the non bis clause contained in the applicable extradition treaty.  Here, as discussed above in Section II(A)(1), the non bis clause of the U.S.-

---

[17] Extradition Treaty Between the United States of America and the United Mexican States, U.S.-Mex., May 4, 1978, 31 U.S.T. 5059, as amended by Protocol to the Extradition Treaty Between the United States of America and the United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S. Treaty Doc. No. 105-46 (1998).  (A copy of this treaty is attached to the Lulejian Decl. as Exhibit E.)

[18] Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc. No. 108-23 (2004), as amended by Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006) ("U.S.-U.K. Treaty").  (A copy of this treaty is attached to the Lulejian Decl. as Exhibit F.)

A detailed analysis of the relevant provisions of this treaty is set forth below in Section II(A)(3)(d)(A).

India Treaty (Article 6), refers only to "offenses" and demands the use of the elements-based test set forth in Blockburger.

This reading of Article 6 is further supported by the text and overall structure of the U.S.-India Treaty.  As an initial matter, Article 2 and Article 6 address different legal terms.  Article 6 refers to the generic word "offense," which as discussed previously, refers to the crime being sought for extradition.  Article 2, on the other hand, defines the phrase "extraditable offense," which is a legal term of art used to describe which crimes, i.e., offenses, charged by the Requesting State fall within the scope of the Treaty and are potentially extraditable.

The difference between these terms is evident by the structure of the Treaty.  The first eight articles of the Treaty establish under what circumstances a person can and cannot be extradited. Article 1 sets forth the general purpose and scope of the Treaty. Specifically, this article provides that the Requesting State can seek extradition of a person who is formally accused of, charged with, or convicted of an "extraditable offense."  Article 2, which is titled "Extraditable Offenses," defines that term and employs a conduct-based test.  The next six articles (Articles 3 through 8) detail the circumstances in which the Requested State must or may deny extradition, even when the conditions of Articles 1 and 2 are otherwise met.  Because these articles, which include Article 6, put limits on Article 2, they require a test that is narrower than the conduct-based test used to determine whether an offense meets the preliminary criteria of constituting an "extraditable offense." Using the narrower Blockburger elements-based test to determine the

24

applicability of Article 6 is therefore consistent with the Treaty's overall structure and purpose.

> ### c.   *Rana's Reliance on Headley's Plea Agreement Is Misplaced*

As discussed in the United States' prior pleadings, Headley's plea agreement is irrelevant because RANA cannot benefit from its terms.  (See Dkt. 26 at 29-30; 67 at 55-56.)  Not only is RANA in a different position than Headley because he did not plead guilty or cooperate with the United States, as is his right, but his inability to benefit from the negotiated terms of Headley's plea agreement is confirmed by the text of the plea agreement itself.

Paragraph 19 of the plea agreement provides that, except as set forth elsewhere in the agreement, the plea agreement does not "constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity." (Dkt. 16-6 at 30, ¶ 19.)  Importantly, the plea agreement further states, "The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement."  (Id.)  RANA's extradition proceedings are separate and apart from Headley's criminal proceedings and are being litigated by a different United States Attorney's Office from the one who negotiated the plea agreement with Headley.  According to its very terms, RANA has no rights under Headley's plea agreement and is therefore prohibited from relying on

1    it in attempt to undermine the United States' position on his

2    extraditability under the Treaty.

3         Even if Headley's plea agreement were somehow relevant, the

4    agreement also confirms that the written agreement, and not any other

5    statements, "represents the entire agreement between the

6    United States Attorney and defendant regarding defendant's criminal

7    liability." (Id. at 30, ¶ 18.)  It is not evident from a plain

8    reading of the written text in paragraph 9 of the plea agreement,

9    which discusses Headley's potential extradition to India, Pakistan,

10   and Denmark, that the United States Attorney's Office for the

11   Northern District of Illinois ("USAO-NDIL") was even attempting to

12   interpret Article 6 of the Treaty.

13        The first sentence of paragraph 9 provides, "Pursuant to Article

14   6 of the Extradition Treaty Between the United States and the

15   Republic of India . . . defendant [Headley] shall not be extradited

16   to the Republic of India . . . for any offense which he has been

17   convicted of in accordance with this plea." (Id., ¶ 9.)  This

18   sentence does not set forth any agreement between the United States

19   and Headley.  Instead, it simply tracks the language of Article 6(1)

20   of the Treaty, which states that Headley cannot be extradited for the

21   "offense" for which he has been convicted.

22        It is the second sentence that actually sets forth the terms of

23   the agreement between USAO-NDIL and Headley:

24        The defendant and the United States Attorney's Office
         accordingly agree that, if the defendant pleads guilty to
25       and is convicted of all offenses set out in the Superseding
         Indictment, . . . then the defendant shall not be
26       extradited to the Republic of India . . . for the foregoing
         offenses, including conduct within the scope of those
27       offenses for which he has been convicted in accordance with
         this plea, so long as he fully discloses all material facts
28

                                   26

1          concerning his role with respect to these offenses and
          abides by all other aspects of this agreement.
2

3   Id. (emphasis added).  RANA claims that the emphasized language

4   demonstrates the United States' belief that "offense" refers to

5   "conduct," but this is not persuasive.  The text of the second

6   sentence reveals that USAO-NDIL used the term "offense" as contained

7   in the Treaty and added the clause "including conduct within the

8   scope of those offenses," which is not expressly included in Article

9   6.  The use of that additional clause referring to conduct means

10  that, as would be expected in a plea negotiation, USAO-NDIL agreed to

11  something more than what the Treaty would have already provided.

12  RANA's suggestion that USAO-NDIL must have interpreted Article 6 to

13  cover conduct thus falls flat.[19]  See 18 U.S.C. § 3186 ("The Secretary

14  of State may order the person committed under sections 3184 or 3185

15  of this title to be delivered to any authorized agent of such foreign

16  government, to be tried for the offense of which charged.") (emphasis

17  added); see also Lopez-Smith v. Hood, 121 F.3d 1322, 1326 (9th Cir.

18  1997) ("[T]he Secretary of State's exercise of discretion regarding

19  whether to extradite an individual may be based not only on

20  "considerations individual to the person facing extradition" but "may

21  be based on foreign policy considerations instead.").

22

23

24  _____
          [19] Even if the Court finds that USAO-NDIL articulated an
25  interpretation of Article 6 as barring extradition for prior conduct,
    (see Lulejian Decl., ¶ 3, Ex. B (Tr. of Headley's Change of Plea,
26  dated 03/18/2010, at 20-21)), the Court should decline to give that
    interpretation any weight because it is inconsistent with paragraphs
27  18 and 19 of the plea agreement itself and runs contrary to the plain
    language of the Treaty and accompanying technical analysis, to which
28  the USAO-NDIL was not a negotiating party.  (See supra Sections
    II(A)(1)-(2).)

1    Accordingly, the Court should reject RANA's reliance on

2    Headley's plea agreement to support his Article 6 claim.

3            d.   *RANA's Reliance on International Law and*
                  *Indian National Law Is Misplaced*

4

5    RANA's claim that international law and Indian national law

6    require Article 6 to be read as incorporating a conduct-based test is

7    not persuasive.  (See Dkt. 77 at 20-21; Dkt. 77-2 at 8-35.)  As an

8    initial matter, RANA's heavy reliance on international and Indian

9    law, through Mr. Garlick's report, is misplaced.  As previously

10   discussed, the applicable Treaty language, along with its technical

11   analysis and applicable canons of construction, control the Court's

12   analysis here.  Those controlling factors direct the Court to

13   interpret Article 6 as requiring the application of an elements-based

14   test.  Neither international law nor Indian constitutional law can,

15   or should, alter that determination.  See Factor, 290 U.S. at 287

16   ("[T]he principles of international law recognize no right to

17   extradition apart from treaty.").  Therefore, the Court need not

18   address RANA's claims on these issues.

19   However, to the extent the Court finds them relevant,

20   international and Indian national law further support the application

21   of an elements-based test under Article 6 of the Treaty.

22           (A)   International Law Does Not Mandate a
                   Conduct-Based Test

23

24   RANA's assertion that "international law" supports the

25   application of a conduct-based test fails because he conflates the

26   concepts of dual criminality, set forth in Article 2 of the Treaty,

27

28

                                   28

and <u>non bis</u>, set forth in Article 6 of the Treaty.[20]   (<u>See</u> Dkt. 77 at

16-17.)   RANA's mistake is not only limited to his interpretation of

the U.S.-India Treaty, but his expert, Mr. Garlick, also erroneously

interprets other extradition treaties and international conventions

upon which he relies.   (<u>See</u> Dkt. 77-2 at 8-23.)

     For example, the fact that the U.S.-U.K. Treaty uses the term

"offense" in both its dual criminality and <u>non bis</u> articles does not

mean that the applicable tests for each article are identical.   In

fact, Mr. Garlick's reliance on the U.S.-U.K. Treaty undermines

RANA's assertion and further supports the United States' position.

     The dual-criminality provision of that treaty, Article 2(1),

provides that,

> An offense shall be an extraditable offense <u>if the conduct
> on which the offense is based</u> is punishable under the laws
> in both States by deprivation of liberty for a period of
> one year or more or by more severe punishment.

U.S.-U.K. Treaty, art. 2(1) (emphasis added).   Based on the plain

language of this article and the use of the term "conduct," a court

examining dual criminality would look at the conduct underlying the

offense.   This conduct-based analysis was endorsed by the House of

Lords in <u>Norris v. United States</u>, [2008] UKHL 16, upon which Mr.

Garlick relies.[21]   Both parties agree that this conduct-based test

also applies to Article 2, the dual-criminality provision, of the

U.S.-India Treaty, but as set forth above and in Section II(A)(2),

that test is not dispositive of how to interpret the Treaty's <u>non bis</u>

provision.

---

[20] Discussion of RANA's erroneous conflation of Articles 2 and 6
is provided in Section II(A)(3)(b).

[21] A copy of <u>Norris</u> is attached to the Lulejian Decl. as
Exhibit G.

1    By contrast, Article 5, the <u>non bis</u> article of the U.S.-U.K.

2  Treaty, provides in relevant part:

3         (1) Extradition shall not be granted where the person
       sought has been convicted or acquitted in the Requested
4      State for the offense for which extradition is requested.

5         (2) The Requested State may refuse extradition when
       the person sought has been convicted or acquitted in a
6      third state <u>in respect of the conduct</u> for which extradition
       is requested.
7

8  (emphasis added).  Here, the U.S.-U.K. treaty explicitly adopts two

9  different approaches depending on which country conducted the prior

10 prosecution.  Article 5(1) addresses the situation where the person

11 sought for extradition was convicted or acquitted in the Requested

12 State, either the United States or the United Kingdom, and bars

13 extradition if that prosecution was for the same "offense" for which

14 extradition is being sought.  On the other hand, for Article 5(2),

15 where the person sought for extradition was convicted or acquitted in

16 a country other than the United States or the United Kingdom, the

17 treaty provides a discretionary basis to deny extradition if the

18 prior prosecution was for the same "conduct" as is the subject of the

19 extradition offense.

20    Despite the distinct language of these two <u>non bis</u> subsections,

21 Mr. Garlick contends that they must both call for the same conduct-

22 based test.  (<u>See</u> Dkt. 77-2 at 16.)  Without providing any legal

23 support, Mr. Garlick maintains that the use of the term "conduct" in

24 subsection 2 governing third-country prosecutions is necessary only

25 because some countries' criminal laws may not frame <u>actus reus</u> and

26 <u>mens rea</u> elements in a way that is comparable to Anglo-American

27 common law.  (<u>See</u> <u>id.</u>)  He further claims that, notwithstanding the

28 absence of the term "conduct" in subsection 1, that clause must also

1  refer to conduct because it would otherwise "be offensive to any

2  sense of fairness to the requested person, or the comity between

3  nations."  (Id.)

4      Mr. Garlick, however, ignores the plain language and stated

5  intent of these two subsections.  If the United States and the United

6  Kingdom had intended to apply a conduct-based test to all cases in

7  which there was a related prior prosecution, that language would have

8  been reflected in both Articles 5(1) and 5(2).  Instead, the

9  different terminology signals that an elements-based test was

10 intended for prior prosecutions in the Requested States, while a

11 conduct-based test was intended for prior prosecutions in any other

12 third state.  This plain reading is consistent with the principle

13 that the language of the specific Treaty's non bis provision

14 controls.  Accordingly, RANA's reliance on the U.S.-U.K. extradition

15 treaty is unhelpful to him and wholly misplaced.

16     Likewise, RANA's examination of the domestic law of the United

17 Kingdom is not informative.  By Mr. Garlick's own admission, Norris

18 was limited to dual criminality and did not mention non bis or double

19 jeopardy.  (See Dkt. 77-2 at 17; see also Lulejian Decl. ¶ 5 at 17-

20 24.)  Thus, Mr. Garlick's conclusion that "it is inconceivable" that

21 a court in the United Kingdom would apply "any different approach,"

22 other than one the double criminality test articulated in Norris, is

23 no more than speculation.[22]

24

25     [22] The United States will not address any of the other
   extradition schemes Mr. Garlick mentions in his opinion.  (See Dkt.
26 77-2 at 18-23.)  The extradition schemes of the European Union and
   the Caribbean Commonwealth rely on laws that differ from and neither
27 bind nor directly involve the United States.  Because treaty analysis
   requires an examination of the plain language of the treaty and the
28 contracting parties' intent, attempting to apply other bilateral
   *(footnote cont'd on next page)*

1
2

(B)   Indian National Law Does Not Mandate a
Conduct-Based Test

3      RANA's reliance on Indian constitutional law is likewise

4  misplaced.  It is well-settled law that a court should defer to a

5  foreign government's interpretation of its own laws.  See, e.g.,

6  Grin, 187 U.S. at 190; Basic v. Steck, 819 F.3d 897, 901 (6th Cir.

7  2016); Skaftouros v. United States, 667 F.3d 144, 160 n.20 (2d Cir.

8  2011); Sainez, 588 F.3d at 717; In re Assarsson, 635 F.2d 1237, 1244

9  (7th Cir. 1980).  Such deference is commensurate with the "comity

10 considerations that lurk beneath the surface of all extradition

11 cases," and with due respect for foreign nations' sovereignty.

12 Martinez, 828 F.3d at 463; see Société Nationale Industrielle

13 Aérospatiale v. U.S. Dist. Court, 482 U.S. 522, 546 (1987) ("[W]e

14 have long recognized the demands of comity in suits involving foreign

15 states, either as parties or as sovereigns with a coordinate interest

16 in the litigation."); Sainez, 588 F.3d at 717; Koskotas v. Roche, 931

17 F.2d 169, 174 (1st Cir. 1991); Ahmad v. Wigen, 910 F.2d 1063, 1067

18 (2d Cir. 1990).  It is further supported by the prudential policy of

19 avoiding the high risk that a U.S. court might erroneously interpret

20 the law of a foreign country.  See Emami v. U.S. Dist. Court for N.

21 Dist., 834 F.2d 1444, 1449 (9th Cir. 1987); Assarsson, 635 F.2d at

22 1244.

23     In this case, the Indian Special Public Prosecutor's position on

24 the application of Indian national law, submitted by the Indian

25 government via diplomatic channels, should be afforded significant

26 deference.  See, e.g., Skaftouros, 667 F.3d at 156 ("Any arguments

27

28 treaty or other nations' extradition schemes to the issue in this
case is not informative.

regarding the demanding country's compliance with its own laws,

therefore, are properly reserved for the courts of that country");

Emami, 834 F.2d at 1449 ("refrain[ing] from interpreting the

requirements of German criminal procedure"); Assarsson, 635 F.2d at

1244 ("refus[ing] to review [Sweden's] compliance with [its] criminal

procedure").

As detailed in Mr. Krishnan's supplementary opinion, Indian

constitutional law supports the application of an element-based test.

(See Lulejian Decl. ¶ 2, Exh. A at 5-34.)  In contrast, RANA, through

Mr. Garlick, selects instances where India has used the term

"offense" under Indian domestic law and incorrectly concludes that

those provisions of domestic law illustrate India's intention to

apply a conduct-based test to Article 6 of the Treaty.  (See Dkt. 77-

2 at 23-36.)  However, for the reasons set forth in Mr. Krishnan's

Supplementary Opinion, this conclusion is flawed.  Accordingly, to

the extent that the Court finds Indian constitutional law relevant in

deciding this case, the United States respectfully requests that the

Court defer to Mr. Krishnan, who represents the Government of India

in its prosecution of RANA.

For all these reasons, RANA has failed to demonstrate that he

cannot be extradited to India as a result of his prior prosecution in

the United States.

**B.   The Extradition Request Contains Sufficient Evidence of Probable Cause for Each Offense**

    1.   Legal Standard for Probable Cause in Extradition Cases

Pursuant to Article 9(3)(c) of the Treaty, India's extradition

request must contain "information as would justify the committal for

trial of the person if the offense had been committed in the

33

1   [United States]."  This refers to the familiar domestic requirement
2   of probable cause.  See Emami, 834 F.2d at 1447.  India is not
3   obligated to send all its evidence to the United States to satisfy
4   this standard.  See Collins, 259 U.S. at 316; Austin v. Healey, 5
5   F.3d 589, 605 (2d Cir. 1993).

6       As set forth in the government's extradition memorandum (Dkt. 67
7   at 13-20), the extradition magistrate's role is to evaluate India's
8   submissions to determine whether they establish probable cause to
9   believe that RANA committed the offenses for which extradition is
10  sought.  See Ornelas v. Ruiz, 161 U.S. 502, 512 (1896).  "The
11  magistrate does not weigh conflicting evidence and make factual
12  determinations but, rather, determines only whether there is
13  competent evidence to support the belief that the accused has
14  committed the charged offense."  Quinn, 783 F.2d at 815.  Because the
15  extradition proceeding is not a mini-trial of RANA's guilt or
16  innocence, the evidence submitted as part of the extradition request
17  is to be taken as true.  See, e.g., In re Extradition of Solis, 402
18  F. Supp. 2d 1128, 1131 (C.D. Cal. 2005); In re Extradition of Lukes,
19  No. 2:02-MC-23-FTM, 2003 WL 23892681, at *4 n.6 (M.D. Fla. May 8,
20  2003); In re Extradition of Cheung, 968 F. Supp. 791, 794 n.6 (D.
21  Conn. 1997) (stating that court "'must accept as true all of the
22  statements and offers of proof by the demanding state,' even if they
23  contain hearsay.") (internally quoting In re Extradition of Marzook,
24  924 F. Supp. 565, 592 (2d Cir. 1996); alteration omitted); Desautels
25  v. United States, 782 F. Supp. 942, 944 n.2 (D. Vt. 1991); Ahmad v.
26  Wigen, 726 F. Supp. 389, 399-400 (E.D.N.Y. 1989), aff'd, 910 F.2d
27  1063 (2d Cir. 1990); In re Extradition of Atta, 706 F. Supp. 1032,
28  1050-51 (E.D.N.Y. 1989) ("The primary source of evidence for the

probable cause determination is the extradition request, and any evidence submitted in it is deemed truthful for the purposes of this determination.") (internally citation omitted).

A magistrate judge's probable cause finding will be upheld in the extradition context when "there was any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988); see United States ex rel. Sakaguchi v. Kaulukukui, 520 F.2d 726, 730-31 (9th Cir. 1975).

> 2.   The Evidence Supports Findings of Probable Cause that RANA Committed the Charged Offenses

As detailed in the United States' extradition memorandum (Dkt. 67 at 40-50), the evidence submitted in India's extradition request, including the testimony Headley provided during RANA's criminal trial in the United States District Court for the Northern District of Illinois, supports a finding of probable cause for the charged offenses. While RANA seeks to undermine Headley's credibility by pointing to RANA's acquittal and Headley's criminal history, these credibility attacks are outside the scope of this extradition proceeding and are not legally supported in any event. Moreover, RANA's alternative interpretations of select pieces of evidence fail to obliterate India's presentation of probable cause.[23]

---

[23] For the sake of brevity, the United States will not repeat all of the evidence that supports a finding of probable cause and rests on its prior pleading in this regard. (See Dkt. 67 at 40-50.) Instead, the United States addresses only the specific evidence that RANA challenges.

1
2

                        *a. RANA's Attacks on Headley's Credibility Exceed the Scope of this Proceeding and Do Not Obliterate Probable Cause*

3      RANA attempts to undermine India's evidence of probable cause by

4 questioning the credibility of the key witness, David Headley. (See

5 Dkt. 77 at 22-23, 27-28.)  Not only is RANA's challenge improper in

6 this extradition proceeding, but his claims are also not supported by

7 the law or the evidence.

8      The Ninth Circuit, consistent with other circuits, has held that

9 credibility determinations are outside the scope of an extradition

10 proceeding.  See, e.g., Santos v. Thomas, 830 F.3d 987, 993 (9th Cir.

11 2016) (en banc) "an individual contesting extradition may not . . .

12 call into question the credibility of the government's offer of

13 proof"); Noeller v. Wojdylo, 922 F.3d 797, 807 (7th Cir. 2019)

14 ("Evidence that contradicts the demanding country's proof or poses

15 questions of credibility—i.e., contradictory evidence—is off-

16 limits."); Shapiro v. Ferrandina, 478 F.2d 894, 905 (2d Cir. 1973)

17 ("The judge's refusal to examine the credibility of the testimony and

18 statements included in the translated material was clearly proper,

19 since the declarants were not before him.").  While the "credibility

20 of witnesses and the weight to be accorded their testimony is solely

21 within the province of the extradition magistrate," Quinn, 783 F.2d

22 at 815, a lack of credibility generally "does not completely

23 obliterate the evidence of probable cause."  Man-Seok Choe, 525 F.3d

24 at 740 ("[Witness's] lack of credibility is merely a weakness in

25 Korea's case.") (internal quotation marks, citation, and alterations

26 omitted); cf. Barapind v. Enomoto, 400 F.3d 744, 749-50 (9th Cir.

27 2005) (en banc) (finding that witness's recantation did not

28 obliterate probable cause because recantation "constituted

conflicting evidence, the credibility of which could not be assessed without a trial.").

Likewise, this Court has followed such precedent and rejected probable cause challenges based on attacks to the credibility of witness statements provided in support of extradition requests. For example, in In re Extradition of Lara Gutierrez, the Court rejected a fugitive's claim that a witness statement "border[ed] on incredible." No. 16-cv-05061, 2017 WL 8231237, at *4 (C.D. Cal. Feb. 22, 2017). The Court nonetheless found that the statement satisfied the probable cause standard:

> [T]hese types of arguments about the credibility of [a witness's] account are misplaced in these proceedings. The circumscribed nature of this Court's inquiry does not permit the Court to weigh the credibility of [the witness's] statements. Rather, the Court must determine whether any competent evidence establishes probable cause.

Id. Similarly, in In re Extradition of Acevedo, the Court rejected another fugitive's claim that a witness statements was "suspect and more likely than not false." No. 16-1766, 2017 WL 3491749, at *8 n.4 (C.D. Cal. Aug. 11, 2017). The Court explained that notwithstanding the fugitive's claim, the evidence did not undermine a finding of probable cause:

> [T]hese arguments raise factual disputes regarding the weight and credibility of evidence. Such determinations are beyond the scope of this extradition proceeding and are properly reserved for trial in the requesting country."

Id. In light of this law, RANA's claims pertaining to Headley's credibility are misplaced.

First, RANA's attack on Headley's credibility based on Headley's character and status as a cooperating defendant (see Dkt. 77 at 22-23) is impermissible in these proceedings because, to address this

1   claim, the Court must make factual findings that go beyond the scope

2   of these proceedings.  See Santos, 830 F.3d at 993; Man-Seok Choe,

3   525 F.3d at 740; Noeller, 922 F.3d at 807; Shapiro, 478 F.2d at 905;

4   Acevedo, 2017 WL 3491749, at *8 n.4; Lara Gutierrez, 2017 WL 8231237,

5   at *4.  Further, assessing Headley's character requires this Court to

6   make a credibility determination based on a cold record without

7   having the opportunity to hear Headley testify and evaluate his

8   demeanor.  See Shapiro, 478 F.2d at 905.  Instead, such

9   determinations are reserved for the Indian court.  See Acevedo, 2017

10   WL 3491749, at *8 n.4; Lara Gutierrez, 2017 WL 8231237, at *4.

11       Second, RANA's claim that Headley's testimony should be given

12   diminished weight because it is not corroborated misstates the legal

13   standard in these extradition proceedings.  (See Dkt. 77 at 22.)

14   Courts have held that the testimony of a single witness is sufficient

15   to satisfy the beyond-a-reasonable-doubt standard required for a

16   conviction under U.S. law.  See, e.g., Bruce v. Terhune, 376 F.3d

17   950, 954 (9th Cir. 2004) (finding no due process violation in jury

18   instruction providing that testimony of single witness could be

19   sufficient to convict without corroboration); People v. Young, 105

20   P.3d 487, 505 (Cal. 2005) ("Unless the testimony is physically

21   impossible or inherently improbable, testimony of a single witness is

22   sufficient to support a conviction.").  Thus, under the lower

23   standard necessary to satisfy probable cause, the lack of

24   corroborating evidence is not fatal.  It is also not necessary

25   because India was not required to submit its entire criminal file in

26   support of its extradition request.  E.g., Collins, 259 U.S. at 316.

27   Moreover, lack of corroboration is not unexpected given that

28   Headley's and RANA's conversations about their involvement with a

terrorist organization and the potential deaths of hundreds of innocent people were presumably private.

Third, while downplaying the overwhelming evidence in India's extradition request detailing RANA's role in supporting the planning and execution of the 2008 Mumbai attacks, RANA suggests that his acquittal on Count 9 in his U.S. criminal trial alone obliterates probable cause.[24]  He claims that the acquittal means the jury flatly rejected the testimonial evidence offered by Headley, and therefore, Headley's uncorroborated testimony is insufficient to establish probable cause.  (See Dkt. 77 at 22-23, 27.)  However, the premise of RANA's claim is wrong.

The jury's acquittal on Count 9 is not evidence that the jury rejected Headley's testimony.  This is particularly true in light of RANA's conviction on two other counts that depended heavily on Headley's testimony.  Instead, the only inference that may be drawn from the jury's decision to acquit RANA on Count 9 is that the government failed prove the elements of the charged offense beyond a reasonable doubt.  United States v. Watts, 519 U.S. 148, 155 (1997) (reversing United States v. Putra, 78 F.3d 1386, 1394 (9th Cir. 1998) and quoting in support dissenting opinion) ("[A]n acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt. Without specific jury findings, no one can logically or realistically draw any factual finding inferences.").

---

[24] In Count 9, USAO-NDIL charged RANA with conspiring to provide material support to terrorism in India, in violation of 18 U.S.C. § 2339A.  (See Dkt. 16-2 at 16-17.)

1   RANA's suggestion that the verdict could mean anything else is pure
2   speculation.

3        Fourth, to the extent RANA is arguing that his acquittal on
4   Count 9 precludes this Court from finding probable cause in this
5   extradition proceeding, he is mistaken.  Article 6 of the Treaty
6   expressly allows for the extradition of fugitives despite a prior
7   conviction or acquittal in the Requested State for different
8   offenses, as is the case here.  It follows that such a prior
9   acquittal does not automatically preclude a finding of probable
10  cause.  (See supra Section II(A).)  Moreover, as the United States
11  set forth in a prior pleading (See Dkt. 42 at 25-26), an acquittal in
12  a criminal trial does not preclude a finding of probable cause in a
13  subsequent proceeding, such as this one.  E.g., Dowling v.
14  United States, 493 U.S. 342, 349 (1990)("[A]n acquittal in a criminal
15  case does not preclude the Government from relitigating an issue when
16  it is presented in a subsequent action governed by a lower standard
17  of proof."); United States v. One Assortment of 89 Firearms, 465 U.S.
18  354, 361 (1984) (holding same) ("[A]n acquittal on criminal charges
19  does not prove that the defendant is innocent; it merely proves the
20  existence of a reasonable doubt as to his guilt."); Fireman's Fund
21  Ins. Co. v. Stites, 258 F.3d 1016, 1022 (9th Cir. 2001) ("[A] failure
22  to prove a fact beyond a reasonable doubt does not mean that it
23  cannot be proven by a preponderance of the evidence.") (citing
24  Borunda v. Richmond, 885 F.2d 1384, 1389 (9th Cir. 1988)); Gomez v.
25  County of Los Angeles, No. 09-cv-02457, 2011 WL 13269747, at *4 (C.D.
26  Cal. 2011) ("An acquittal on a criminal charge may merely reflect the
27  failure of the prosecution to sustain its burden of proving the

28

charges true beyond a reasonable doubt.  Obviously, this is a higher standard than probable cause.").

Accordingly, for the foregoing reasons, the Court should reject RANA's attempt to obliterate probable cause by seeking to undermine Headley's credibility.

> b.   *RANA's Critiques of the Supporting Evidence Do Not Obliterate Probable Cause*

Like his attempt to broadly attack Headley's credibility, RANA's challenge to specific pieces of evidence presented in the extradition request fails.  (See Dkt. 77 at 23-27.)  Not only does RANA seek to introduce impermissible contradictory evidence, but he fails to point to evidentiary weaknesses that would obliterate India's presentation of probable cause.

> (A)   Evidence Relating to the Mumbai Office of RANA's Business Supports a Finding of Probable Cause

RANA attempts to undermine a finding of probable cause by alleging that the Mumbai office of his business, which Headley was purportedly using as a cover for his surveillance activities, conducted, or attempted to conduct, legitimate business that was supported by RANA.  (See Dkt. 77 at 23-26.)  The evidence does not support this assertion (see Dkt. 67 at 46-47, 49), but even if it did, the engagement of legitimate business activities does not preclude a finding that RANA's business also served as a cover for Headley's terrorism-related activities in Mumbai.

Even to the extent RANA sought to conduct a legitimate business in Mumbai, the record contains ample evidence that Headley used it, with RANA's knowledge, as a cover to support terrorism.  (Id. at 45-50.)  While RANA may have wanted to open an office in India prior to

41

1    2008, the fact is he did not do so until Headley proposed the idea of

2    opening it so that Headley could conduct surveillance activities in

3    Mumbai on behalf of terrorists.  Indeed, RANA does not present any

4    alternative reason for opening the office at that time, nor does he

5    present any alternative reason for why, after not having opened his

6    desired office for many years, he would suddenly do so at Headley's

7    persistence.  Moreover, even if RANA wanted to continue his business

8    endeavors in Mumbai after the attacks, the evidence shows that he did

9    not do so.  Thus, by opening the Mumbai office, RANA not only

10   willingly aided his childhood friend's criminal mission, but also

11   attempted to profit from any incidental business the office

12   generated.  These goals are not mutually exclusive.

13       RANA's claims regarding the financing of the Mumbai office also

14   do not undermine probable cause that he knew of Headley's intentions.

15   RANA has introduced an email that he claims demonstrates RANA's

16   financial support of the business, even though Headley had

17   purportedly promised funding from his terrorist contacts.  (See Dkt.

18   77 at 25; Dkt. 77-4.)  RANA admits, however, that when Headley was

19   confronted with this email at the U.S. trial, Headley was uncertain

20   of its contents and described it as "ambiguous."  (See Dkt. 77 at

21   25.)  This ambiguity significantly undermines the value RANA places

22   on it.  More importantly, even if RANA were helping to finance the

23   office in Mumbai, that fact is not critical to determining whether

24   RANA knew of and supported Headley's activities.  As noted above,

25   neither RANA's legitimate business pursuits nor Headley's broken

26   promises preclude a finding that RANA agreed to allow Headley to use

27   his Mumbai office as a cover.

28

1   Accordingly, none of RANA's claims about the Mumbai office

2   negate probable cause.

3                    (B)   RANA's Trip to India After Being Warned of
                           the Attacks Does Not Preclude a Finding of
4                          Probable Cause

5   RANA's claim that he could not have been involved with the

6   conspiracy because it would be illogical for him to travel to India

7   after being warned about the attack also fails.  When Headley learned

8   that RANA was coming to India, he decided to warn RANA through a co-

9   conspirator, who met RANA in Dubai, that an attack may be

10  forthcoming.  (See Dkt. 66-11 at 14-15.)  While the details of the

11  conversation between RANA and the co-conspirator are unknown, the

12  evidence reveals that RANA received the warning but still felt

13  comfortable traveling to Mumbai in early November 2008.[25]  (See Dkt.

14  66-11 at 262-64.)  Thus, it is not clear what information RANA had

15  when he traveled to India shortly before the attacks.  Accordingly,

16  the sole fact that he took a trip to India shortly before the attacks

17  does not preclude a finding of probable cause.

18                   (C)   RANA's Claim that He Did Not Review
                           Headley's Visa Application Is Unsupported by
19                         the Evidence

20  While RANA does not dispute that Headley's visa applications

21  contain false information, he tries to distance himself from

22  Headley's statement that RANA reviewed the forms after Headley

23  completed them.  (See Dkt. 77 at 26-27.)  Specifically, he claims

24  that it is "unlikely that he checked [the applications] for accuracy"

25

26       [25] In its extradition memorandum, the United States mistakenly
    wrote that RANA did not return to India following the warning.  (See
27  Dkt. 67 at 23 n.8.)  However, upon further review of the evidence,
    the United States agrees that RANA returned to India after meeting
28  with the co-conspirator in Dubai, but left India before the Mumbai
    attacks.

1   because he would have corrected an alleged error with the name of

2   RANA's business.  (Id.)  The fact that Headley wrote on his 2006 visa

3   application that he was being sent to India on behalf of "First World

4   Immigration," rather than "Immigrant Law Center," is not persuasive.

5   (See Dkt. 66-10 at 132.)  RANA does not dispute that "First World

6   Immigration" was the name of his business.  While "Immigration Law

7   Center" is a "DBA for Raymond J. Sanders," RANA's business partner,

8   both entities shared the same address and telephone number.  (See

9   Dkt. 66-9 at 69; Dkt. 66-14 at 90.)  Significantly, India issued

10  Headley a business visa, even though he wrote "First World

11  Immigration" on his 2006 visa application and an accompanying support

12  letter from Mr. Sanders referred to the employing entity as

13  "Immigration Law Center."  Thus, RANA's claim does not undermine

14  probable cause and is not persuasive.  Cf. Bingham v. Bradley, 241

15  U.S. 511, 517 (1916) (rejecting challenges to extradition that "savor

16  of technicality").

17       Therefore, RANA is unable to demonstrate that India's

18  extradition request lacks sufficient evidence of probable cause.

19  **III. CONCLUSION**

20       For the foregoing reasons, the United States respectfully

21  requests the certification of fugitive TAHAWWUR HUSSAIN RANA's

22  extradition to India on the offenses for which his extradition has

23  been sought.

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF JOHN J. LULEJIAN

I, John J. Lulejian, declare as follows:

1.    I am an Assistant United States Attorney and have been assigned to prosecute <u>United States v. Tahawwur Hussain Rana, a Fugitive from the Government of the Republic of India</u>, Case No. 2:20-CV-07309-DSF (JC).  I make this declaration in support of the United States' Reply in Support of its Request for Certification of Extradition.

2.    Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Supplementary Opinion of Senior Advocate Dayan Krishnan, dated 03/15/2021, redacted of personal identifiers.  On March 22, 2021, I provided RANA's counsel with an unredacted version of this document. I am informed and believe that India is sending through diplomatic channels Mr. Krishnan's Supplementary Opinion as a supplement to its extradition request.

3.    Attached hereto as <u>Exhibit B</u> is a true and correct copy of the transcript of the change of plea hearing for David Coleman Headley, dated 03/18/2010, in <u>United States v. Headley</u>, Case No. 09 CR 830(3) (N.D. Ill.);

4.    Attached hereto are true and correct copies of the following extradition treaties:

a.    <u>Exhibit C</u>:  Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Italy, U.S.-Italy, Oct. 13, 1983, 35 U.S.T. 3023, <u>as amended by</u> Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the

1  Government of the Italian Republic signed 13 October 1983, U.S.-

2  Italy, May 3, 2006, S. Treaty Doc. No. 109-14 (2006);

3          b.   Exhibit D:  Treaty Between the United States and

4  Czechoslovakia for the Extradition of Fugitives from Justice, U.S.-

5  Czech., July 2, 1925, 44 Stat. 2367, as amended by Supplementary

6  Extradition Treaty Between the United States of America and

7  Czechoslovakia, U.S.-Czech., Apr. 29, 1935, 49 Stat. 3253, and Second

8  Supplementary Treaty on Extradition Between the United States of

9  America and the Czech Republic, U.S.-Czech., May 16, 2006, S. Treaty

10  Doc. No. 109-14 (2006);

11          c.   Exhibit E:  Extradition Treaty Between the

12  United States of America and the United Mexican States, U.S.-Mex.,

13  May 4, 1978, 31 U.S.T. 5059, as amended by Protocol to the

14  Extradition Treaty Between the United States of America and the

15  United Mexican States of May 4, 1978, U.S.-Mex., Nov. 13, 1997, S.

16  Treaty Doc. No. 105-46 (1998);

17          d.   Exhibit F:  Extradition Treaty Between the Government

18  of the United States of America and the Government of the United

19  Kingdom of Great Britain and Northern Ireland, U.S.-U.K., Mar. 31,

20  2003, S. Treaty Doc. No. 108-23 (2004), as amended by Instrument as

21  contemplated by Article 3(2) of the Agreement on Extradition Between

22  the United States of America and the European Union signed 25 June

23  2003, as to the application of the Extradition Treaty Between the

24  Government of the United States of America and the Government of the

25  United Kingdom of Great Britain and Northern Ireland signed 31 March

26  2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006).

27  \\

28  \\

2

5.    Attached hereto as <u>Exhibit G</u> is a true and correct copy of <u>Norris v. United States</u>, [2008] UKHL 16.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this <u>22nd</u> day of March 2021, at Los Angeles County, California.

<i>/s/ John J. Lulejian</i>
JOHN J. LULEJIAN