JS-6

| FILED |
| CLERK, U.S. DISTRICT COURT |
| May 16, 2023 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____KH_____ DEPUTY |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

IN RE THE MATTER OF THE
EXTRADITION OF TAHAWWUR
HUSSAIN RANA,

)
)
)
)
)
)
)
)
)
)

Case No. 2:20-cv-7309-DSF-JC

CERTIFICATION OF
EXTRADITABILITY AND ORDER
OF COMMITMENT

## I.      INTRODUCTION

This is a proceeding under 18 U.S.C. § 3184 pursuant to a request by the Republic of India ("India"), through the United States Government (the "United States" or "Government"), for the extradition of Tahawwur Hussain Rana ("Rana") under the provisions of the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of India, signed on June 25, 1997, S. Treaty Doc. No. 105-30 (1997), entered into force on July 21, 1999 ("Treaty").

On June 10, 2020, the Government filed a Complaint seeking the provisional arrest of Rana with a view towards extradition.  (Dkt. Nos. 1, 4). According to the Complaint, on August 28, 2018, a District and Sessions Judge for the Special Court of National Investigation Agency in New Dehli, India issued a

warrant for Rana, who is being prosecuted in India for a number of offenses related to the November 2008 terrorist attacks in Mumbai, India.  (Dkt. No. 4).  On the same date, the Court issued a warrant for Rana's arrest.  (Dkt. No. 2).  Rana was subsequently arrested, and on July 21, 2020, the Court granted the Government's Request for Detention Pending Extradition.  (Dkt. Nos. 6, 44).

On August 13, 2020, the Government filed a Request for Extradition ("Request") pursuant to 18 U.S.C. § 3184 with accompanying exhibits/attachments, including the Declaration of Tom Heinemann ("Heinemann Decl."), an Affidavit of Superintendent of Police Sanjukta Parasor ("Parasor Aff.") and excerpts of reporter's transcripts ("RT") from United States v. Kashmiri, United States District Court for the Northern District of Illinois, Case No. 1:09-00830 ("NDIL Case").   (Dkt. Nos. 56, 66).  On September 28, 2020, the Government filed an Extradition Memorandum ("Govt. Mem.").  (Dkt. No. 67). Between February 1, 2021 and February 4, 2021, Rana filed an Opposition to the Request with an accompanying Memorandum of Points and Authorities ("Opposition") with exhibits.  (Dkt. Nos. 77, 78).  On March 22, 2021, the Government filed a Reply with the Declaration of John J. Lulejian and exhibits. (Dkt. No. 79).  On April 5, 2021, Rana filed a Surreply, and on April 12, 2021, the Government filed a Surrebuttal with the Second Declaration of John J. Lulejian. (Dkt. Nos. 87-88).  On June 21 and 23, 2021, the Government lodged supplemental exhibits in support of the Extradition Request.  (Dkt. Nos. 89-92).

On June 24, 2021, the Court conducted a hearing pursuant to 18 U.S.C. § 3184, at which Government counsel, Rana, and Rana's counsel appeared.  (See Dkt. No. 98 (Extradition Hearing Transcript ("EHT"))).

On June 25, 2021, the Government filed a Notice of Supplemental Authority supporting its Extradition Request.  (Dkt. No. 93).

On July 15, 2021, the Government and Rana each submitted Proposed Findings of Fact and Conclusions of Law, and on July 21, 2021, the Government

filed a Response to Rana's Proposed Findings on July 21, 2021.  (Dkt. Nos. 100-102).

The Court has reviewed and considered all of the documents submitted in support of and in opposition to the Request, and has considered the arguments presented at the hearing.  Based on such review and consideration and for the reasons discussed herein, the Court makes the findings set forth below, and CERTIFIES to the Secretary of State of the United States the extraditability of Rana on the charged offenses that are the subject of the Request.

## II.    FACTS

Between November 26 and 29, 2008, ten Lashkar-e-Tayyiba ("Lashkar")[1] members carried out coordinated attacks at various locations throughout Mumbai, India, including the Taj Mahal Palace Hotel.  (Parasor Aff. ¶¶ 3, 24, 37).  These attacks killed 166 people, injured 239 people, and resulted in excess of $1.5 billion dollars in property damage.  (Parasor Aff. ¶¶ 24, 37).  The Indian government has charged multiple individuals, including Rana, with crimes related to the attacks, accusing Rana of conspiring with his childhood friend David Coleman Headley, also known as "Daood Gilani," and others to help plan and carry out the Lashkar terrorist attacks in Mumbai.  (Parasor Aff. ¶¶ 3, 28-29, 38).

In particular, on August 28, 2018, Poonam A. Bamba, District and Sessions Judge, Special Court of National Investigation Agency, issued a warrant for Rana's arrest on charges related to the Mumbai attacks, including:  (1) conspiracy to (a) wage war (Object 1), (b) commit murder (Object 3), (c) commit forgery for the purpose of cheating (Object 4), (d) use as genuine a forged document or electronic record (Object 5), and (e) commit a terrorist act (Object 6), in violation

---

[1] The United States has designated Lashkar as a foreign terrorist organization, and Lashkar is banned in India as a designated terrorist group.  (See Parasor Aff. ¶ 25).  There appear to be various spellings of Lashkar.  (See id.).

of Indian Penal Code ("IPC") § 120B[2] read with IPC §§ 121,[3] 302,[4] 468,[5] 471,[6] and

---

[2]Under the IPC, a criminal conspiracy occurs: "When two or more persons agree to do, or cause to be done, – (1) an illegal act, or (2) an act which is not illegal by illegal means[,] . . . [p]rovided that no agreement except an agreement to commit an offence shall amount to a criminal conspiracy unless some act besides the agreement is done by one or more parties to such agreement in pursuance thereof." IPC § 120A. A "party to a criminal conspiracy to commit an offence punishable with death, [] [imprisonment for life] or rigorous imprisonment for a term of two years or upwards, shall, where no express provision is made in [the IPC] for the punishment of such a conspiracy, be punished in the same manner as if he had abetted such offence." IPC § 120B. (Dkt. No. 42-2 at 4-5 (as paginated on the Court's electronic docket)).

[3]Under the IPC: "Whoever wages war against the [] [Government of India], or attempts to wage such war, or abets the waging of such war, shall be punished with death, or [] [imprisonment for life] [] [and shall also be liable to fine]." IPC § 121. (Dkt. No. 42-2 at 5).

[4]Under the IPC, a person is guilty of murder if he performs an act that causes death and "if the act by which the death is caused is done with the intention of causing death, or – [] [i]f it is done with the intention of causing such bodily injury as the offender knows to be likely to cause the death of the person to whom the harm is caused, or – . . . [i]f it is done with the intention of causing bodily injury to any person and the bodily injury intended to be inflicted is sufficient in the ordinary course of nature to cause death, or – . . . [i]f the person committing the act knows that it is so imminently dangerous that it must, in all probability, cause death, or such bodily injury as is likely to cause death, and commits such act without any excuse for incurring the risk of causing death or such injury as aforesaid." IPC § 300. "Whoever commits murder shall be punished with death or [][imprisonment for life], and shall also be liable to fine." IPC § 302. (Dkt. No. 42-2 at 6-8).

[5]Under the IPC: "[Whoever makes any false documents or false electronic record or part of a document or electronic record, with intent to cause damage or injury], to the public or to any person, or to support any claim or title, or to cause any person to part with property, or to enter into any express or implied contract, or with intent to commit fraud or that fraud may be committed, commits forgery." IPC § 463. "Whoever commits forgery shall be punished with imprisonment of either description for a term which may extend to two years, or with fine, or with both." IPC § 465. (Dkt. No. 42-2 at 11-13). Further: "Whoever, by deceiving any person, fraudulently or dishonestly induces the person so deceived to deliver any property to any person, or to consent that any person shall retain any property, or intentionally induces the person so deceived to do or omit to do anything which he would not do or omit if he were not so deceived, and which act or omission causes or is likely to cause damage or harm to that person in body, mind, reputation or property, is said to 'cheat'." IPC § 415. "Whoever commits forgery, intending that the [][document or electronic record forged] shall be used for the purpose of cheating, shall be punished with imprisonment of either description for a term which may extend

(continued...)

4

Unlawful Activities Prevention Act ("UAPA") § 16;[7] (2) waging war, in violation of IPC § 121; (3) conspiracy to wage war, in violation of IPC § 121A;[8] (4) murder, in violation of IPC § 302; (5) committing a terrorist act, in violation of UAPA § 16; and (6) conspiracy to commit a terrorist act, in violation of UAPA § 18.[9]

---

[5](...continued)
to seven years, and shall also be liable to fine." IPC § 468. (Dkt. No. 42-2 at 9, 13).

[6]Under the IPC: "Whoever fraudulently or dishonestly uses as genuine any [][document or electronic record] which he knows or has reason to believe to be a forged [][document or electronic record] shall be punished in the same manner as if he had forged such [][document or electronic record]. IPC § 471. (Dkt. No. 42-2 at 13).

[7]Under UAPA § 16: "(1) Whoever commits a terrorist act shall, – [¶] (a) if such act has resulted in the death of any person, be punishable with death or imprisonment for life, and shall also be liable to fine; [¶] (b) in any other case, be punishable with imprisonment for a term which shall not be less than five years but which may extend to imprisonment for life, and shall also be liable to fine." (Dkt. No. 66-15 at 10).

[8]Under the IPC: "Whoever within or without [] [India] conspires to commit any of the offences punishable by section 121, [] . . . or conspires to overawe, by means of criminal force or the show of criminal force, [] [the Central Government or any [] [State] Government [] . . .], shall be punished with [] [imprisonment for life], or with imprisonment of either description which may extend to ten years, [] [and shall also be liable to fine]. IPC § 121A. (Dkt. No. 42-2 at 5).

[9]Under the UAPA: "Whoever conspires or attempts to commit, or advocates, abets, advises or incites, directs or knowingly facilitates the commission of, a terrorist act or any act preparatory to the commission of a terrorist act, shall be punishable with imprisonment for a term which shall not be less than five years but which may extend to imprisonment for life, and shall also be liable to fine." UAPA § 18. (Dkt. No. 66-15 at 10). The UAPA defines "terrorist act" as:

> Whosoever does any act with intent to threaten or likely to threaten the unity, integrity, security, economic security, or sovereignty of India or with intent to strike terror or likely to strike terror in the people or any section of the people in India or in any foreign country, – (a) by using bombs, dynamite or other explosive substances or inflammable substances or firearms or other lethal weapons or poisonous or noxious gases or other chemicals or by any other substances (whether biological radioactive, nuclear or otherwise) of a hazardous nature or by any other means of whatever nature to cause or likely to cause – [¶] (i) death of, or injuries to, any person or persons; or [¶] (ii) loss of, or damage to, or

(continued...)

1   (Dkt. Nos. 4-1, 42-2, 66-2, 66-6, 66-15; Parasor Aff. ¶¶ 1-5, 12-13).[10]  The Indian
2   Government has provided the following evidence in support of its request to
3   extradite Rana on the aforementioned charges, including transcripts of Headley's
4   testimony in the NDIL Case.

5       Rana and Headley met when they attended a military boarding high school
6   together in Pakistan, became close friends, and remained so for many years.
7   (Parasor Aff. ¶ 29; RT 59-60, 115, 643-46).  After high school, Rana served as a
8   doctor with the rank of Captain in the Pakistan army; however, he later deserted
9   from the army and became a Canadian citizen before moving to Chicago, Illinois
10  and opening several businesses, including the Immigration Law Center, which had
11  offices in Chicago, New York and Toronto.  (Parasor Aff. ¶¶ 29, 38; RT 177, 653-
12  55).  Meanwhile, Headley became involved with heroin trafficking and was twice

15      [9](...continued)
16  destruction of, property; or [¶] (iii) disruption of any supplies or services essential
    to the life of the community in 1ndia or in any foreign country; or [¶]  (iii-a)
17  damage to, the monetary stability of India by way of production or smuggling or
    circulation of high quality counterfeit Indian paper currency, coin or of any other
18  material; or [¶]  (iv) damage or destruction of any property in India or in a foreign
    country used or intended to be used for the defence of India or in connection with
19  any other purposes of the Government of India, any State Government or any of
    their agencies; or [¶]  (b) overawes by means of criminal force or the show of
20  criminal force or attempts to do so or causes death of any public functionary or
    attempts to cause death of any public functionary; or [¶] (c) detains, kidnaps or
21  abducts any person and threatens to kill or injure such person or does any other act
22  in order to compel the Government of India, any State Government or the
    Government of a foreign country or an international or inter-governmental
23  organisation or any other person to do or abstain from doing any act; or [¶]
24  commits a terrorist act.

26  UAPA § 15.  (Dkt. No. 66-15 at 8-9).

27      [10]The United States is not proceeding on several other charges identified in the warrant
    and related documents, and the Court will not further address such charges.  (See Dkt. No. 67 at
28  26).

1  convicted of drug offenses.[11]  (RT 61-62).  Following Headley's 1997 arrest for

2  importing heroin into the United States, Rana posted his house as collateral for

3  Headley's bond.  (RT 63).  Moreover, during their friendship, Rana held money

4  for Headley and sent it to him as needed.  (RT 63-64, 657-58).

5       Headley's involvement with Lashkar predates the Mumbai attacks.  (Parasor

6  Aff. ¶¶ 38; RT 66-67).  In 2000, Headley went to his first Lashkar meeting,

7  listened to speeches about jihad, donated money, and volunteered.  (RT 67-71,

8  660).  Headley moved from the United States to Pakistan in December 2001, and

9  between 2002 and 2005, he attended numerous training courses with Lashkar,

10  including receiving military, intelligence and anti-terrorist training regarding

11  subjects such as weapons, hand-to-hand combat, surveillance, and setting up safe

12  houses in enemy territory.  (RT 71-87, 662, 673-75; Dkt. No. 16-6 at 4-5).

13  Headley moved back to the United States in August 2005, met with Rana, and told

14  Rana about the training he had received from Lashkar, including that he had

15  received, among other things, "weapons training, ambush, raids, [and] military

16  training."  (RT 87-88; Dkt. No. 16-6 at 5).  Headley also informed Rana that

17  Lashkar wanted him (Headley) to go to India for surveillance or an attack, and he

18  was changing his name for that purpose so that "nobody would be able to tell that

19  [Headley] was a Muslim or a Pakistani."  (RT 88-89, 1148; Dkt. No. 16-6 at 5;

20  Parasor Aff. ¶ 39).  Headley legally changed his name to David Coleman Headley

21  in February 2006 and obtained a new passport in that name.  (RT 109-10).

22       In late 2005 or early 2006, Headley met with Lashkar members who ordered

23  him to travel to India to conduct surveillance of places of public use and state and

24  government facilities within that country.  (RT 90, 96, 98, 107, 110-12).  In the

25

26       _____

27       [11]Headley was convicted of offenses related to importing heroin in 1988 and 1997 and
received a four-year sentence for the first conviction and a 15-month sentence for the second
conviction.  (RT 61-62).  In both instances he received leniency for cooperating with
28  investigators.  (RT 62).

spring or early summer of 2006, Headley met with Lashkar members and discussed opening an immigration office in Mumbai, India as cover for his surveillance activities. (RT 112-16). Headley had told Lashkar about his friendship with Rana and Rana's ownership and operation of the Immigration Law Center. (Parasor Aff. ¶ 29; RT 115-17). Headley and his contacts agreed that Rana's business would be an ideal front for their activities because it would allow Headley to travel freely in and out of India and to establish connections with powerful individuals in India. (RT 115-16, 127, 129).

In or about June 2006, Headley traveled to Chicago and met with Rana. (RT 119-20; Dkt. No. 16-6 at 5). Headley told Rana about his association with Lashkar and his orders to conduct surveillance around Mumbai. (RT 120, 126-28; Parasor Aff. ¶ 42). Headley explained that opening an office for Immigration Law Center would provide a cover story for his activities. (RT 128; Dkt. No. 16-6 at 5-6). Headley also told Rana that one of the co-conspirator's could help with Rana's status as a deserter from the Pakistani army. (RT 128-29). After hearing Headley's explanation, Rana agreed to open a Mumbai Branch office of his business to assist Headley.[12] (RT 128-29, 1149; Dkt. No. 16-6 at 6; Parasor Aff. ¶¶ 39, 71(b)). Although Headley had no immigration experience, Rana also helped Headley secure a business visa from Indian authorities as the "Regional Manager" of the Mumbai Office of the Immigration Law Center, with Headley purportedly responsible for supervising and coordinating the company's operations in Asia. (RT 129-30, 135; Parasor Aff. ¶ 62; Dkt. No. 66-9 at 65-71, 130-32). Headley prepared the relevant Indian visa application forms, which contained false information about his identity and purpose for travel to India. (RT 130-32; Dkt. No. 16-6 at 6). Rana reviewed these forms and knew that the

---

[12]One of Headley's co-conspirators who helped plan the Mumbai attacks provided money for the Mumbai branch of the Immigration Law Center, which Headley used for living expenses. (RT 141, 146-47, 159-60; Parasor Aff. ¶ 41).

information Headley had provided was false, but did not correct the forms before submission to the Indian authorities. (RT 132). Rana deceived his business partner – the immigration attorney at Immigration Law Center – to approve the forms. (RT 133-38). Headley presented the forms to the Indian Consulate in Chicago and was granted a business visa. (RT 138-41). Having the office in India and business visa was important for Headley's plans because it allowed him to stay in India long term and perform surveillance. (RT 1149).

Through his unsuspecting business partner, Rana also helped Headley complete an application with the Reserve Bank of India to open the Mumbai branch office of Immigration Law Center. (RT 178-81; Parasor Aff. ¶¶ 40, 63; Dkt. No. 66-9 at 93-110, 135-37). The application stated that Headley would serve as the Immigration Law Center's "South Asian Regional Director" and "Office Head." (RT 180; Dkt. No. 66-9 at 97, 109, 136). The bank ultimately rejected the application. (RT 180; Parasor Aff. ¶¶ 40, 63; Dkt. No. 66-9 at 107).

After Headley obtained the visa, he went to Pakistan and met with Lashkar members and other co-conspirators, informing them that Rana had permitted them to use the Immigration Law Center and showing them the visa he had obtained with Rana's assistance. (RT 141-43; Dkt. No. 16-6 at 6). Headley was instructed to take general videos of Mumbai, including of the Taj Mahal hotel. (RT 143-46). Headley traveled to Mumbai in September 2006 and conducted many hours of video surveillance, including the requested recordings of the Taj Mahal Hotel. (RT 147-51, 164-65; Dkt. No. 16-6 at 6; Parasor Aff. ¶ 39). At that time, Headley "was received by an individual close to Rana" who "is a protected witness who has stated that at the telephonic request of Rana, he arranged accommodations and other logistics for [Headley]." (Parasor Aff. ¶ 67; Dkt. No. 66-9 at 138-42). In early December, Headley traveled to Pakistan, met with Lashkar members and others, provided them with the video recordings he had made, discussed the video and surveillance he had conducted in India, and received instructions to again go

to the Taj Mahal Hotel and visit the second floor to obtain video of the hotel's conference halls since it was believed that some defense contractors or scientists held meetings in those halls.  (RT 163-68).

While in Mumbai in the fall of 2006, Headley also rented an apartment, signed a lease for office space for Rana's immigration business, hired a secretary for the business, put advertisements in newspapers and printed fliers for the business.  (RT 150-52, 157-58; Parasor Aff. ¶ 60; Dkt. No. 66-9 at 76-85).  In signing the lease for office space, Headley used a letter from Rana's business partner claiming that Headley served as the company's South Asian Regional Director, represented the Immigration Law Center's interests in India, Bangladesh, and Pakistan, and had the authority to negotiate contracts, sign an office lease, and open bank accounts on behalf of the business.  (RT 153-57).  During its period of alleged operation, the Mumbai Office of the Immigration Law Center generated little to no business.  (Parasor Aff. ¶¶ 64, 71(c); RT 158-59, 175, 181-82, 194-95, 701, 830-31; Dkt. No. 66-9 at 111-12, 120-29).[13]

---

[13]According to Headley, people sometimes responded to the advertisements he placed, and he would sometimes refer them to Rana for a consultation.  (RT 158-59).  Headley stated there were some very small payments made by clients and that they obtained no visas for any clients in India between October 2006 and September 2007, but they did "servic[e]" some of Rana's clients from Chicago.  (RT 175, 181-82, 194-95).  Headley also stated that if a client paid money and did not receive a visa, the money was returned.  (RT 830-31; see also Dkt. No. 66-9 at 111-12, 120-21 (statements of individuals who paid money to obtain visa from Immigration Law Center's Mumbai office and were refunded money when no visa was obtained)).  The Superintendent of Police in charge of the investigation in India stated that:

> No immigration work whatsoever was actually carried out by [the] office [Headley established for Rana in Mumbai].  Even when the business was visited by interested persons following an advertisement they had made, and the persons paid some money for immigration services, no such service was provided and in fact it was Rana who repaid the amount taken from them.  To maintain the facade of the office Rana had agreed to hire a secretary.  Consequently, Mahrukh Bharucha was appointed as an employee at the Mumbai office.  She has stated that no immigration work had ever taken place from this office.

(Parasor Aff. ¶ 64).

1    At the direction of co-conspirators in Pakistan, Headley returned to Mumbai

2    on multiple other occasions between February 2007 and September 2007,

3    conducted more surveillance of various locations there, including the second floor

4    of the Taj Mahal Palace Hotel, and thereafter traveled to Pakistan, met with

5    Lashkar members and other co-conspirators, provided them with the video

6    recordings he made, and discussed the video and surveillance he conducted in

7    Mumbai.  (RT 158-59, 176-78, 182-86, 191-93; Dkt. No. 16-6 at 7).

8    In July 2007, Headley traveled to Chicago and stayed with Rana.  (RT 185).

9    Headley told Rana about the surveillance he conducted and would continue to

10   conduct in India, including the videos he had taken of the Taj Mahal Palace Hotel.

11   (RT 185-87, 195-96; Dkt. No. 16-6 at 7).  Headley also told Rana about meeting

12   co-conspirators in Pakistan and their reactions regarding the surveillance he

13   conducted.  (RT 186-87, 190; Dkt. No. 16-6 at 7).  Since Headley's Indian visa

14   had expired, Rana helped Headley obtain a new visa by processing the forms

15   through the Immigration Law Center.  (RT 188-90).  The visa application included

16   the same false information previously submitted to the Indian government.  (RT

17   188-90; Parasor Aff. ¶ 62; Dkt. No. 66-9 at 72-75, 133-34).  As a result of Rana's

18   assistance, Headley secured a five-year multi-entry visa from Indian authorities on

19   July 18, 2007.  (RT 189-90).

20   In December 2007, at Lashkar's Pakistan headquarters office, Headley met

21   with co-conspirators who told him about portions of their attack plans and showed

22   him a styrofoam mock-up of the Taj Mahal Palace Hotel.  (RT 199-202, 208).

23   In March 2008, Headley met with other co-conspirators in Pakistan to

24   discuss potential landing sites in Mumbai where a team of attackers could arrive

25   by sea.  (RT 209-13; Dkt. No. 16-6 at 8).  At their direction, Headley returned to

26   Mumbai the following month and conducted additional surveillance, took boat

27   trips in and around the harbor to locate possible landing sites, and used a GPS

28   device to record such locations.  (RT 213-27; Dkt. No. 16-6 at 8).  He returned to

Pakistan and advised his co-conspirators of his recommendations for potential landing sites, but learned that the attack plans would be delayed, in part to await calmer seas.  (RT 230-34; Dkt. No. 16-6 at 8).

In May 2008, Headley met with Rana in Chicago over a period of several days and told Rana about his extensive surveillance in Mumbai, his meetings with co-conspirators in Pakistan, the styrofoam mock-up he had been shown, the landing ideas (including specifically where a team of attackers would land in front of the Taj Mahal Palace Hotel), his boat trips in and around the harbor and use of the GPS device, and the delay of the attack plans, in part to await calmer waters. (RT 236-40, 245-48, 755-58, 767-72, 774-75, 1151; Dkt. No. 16-6 at 8; Parasor Aff. ¶ 43).  Rana smiled and laughed when Headley told him about the landing site in front of the Taj Mahal Palace Hotel and when Headley said he thought the mock-up was "terrible."  (RT 238-40).  Additionally, during May 2008, Headley included Rana with other co-conspirators in email discussions regarding how one of Headley's contacts in India could be used to benefit Lashkar.  (RT 248-79; Dkt. No. 66-9 at 161-66, 168-88, 203-05).

In June 2008, Headley returned to Pakistan and met with his co-conspirators, who gave him a list of targets in Mumbai for surveillance, provided him with a GPS device, and requested that Headley recheck the landing site.  (RT 279-88; Dkt. No. 16-6 at 9).  One of the co-conspirators also told Headley to close the office and take out a newspaper advertisement pretending to be an employment agency looking for people to work as security personnel in Canada since it was felt that this would attract retired military personnel.  (RT 285-86).  A day or two later, after Rana had a discussion with the co-conspirator who had told Headley to close the office, Rana also told Headley to close the office.  (RT 803, 1168, 1180-81).

Headley returned to Mumbai at the end of June or the beginning of July 2008 and began taking steps to close the office and complete the surveillance tasks he had been given, and Rana gave Headley instructions on how he wanted the

12

1   office closed.  (RT 288-95).  However, Headley was unable to close the office

2   because the landlord did not want to refund the deposit.  (RT 295).  Thereafter,

3   Headley consulted Rana, and it was decided to keep the office open until the

4   deposit ran out.  (RT 296).  During this time, another business began sharing the

5   office and paying half of the rent.  (RT 295-96).  After Headley negotiated a short

6   extension, the Mumbai lease expired approximately two weeks before the Mumbai

7   attacks.  (Parasor Aff. ¶¶ 65, 71(c); Dkt. No. 66-9 at 76-85, 90, 118).

8       After leaving India, Headley returned to Pakistan and met with his co-

9   conspirators and gave them the videos he had taken, the GPS device, and some

10  bracelets he had purchased to help disguise the attackers.  (RT 296-98).

11      In the fall of 2008, Headley learned that Rana was planning to go to China,

12  Dubai and India.  (RT 313).  Headley arranged for Rana to meet a co-conspirator

13  in Dubai, where, at Headley's request, the co-conspirator advised Rana not to go

14  to India because the attacks were imminent.  (RT 313-14; Parasor Aff. ¶¶ 44, 60,

15  65).  On September 7, 2009, Rana and Headley discussed this incident during a

16  long conversation that, unbeknownst to them, the FBI recorded ("September 7,

17  2009 conversation"), with Rana confirming the co-conspirator "had mentioned

18  that in Dubai[.]"  (RT 536-37, 560-61; Parasor Aff. ¶¶ 44, 60).

19      As noted above, the Mumbai terrorist attacks occurred between November

20  26 and 29, 2008, killing 166 people, injuring 239 people, and causing significant

21  property damage.[14]  (Parasor Aff. ¶¶ 24, 37).

22      Headley returned to the United States in December 2008, and discussed the

23  attacks with Rana, sharing the details Headley learned from the co-conspirators

24  about the attacks and reminding Rana that he (Headley) had made videos of the

25  locations that had been attacked.  (RT 316, 325, 334, 348-50).  Referring to a 1971

26  attack on his school in Pakistan, Headley told Rana that he believed he was "even

27

28      [14]A stipulation during the trial in the NDIL Case indicated the Mumbai attacks occurred
    between November 26 and 28, 2008, and that 164 people were killed, including six United States
    nationals.  (RT 1201-04).

13

1   with the Indians now." (RT 350). In response, Rana said the Indian people

2   "deserved it." (RT 350).

3          On December 25, 2008, the co-conspirator who met Rana in Dubai sent

4   Headley an email asking "'How's . . . [Rana's] reaction on what all is happening,

5   is he terrified or relaxed?'" (RT 346-48). Headley responded the next day that

6   Rana "'is very relaxed'" and was trying to calm Headley down. (RT 350-52).

7          In the September 7, 2009 conversation, Rana told Headley that the nine

8   Lashkar terrorists who had been killed in the Mumbai attacks "'should be given

9   Nishan-e-Haider,'" which is Pakistan's highest military honor. (RT 552-53;

10  Parasor Aff. ¶ 44). Rana also asked Headley to tell one of the co-conspirator's

11  responsible for planning the Mumbai attacks that he should get "a medal for top

12  class." (RT 553-55). Rana was pleased to learn Headley had already conveyed

13  the compliment based on prior statements Rana had made equating the co-

14  conspirator to a famous general. (Parasor Aff. ¶ 71(g); RT 490-92, 495, 553-55).

15         In 2009, Headley conducted surveillance activities for potential future

16  terrorist attacks in other parts of India as well as for an intended, but ultimately

17  foiled, terrorist plot in Denmark that was meant to retaliate against a Danish

18  newspaper for publishing a cartoon Headley and his co-conspirators found

19  offensive. (See, e.g., RT 317-19, 325, 334, 362-81, 389-91, 396-400, 407-11,

20  417-18, 422-24, 433, 474-86, 1149-50, 1220-25; Dkt. No. 16-6 at 10, 12-17). In

21  India, Headley conducted surveillance on Chabad Houses in Delhi, Goa, and

22  Pushkar as well as the National Defence College ("NDC"), which "teaches courses

23  for high-level Indian Army officers, colonels and up."[15] (RT 330, 405-07, 417-23,

24  1079). He kept Rana apprised of the surveillance activities. (RT 334, 362-68,

25  382-86, 392-93, 436-40, 484-86, 555-59, 815-16, 926, 1149-50; Dkt. No. 16-6 at

26  13-14, 16). For example, in the September 7, 2009 conversation, Headley and

27

28          [15]On cross-examination in the NDIL Case, Headley also stated that he had made a video
    of a fourth Chabad House in Pune. (RT 1079-80).

14

1    Rana discussed targeting the NDC, Rana told Headley that he was already aware

2    that the NDC was a target, and they talked about how such an attack would kill

3    more high-ranking Indian military officials than previous wars between India and

4    Pakistan.  (RT 555-59).  Moreover, Rana set up an email account for Headley so

5    that Headley could communicate securely with Rana,[16] and Headley transferred a

6    list of Chabad houses in India – including the ones he was supposed to conduct

7    surveillance on – into the email account for security purposes.[17]  (RT 410-16; Dkt.

8    No. 66-9 at 153-59, 207-10, 289-95).  Rana also occasionally communicated

9    directly with some of Headley's contacts in Pakistan.  (RT 470-73, 704; Parasor

10   Aff. ¶¶ 41, 61; Dkt. No. 66-9 at 198-02; see also Parasor Aff. ¶ 42 ("Rana was also

11   in direct touch with the . . . handlers for [Headley] and passed on information as

12   and when required.").

13       Headley was arrested in Chicago on October 3, 2009, and Rana was arrested

14   on October 18, 2009.  (RT 57, 638, 1020, 1039, 1381; Dkt. No. 16-6 at 16-17).

15   On January 14, 2010, in the NDIL Case, a First Superseding Indictment was filed

16   against Rana, Headley, and two other co-conspirators, and on April 21, 2011, the

17   operative twelve-count Second Superseding Indictment ("Indictment") was filed in

18   the NDIL Case charging Rana and six co-conspirators with multiple federal

19   offenses relating to the Mumbai attacks and the Denmark plot.[18]  (Dkt. No. 16-2;

20   _____

21       [16]Rana set up this email address and informed Headley of it in a coded email; however,
22   Headley did not understand the code and Rana had to explain it to him in a phone call.  (RT 412-
     14).

23       [17]Headley explained he put the list in an email rather than keeping a handwritten list
24   because "if I was stopped and somebody found a list in my pocket, it would not seem right."  (RT
     415-16).
25

26       [18]On March 18, 2010, in the NDIL Case, Headley pled guilty to, and was convicted of,
27   twelve charges relating to his activities in India and Denmark: (1) conspiracy to bomb places of
     public use in India in violation of 18 U.S.C. § 2332f(a)(2); (2) conspiracy to murder and maim
28   persons in India in violation of 18 U.S.C. § 956(a)(1); (3-8) aiding and abetting the murders of
     six United States nationals in Mumbai, India in violation of 18 U.S.C. § 2332(a)(1);

                                                              (continued...)

NDIL Case Dkt. ("NDIL Dkt.") Nos. 32, 213).  The Indictment charged Rana with three counts:  (1) Count 9 – Conspiracy to Provide Material Support to Terrorism in India in violation of 18 U.S.C. § 2339A – which essentially alleged that Rana conspired to provide material support to Lashkar in connection with such entity's conspiracies to commit the Mumbai attacks as charged against others in Counts 1 and 2, and, as pertinent to sentencing, that death resulted to approximately 164 persons;[19] (2) Count 11 – Conspiracy to Provide Material Support to Terrorism in Denmark in violation of 18 U.S.C. § 2339A – which essentially alleged that Rana conspired to provide material support for a planned attack (which ultimately did

[18](...continued)
(9) conspiracy to provide material support to terrorism in India in violation of 18 U.S.C. § 2339A; (10) conspiracy to murder and maim persons in Denmark in violation of 18 U.S.C. § 956(a)(1); (11) conspiracy to provide material support to terrorism in Denmark in violation of 18 U.S.C. § 2339A; and (12) providing material support to Lashkar in violation 18 U.S.C. § 2339B.  (Dkt. No. 16-6 at ¶¶ 2, 5; Dkt. No. 79-2).  Headley was ultimately sentenced to 35 years in prison.  (NDIL Case, Defendant #3, Dkt. No. 365).

[19]18 U.S.C. § 2339A provides in pertinent part:  "Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [sections 956 or 2332f] of this title . . . or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life."  18 U.S.C. § 2339A(a).

The District Judge in the NDIL Case instructed the jury that "[t]o sustain the charge of conspiracy as alleged in Count [9], the government must prove two elements:  [¶] First, that a conspiracy to provide material support or resources or to conceal or disguise the nature, location, source and ownership of such material support or resources existed, as charged in Count [9]; and [¶] Second, that the defendant became a member of the conspiracy, knowing or intending that the material support or resources provided, or concealed or disguised, were to be used in preparation for, or in carrying out, one of the two conspiracies charged in Counts [1] and [2] of the [] Indictment [i.e., conspiracies to bomb places of public use in India and to murder and maim in India]."  (NDIL Dkt. No. 284 at 19).  He further advised the jury that "[a] conspiracy is an agreement between two or more persons to accomplish an unlawful objective[,]" that "[a] conspiracy may be established even if its purpose is not accomplished," and that "[t]o be a member of a conspiracy, the defendant need not joint at the beginning, or know all the other members or the means by which its purpose was to be accomplished[,]" but that "[t]he government must prove beyond a reasonable doubt that the defendant was aware of the common purpose and was a willing participant."  (NDIL Dkt. No. 284 at 20).

16

not take place) against a private newspaper in Denmark as charged against others in Count 10;[20] and (3) Count 12 – Providing Material Support to Lashkar in violation of 18 U.S.C. § 2339B, which alleged that Rana provided material support to Lashkar, and, as pertinent to sentencing, that death resulted to approximately 164 persons.[21]  (Dkt. No. 16-2; NDIL Dkt. No. 213).

On July 16, 2010 and April 29, 2011, the Government filed two Bills of Particulars supporting its allegations relating to Counts 9, 11 and 12.  (Dkt. No. 16-3; NDIL Dkt. Nos. 109, 223).

---

[20]The District Judge in the NDIL Case instructed the jury that "[t]o sustain the charge of conspiracy as alleged in Count [11], the government must prove two elements: [¶] First, that a conspiracy to provide material support or resources or to conceal or disguise the nature, location, source and ownership of such material support or resources existed, as charged in Count [11]; and [¶] Second, that the defendant became a member of the conspiracy, knowing or intending that the material support or resources provided, or concealed or disguised, were to be used in preparation for, or in carrying out, the conspiracy charged in Count [10] of the [] Indictment." (NDIL Dkt. No. 284 at 26).

[21]Title 18, United States Code section 2339B provides in pertinent part:  "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than [15] years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . , that the organization has engaged or engages in terrorist activity . . . , or that the organization has engaged or engages in terrorism . . . ."  18 U.S.C. § 2339B(a)(1).  In 2015, Section 2339B(a)(1) was amended to replace 15 years with 20 years.

The District Judge in the NDIL Case instructed the jury that "[t]o sustain the charge as alleged in Count [12], the government must prove:  [¶] First, that the defendant knowingly provided material support or resources to *Lashkar e Tayyiba*; and [¶] Second, that the defendant knew that *Lashkar e Tayyiba* was a designated terrorist organization, or knew that *Lashkar e Tayyiba* had engaged in or was engaging in terrorist or terrorism activity; and [¶] Third, that one of the [specified] jurisdictional requirements . . . is satisfied."  (NDIL Dkt. No. 284 at 34).  He further instructed that if the jury found Rana guilty of Count 12, it "must then determine whether the government ha[d] proved that at least one individual died as a result of the conduct charged in Count [12]" and that "[i]n order to find that at least one individual died as a result of the conduct charged in Count [12], the government must prove that the defendant's conduct contributed to an individual's death in the attacks committed by *Lashkar e Tayyiba* in Mumbai, India, in November 2008, even if that conduct by itself would not have caused the death." (NDIL Dkt. No. 284 at 38).

As to Count 9 – which charged Rana with conspiring to provide material support and resources, namely personnel, tangible property, expert advice and assistance, money, and false documentation and identification that were used in connection with the conspiracies to bomb, murder and maim individuals in India as charged in Counts 1 and 2 – the Government identified (1) the personnel to include Headley and Rana; (2) the tangible property to include (a) memory cards containing videos and photographs of various locations in India provided to co-conspirators for the purpose of planning attacks in India; (b) maps and books relating to locations in India provided to co-conspirators for the purpose of planning attacks in India; and (c) red string bracelets obtained by Headley at or near the Siddi Vinayak temple and provided to a co-conspirator for the purpose of disguising the ten attackers described elsewhere in Count 1; (3) the expert advice and assistance to include (a) Rana providing his immigration expertise to assist in obtaining a business visa for Headley to travel to, and work in, India; (b) Rana providing his immigration business expertise to establish and seek the necessary approval to operate an immigration business in Mumbai, India, for the purpose of providing a cover to Headley; and (c) Rana providing his immigration business expertise to maintain and run an immigration business in Mumbai, India, for the purpose of effectuating the cover; (4) the money to include (a) the wiring of money to Headley while in India, including on four specified dates in late 2006; (b) the payment of expenses associated with the Immigrant Law Center in Mumbai, India, which acted as a cover for the surveillance activities of Headley; and (c) the payment of living expenses for Headley in Chicago, Illinois; and (5) the false documentation and identification to include Headley's application for an Indian visa, containing false information.  (Dkt. No. 16-3 at 2-4; NDIL Dkt. Nos. 109 at 1-3 & 223 at 2-3).

As to Count 11 – which charged Rana with conspiring to provide material support and resources, namely personnel, tangible property, expert advice and

assistance, and money that were used in connection with the conspiracy to murder and maim individuals in Denmark as charged in Count 10 – the Government identified (1) the personnel to include Headley and Rana; (2) the tangible property to include memory cards containing videos and photographs of various locations in Denmark provided to co-conspirators for the purpose of planning attacks in Denmark; (3) the expert advice and assistance to include: (a) Rana providing his immigration business expertise to assist in establishing a cover for Headley in Denmark; and (b) Rana providing his immigration business expertise for the purpose of effectuating the cover for surveillance in Denmark; and (4) the money to include the payment of travel expenses associated with Headley's trips to Pakistan, Denmark and other locations in Europe, as well as living expenses for Headley in Chicago, Illinois. (Dkt. No. 16-3 at 4; NDIL Dkt. Nos. 109 at 4 & Dkt. No. 223 at 3-4).

As to Count 12 – which charged Rana with providing material support and resources, namely personnel, currency, expert advice and assistance, tangible property, and false documentation and identification to a foreign terrorist organization, namely *Lashkar e Tayyiba*, the Government incorporated its identification of personnel, currency, expert advice and assistance, tangible property, and false documentation and identification, as stated above in reference to Counts 9 and 11. (Dkt. No. 16-3 at 4-5; NDIL Dkt. Nos. 109 at 4-5 & 223 at 4).

Rana's trial commenced on May 23, 2011. (NDIL Dkt. No. 270). Headley testified as the main prosecution witness. (RT 56-1189). On June 9, 2011, the jury returned its verdicts, acquitting Rana of Count 9 (conspiracy to provide material support to terrorism in India) and convicting Rana of Count 11 (conspiracy to provide material support to terrorism in Denmark) and Count 12 (providing material support to Lashkar), but finding, as to Count 12, that death had not resulted from the conduct charged. (Dkt. No. 16-4; NDIL Dkt. No. 283).

///

19

On September 19, 2011, Rana filed motions for a new trial and for a judgment of acquittal  (NDIL Dkt. Nos. 305-07), which were denied.  (NDIL Dkt. Nos. 331-32, 342-43).  In denying such motions, the District Judge in the NDIL Case addressed Rana's contention that "nearly all of the Government's evidence was from or interpreted by David Headley, and because the jury found Headley not credible, the evidence was insufficient to convict Rana, stating:

> The jury was presented with two very different pictures of Rana:  the man who knowingly supported his lifelong friend as Headley traveled the world plotting and preparing for terrorist attacks, and the ambitious businessman manipulated by a friend into unwittingly providing cover for terrorist plots.  Each side presented evidence to support its account and identified apparent inconsistencies or gaps in the other party's argument.  Ultimately, the Court cannot conclude that no rational jury would accept the Government's version of events and find Rana guilty, and therefore affirms the verdicts.

(NDIL Dkt. No. 343 at 9).

On January 17, 2013, the District Judge in the NDIL Case sentenced Rana to 168 months (14 years) imprisonment on Counts 11 and 12.  (Dkt. No. 16-5; NDIL Dkt. No. 361).  Rana apparently did not appeal his conviction or sentence.  (NDIL Dkt.).

On June 9, 2020, the District Judge in the NDIL Case found that Rana qualified for compassionate release, reduced Rana's sentence to time served and ordered his immediate release while leaving intact all other aspects of his criminal convictions.  (Dkt. No. 16-7; NDIL Dkt. No. 416).  However, as set forth above, Rana was subsequently arrested and detained pending resolution of the extradition request.  (Dkt. Nos. 1-2, 4, 6, 44).

///
///

20

## III.   GOVERNING LEGAL STANDARDS

Extradition is "the surrender by one nation to another of an individual accused or convicted of an offense outside of its own territory, and within the territorial jurisdiction of the other, which, being competent to try and to punish him, demands the surrender."  Terlinden v. Ames, 184 U.S. 270, 289 (1902).  "Authority over the extradition process is shared between the executive and judicial branches."  Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016) (en banc).  An extradition statute, 18 U.S.C. § 3184, confers jurisdiction on "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States"[22] to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State.  18 U.S.C. § 3184;[23] Santos, 830 F.3d at 1000-01; see also Vo v. Benov, 447 F.3d 1235, 1237 (9th Cir.) (An "extradition court . . . exercises very limited authority in the overall

---

[22]The Central District's General Order 05-07 delegates to magistrate judges the authority to hear extradition matters.

[23]  Specifically, 18 U.S.C. § 3184 provides:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, . . . any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States . . . may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, . . . issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate judge, to the end that the evidence of criminality may be heard and considered. . . .  If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, . . . he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

process of extradition[,]" which "'is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function.'" (citation omitted)), <u>cert. denied</u>, 549 U.S. 935 (2006).

Under Section 3184, "the country seeking extradition must first file a request with the State Department." <u>Patterson v. Wagner</u>, 785 F.3d 1277, 1279 (9th Cir. 2015); <u>Santos</u>, 830 F.3d at 990. "If the State Department determines that the request falls within the governing extradition treaty, a U.S. Attorney files a complaint in federal district court indicating an intent to extradite and seeking a provisional warrant for the person sought." <u>Santos</u>, 830 F.3d at 991; <u>Vo</u>, 447 F.3d at 1237. "Upon the filing of a complaint, a judicial officer (typically a magistrate judge) issues a warrant for an individual sought for extradition, provided that an extradition treaty exists between the United States and the country seeking extradition and the crime charged is covered by the treaty." <u>Vo</u>, 447 F.3d at 1237; 18 U.S.C. § 3184. "After the warrant issues, the judicial officer conducts a hearing to determine whether there is 'evidence sufficient to sustain the charge under the provisions of the proper treaty or convention,' or, in other words, whether there is probable cause." <u>Vo</u>, 447 F.3d at 1237 (quoting 18 U.S.C. § 3184); <u>see also</u> <u>Santos</u>, 830 F.3d at 991 ("[T]he extradition court's review is limited to determining, first, whether the crime of which the person is accused is extraditable, that is, whether it falls within the terms of the extradition treaty between the United States and the requesting state, and second, whether there is probable cause to believe the person committed the crime charged."). "If the judge or magistrate judge concludes that 'the crime is extraditable,' and that 'there is probable cause to sustain the charge,' the judge or magistrate judge must certify the extradition." <u>Manta v. Chertoff</u>, 518 F.3d 1134, 1140 (9th Cir. 2008) (quoting 18 U.S.C. § 3184); <u>see also</u> <u>Santos</u>, 830 F.3d at 993 ("If the extradition court determines that there is probable cause to extradite, it enters an order certifying extradition to the Secretary of State, who ultimately decides whether to surrender

1  the individual to the requesting state.").  "After an extradition magistrate certifies
2  that an individual can be extradited, it is the Secretary of State, representing the
3  executive branch, who ultimately decides whether to surrender the fugitive to the
4  requesting country."  Vo, 447 F.3d at 1237.

5  **IV.   DISCUSSION**

6       For the Court to certify Rana as extraditable, the Government must establish
7  that "(1) the extradition judge ha[s] jurisdiction to conduct proceedings; (2) the
8  extradition court ha[s] jurisdiction over the fugitive; (3) the extradition treaty [is]
9  in full force and effect; (4) the crime [falls] within the terms of the treaty; and
10 (5) there [is] competent legal evidence to support a finding of extraditability."
11 Manta, 518 F.3d at 1140; Zanazanian v. United States, 729 F.2d 624, 625-26 (9th
12 Cir. 1984).  "The fifth factor, stated another way, requires [the Court] to consider
13 whether competent legal evidence 'demonstrate[s] probable cause to believe that
14 the accused committed the crime charged' by the foreign nation."  Manta, 518
15 F.3d at 1140 (citation omitted); Zanazanian, 729 F.2d at 626.  "In addition to its
16 probable cause determination, the [Court] must also assess whether any of the
17 applicable treaty provisions bar extradition of the alien for any of the charged
18 offenses."  Barapind v. Reno, 225 F.3d 1100, 1105 (9th Cir. 2000); Patterson, 785
19 F.3d at 1280.

20      Based on the parties' submissions and extradition hearing arguments, the
21 first four factors are undisputed (see EHT 5-8), and, as set out in Part V, infra, the
22 Court finds the Government has established them.[24]  The Court focuses its
23 discussion on two disputed issues:  (1) whether, as Rana contends, the extradition
24 to India is barred under Article 6 of the Treaty, the non bis in idem provision; and

25

26        [24]Rana does not dispute that he has been charged with extraditable offenses that fall
27  within the dual criminality provision (Article 2) of the Treaty.  (See EHT 6).  Rather, as
   discussed below, Rana argues the Treaty's non bis in idem provision, Article 6, precludes his
28  extradition.

23

1    (2) whether, as Rana also argues, the Government has failed to establish probable

2    cause to believe that Rana committed the offenses in issue because the

3    Government's showing almost entirely rests on the uncorroborated and incredible

4    trial testimony of Headley in the NDIL Case.  (Opposition at 3-22).

5           **A.**    **Non Bis in Idem**

6           "Prior Prosecution," also known as prior jeopardy or <u>non bis in idem</u>,[25] "is a

7    concept incorporated in many bilateral extradition treaties . . . which precludes

8    extradition in certain cases where the subject of the extradition request has

9    previously been placed in 'jeopardy' on the same or similar charges."  <u>United

10    States v. Demirtas</u>, 204 F. Supp. 3d 158, 167 (D.D.C. 2016); <u>see also</u> <u>Zhenli Ye

11    Gon v. Holt</u>, 774 F.3d 207, 211 (4th Cir. 2014) (A Treaty's prior prosecution

12    provision "is analogous to our constitutional prohibition on double jeopardy.  In

13    essence, it prevents a fugitive from being tried for the same offense in two

14    different countries."), <u>cert. denied</u>, 576 U.S. 1035 (2015).  Prior prosecution

15    provisions "have become 'common to most extradition treaties.'"  <u>Sindona v.

16    Grant</u>, 619 F.2d 167, 177 (2d Cir. 1980) (citation omitted); <u>see also</u> <u>Elcock v.

17    United States</u>, 80 F. Supp. 2d 70, 75 (E.D.N.Y. 2000) ("[M]any extradition treaties

18    – including virtually all of the United States' extradition treaties negotiated since

19    World War II – contain provisions on double jeopardy.").

20           Article 6 of the Treaty contains a "Prior Prosecution" provision, which

21    states:

22    ///

23    ///

24

25

26         [25]<u>Non bis in idem</u> "means 'not twice for the same thing.'"  <u>Zhenli Ye Gon v. Holt</u>, 774 F.3d 207, 211 (4th Cir. 2014) (citation omitted), <u>cert. denied</u>, 576 U.S. 1035 (2015); <u>see also</u>

27    <u>McKnight v. Torres</u>, 2008 WL 11441887, *6 n.7 (C.D. Cal. 2008) ("*Non bis in idem* means 'not twice for the same thing' and refers to the law forbidding more than one trial for the same

28    offense." (citations omitted)).

1.      Extradition shall not be granted when the person sought has
been convicted or acquitted in the Requested State for the
offense for which extradition is requested.

2.      Extradition shall not be precluded by the fact that the
authorities in the Requested State have decided not to
prosecute the person sought for the acts for which extradition is
requested, or to discontinue any criminal proceedings which
have been instituted against the person sought for those acts.

Rana contends Article 6 bars his extradition since the term "offense" in
Article 6(1) refers to the conduct underlying the charged offense and he has been
tried and found not guilty of the same conduct in the NDIL Case.  (Opposition at
3-15).  Rana bases his argument on "the Treaty's language, the government's
interpretation of Article 6 in Headley's plea agreement, and contemporary practice
under international and Indian law[.]"  (Opposition at 10).

The Government disagrees, arguing the fact that Article 6(1) uses the term
"offense" – rather than "acts" or "conduct" – demonstrates that Article 6(1) was
only intended to bar extradition when a Requesting State seeks extradition of a
person "for the exact same crime" that the person has been convicted or acquitted
of in the Requested State.  (Govt. Mem. at 38-40).  The Government asserts that
the "same elements" test articulated in Blockburger v. United States, 284 U.S. 299
(1932), provides the appropriate standard for determining whether the exact same
crime is involved, and since the charged Indian offenses contain different elements
from the crimes adjudicated in the Northern District of Illinois, Article 6 does not
preclude Rana's extradition.[26]  (Govt. Mem. at 39-40); Blockburger, 284 U.S. at

_____

[26]Among other arguments, Rana asserts, in essence, that the Government should be
judicially estopped from contending that Article 6(1) mandates an elements-based test since "[i]n

(continued...)

1  304.  Accordingly, the Court must consider the meaning of the term "offense" in

2  Article 6(1).

3  "'The interpretation of a treaty . . . begins with its text.'"  Abbott v. Abbott,

4  560 U.S. 1, 10 (2010) (quoting Medellin v. Texas, 552 U.S. 491, 506 (2008)); see

5  also Water Splash, Inc. v. Menon, 137 S. Ct. 1504, 1508-09 (2017) ("In

6  interpreting treaties, "we begin with the text of the treaty and the context in which

7  the written words are used.'" (citation omitted)).  The Court must "give the

8  specific words of the treaty a meaning consistent with the shared expectations of

9

10

11       [26](...continued)
   Headley's plea agreement, the government interpreted 'offense' in Article 6 to refer to conduct."

12  (Opposition at 12-14).  The portion of the plea agreement in question provides:

13       Pursuant to Article 6 of the Extradition Treaty Between the United States and
        the Republic of India, . . . [Headley] shall not be extradited to the Republic of

14      India . . . for any offenses for which he has been convicted in accordance with this
        plea.  [Headley] and the United States Attorney's Office accordingly agree that, if

15      [Headley] pleads guilty to and is convicted of all offenses set out in the
        Superseding Indictment, . . . then [Headley] shall not be extradited to the Republic

16      of India . . . for the foregoing offenses, including conduct within the scope of
        those offenses for which he has been convicted in accordance with this plea, so

17      long as he fully discloses all material facts concerning his role with respect to
        these offenses and abides by all other aspects of this agreement.

18

19

20  (Dkt. No. 16-6 at 20).  The Government disagrees.  (See Reply at 25-28).  Judicial estoppel,
   which "only applies when the positions at issue are clearly contradictory, and the estopped

21  party's conduct involves 'more than mistake or inadvertence,'" is "construed even more narrowly
   when requested against the government."  Audio Technica U.S., Inc. v. United States, 963 F.3d

22  569, 575-76 (6th Cir. 2020) (citations omitted); see also Heckler v. Cmty. Health Serv. of
   Crawford Cnty., Inc., 467 U.S. 51, 60 (1984) ("When the Government is unable to enforce the

23  law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as
   a whole in obedience to the rule of law is undermined.  It is for this reason that it is well settled

24  that the Government may not be estopped on the same terms as any other litigant.").  Here, since
   Headley is not a party before this Court and Rana cites no case law applying judicial estoppel in

25  extradition proceedings, the Court declines Rana's request to interpret Headley's plea agreement

26  to bar Rana's extradition.  See Matter of Knotek, 2016 WL 4726537, *4 n.3 (C.D. Cal. 2016)
   (rejecting attempt to apply judicial estoppel in an extradition proceeding), denial of habeas

27  corpus aff'd, 925 F.3d 1118 (9th Cir. 2019).

28

the contracting parties." <u>Air France v. Saks</u>, 470 U.S. 392, 400 (1985); <u>El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng</u>, 525 U.S. 155, 167 (1999).  The Court is required "to construe extradition treaties liberally."  <u>Manta</u>, 518 F.3d at 1144; <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 293 (1933); <u>United States ex rel. Sakaguchi v. Kaulukukui</u>, 520 F.2d 726, 731 (9th Cir. 1975); <u>see also</u> <u>Elcock</u>, 80 F. Supp. 2d at 79 ("[C]onstruction of an extradition treaty is . . . guided by the familiar rule that the obligations of treaty should be liberally construed to effect their purpose, namely, the surrender of fugitives to be tried for their alleged offenses." (citations and internal quotation marks omitted)).

Article 6 does not bar extradition unless "the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested."  "The use of 'offenses' is common in extradition treaties to which the United States is a party, but its meaning is not always clear."  <u>United States v. Trabelsi</u>, 845 F.3d 1181, 1189 (D.C. Cir.), <u>cert. denied</u>, 138 S. Ct. 194 (2017) (citation omitted); <u>see also</u> <u>In re Gambino</u>, 421 F. Supp. 2d 283, 300 (D. Mass. 2006) ("the term 'same offense' can yield a range of obvious or ordinary meanings" (citing <u>Sindona</u>, 619 F.2d at 177)); <u>Elcock</u>, 80 F. Supp. 2d at 80 (noting "the absence of any generally recognized meaning for the term 'offense' in international law").  Rana asserts that the "text of the Treaty shows that the term 'offense' refers to conduct rather than elements."  (Opposition at 10-12).  In particular, Rana notes that the term "offense" is also used in Article 2(1), the "dual criminality" provision, and in that provision "offense" refers to the conduct charged, not the elements of the crimes being compared.  (Opposition at 10-11); <u>see also</u> <u>Manta</u>, 518 F.3d at 1141 ("Dual criminality exists if the 'essential character' of the acts criminalized by the laws of each country are the same and the laws are 'substantially analogous.'  The name by which the crime is described in each country and the scope of liability need not be the same.  The elements of the crime allegedly committed in a foreign country also need not be identical to the

27

1  elements of the substantially analogous crime." (citations omitted); <u>Clarey v.</u>

2  <u>Gregg</u>, 138 F.3d 764, 766 (9th Cir.) ("The primary focus of dual criminality has

3  always been on the conduct charged; the elements of the analogous offenses need

4  not be identical."), <u>cert. denied</u>, 525 U.S. 853 (1998).  Therefore, Rana contends

5  that since "[t]he normal rule of statutory construction assumes that identical words

6  used in different parts of the same act are intended to have the same meaning[,]"

7  <u>Sorenson v. Sec'y of Treasury</u>, 475 U.S. 851, 860 (1986) (citation and internal

8  quotation marks omitted), "offense" in Article 6(1) must mean "the conduct

9  underlying the previous charge and the charge for which extradition is sought, not

10  . . . the elements of the crimes involved in the two prosecutions."  (Opposition at

11  11).  This Court declines to so conclude.  <u>See</u> <u>In re Gambino</u>, 421 F. Supp. 2d at

12  306-09 (rejecting similar argument and stating "While this court agrees that the

13  treaty should be read in context and as a whole, it cannot overlook the starkly

14  different reasons for the clauses and the principles of dual criminality and

15  extraditable offenses as distinct from the principle of *non bis in idem*.").

16      The presumption Rana relies on "is not absolute.  It yields readily to

17  indications that the same phrase used in different parts of the same statute means

18  different things, particularly where the phrase is one that speakers can easily use in

19  different ways without risk of confusion."  <u>Barber v. Thomas</u>, 560 U.S. 474, 484

20  (2010); <u>see also</u> <u>Atlantic Cleaners & Dyers v. United States</u>, 286 U.S. 427, 433

21  (1932) ("Undoubtedly, there is a natural presumption that identical words used in

22  different parts of the same act are intended to have the same meaning.  But the

23  presumption is not rigid and readily yields whenever there is such variation in the

24  connection in which the words are used as reasonably to warrant the conclusion

25  that they were employed in different parts of the act with different intent.  Where

26  the subject-matter to which the words refer is not the same in the several places

27  where they are used, or the conditions are different, or the scope of the legislative

28  power exercised in one case is broader than that exercised in another, the meaning

well may vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed." (citation omitted)).  In other words, it "is not unusual for the same word to be used with different meanings in the same act, and there is no rule of statutory construction which precludes the courts from giving to the word the meaning which the Legislature intended it should have in each instance."  Atlantic Cleaners & Dyers, 286 U.S. at 433; see also Yates v. United States, 574 U.S. 528, 537 (2015) ("We have several times affirmed that identical language may convey varying content when used in different statutes, sometimes even in different provisions of the same statute."); Vanscoter v. Sullivan, 920 F.2d 1441, 1448 (9th Cir. 1990) ("Identical words appearing more than once in the same act, and even in the same section, may be construed differently if it appears they were used in different places with different intent.").

The Treaty's language favors the Government's interpretation of the term "offense" in Article 6(1).  In particular, while Article 6(1) precludes extradition of someone who has been convicted or acquitted of the "offense" for which extradition is requested, Article 6(2) provides that extradition is not barred when "the authorities of the Requested State have decided not to prosecute the person sought ***for the acts for which extradition is requested***. . . ."  (emphasis added).  The use of both "offense" and "acts" in Article 6 suggests the term "offense" must encompass more than simply the acts or conduct underlying the offense.[27]  See

---

[27]During the extradition hearing, Rana disagreed, suggesting the term "acts" in Article 6(2) had the same meaning as the term "offense" in Article 6(1) and that the use of such different terms in the same Article was "sort of clumsy draftsmanship."  (EHT 29).  This Court declines to so conclude, particularly as the same offense/acts distinction has been used in other treaties.  See, e.g., Ramanauskus v. United States, 526 F.3d 1111, 1113-14 (8th Cir. 2008) (discussing the "Prior Prosecution" provision of the Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Lithuania, which states in Article 5(1) that "Extradition shall not be granted when the person sought has been convicted or acquitted in

(continued...)

1   Saks, 470 U.S. at 398 (use of different terms in related parts of a treaty "implies

2   that the drafters . . . understood the word[s] . . . to mean something different. . . ,

3   for they otherwise logically would have used the same word"); Hosaka v. United

4   Airlines, Inc., 305 F.3d 989, 995 (9th Cir. 2002) (describing this implication as "a

5   sound principle of treaty construction"), cert. denied, 537 U.S. 1227 (2003).  "The

6   most natural reading of 'offense,' as distinct from 'acts,' is that 'offense' refers to

7   the definition of the crime itself.  This weighs heavily in favor of the government's

8   elements-based *Blockburger* approach."[28]  Zhenli Ye Gon, 774 F.3d at 215.[29]

---

[27](...continued)
the Requested State ***for the offense for which extradition is requested***" and in Article 5(2)(a)
that "Extradition shall not be precluded by the fact that the competent authorities of the
Requested State have decided . . . not to prosecute the person sought for ***the acts for which
extradition is requested***" (emphasis added)); Extradition Treaty Between the Government of the
United States of America and the Republic of Columbia, Article 5(1) ("Extradition shall not be
granted when the person sought has been tried and convicted or acquitted by the Requested State
***for the offense for which extradition is requested***." (emphasis added)), Article 5(2) ("The fact
that the competent authorities of the Requested State have decided not to prosecute the person
sought for ***the acts for which extradition is requested*** or decided to discontinue any criminal
proceedings which have been initiated shall not preclude extradition." (emphasis added)).

[28]Other extradition treaties have non bis in idem provisions that specifically mention
underlying acts or conduct.  For instance, Article 6 of the Extradition Treaty between the United
States and Italy provides that "Extradition shall not be granted when the person sought has been
convicted, acquitted or pardoned, or has served the sentence imposed, by the Requested Party ***for
the same acts*** for which extradition is requested." (Dkt. No. 79-3 (emphasis added)).  This
demonstrates that the United States and its treaty partners know how to draft broader non bis in
idem provisions that specifically refer to acts or conduct when they intend to do so, see Elcock,
80 F. Supp. 2d at 79 ("[I]t appears relatively clear that use of the term 'same acts' in a *non bis in
idem* clause confers broader protection against extradition than a clause that uses the term 'same
offense[.]'" (citations omitted)), and suggests that such intent was lacking here.

[29]In Sindona, the Second Circuit declined to apply a same elements analysis to a non bis
in idem provision that stated that extradition shall not be granted "(w)hen the person whose
surrender is sought is being proceeded against or has been tried and discharged or punished in the
territory of the requested Party for the offense for which his extradition is requested."  Sindona,
619 F.2d at 176-79.  Instead, the Sindona Court approved a test asking "'whether the same
conduct or transaction underlies the criminal charges in both transactions.'"  Id. at 178.  The

(continued...)

"While '[t]he interpretation of a treaty . . . begins with its text,' it does not end there."  Patterson, 785 F.3d at 1281 (quoting Medellin, 552 U.S. at 506). Rather, "[b]ecause a treaty ratified by the United States is 'an agreement among sovereign powers,' [the Supreme Court has] also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations."  Medellin, 552 U.S. at 507 (citations omitted); see also United States v. Stuart, 489 U.S. 353, 366 (1989) ("Nontextual sources . . . often assist us in 'giving effect to the intent of the Treaty parties,' such as a treaty's ratification history and its subsequent operation[.]" (citation omitted)); Patterson, 785 F.3d at 1281-82 ("Because the purpose of treaty interpretation is to 'give the specific words of the treaty a meaning consistent with the shared expectations of the contracting parties,' courts – including our Supreme Court – look to the executive branch's interpretation of the issue, the views of other contracting states, and the treaty's negotiation and drafting history in order to ensure that their interpretation of the text is not contradicted by other evidence of intent.").  Here, such evidence provides further support for the Government's interpretation of Article 6.  Id.

In particular, in connection with the Treaty's ratification, the Departments of State and Justice provided the Senate Committee on Foreign Relations with a section-by-section technical analysis of the Treaty ("Analysis").  Extradition

---

[29](...continued)
Court declines to apply Sindona for the reasons set forth in Zhenli Ye Gon.  See Zhenli Ye Gon, 774 F.3d at 216-17; see also McKnight, 2008 WL 11441887 at *6, *9 n.9 (rejecting application of Sindona to a non bis in idem provision stating that "'[e]xtradition shall not be granted when the person sought has been finally convicted or acquitted in the Requested State for the offense for which extradition is requested'" and concluding that "[t]o the extent that the parties contemplated principles of double jeopardy as applied in the United States in using the word 'offense' in [the non bis in idem] provision, it appears . . . that the parties intended for this word to refer to crimes having the same elements, rather than to crimes arising from the same conduct.").

31

Treaty With India, S. Exec. Rep. No. 105-23, 105th Cong., 2d Sess. (1998); (see Dkt. 26-5).  With regard to Article 6, the Analysis states, in pertinent part:

> This article permits extradition when the person sought is charged by each Contracting State with different offenses arising out of the same basic transaction.  [¶]  Paragraph 1, which prohibits extradition if the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested, is similar to language present in many U.S. extradition treaties. ***This provision applies only when the person sought has been convicted or acquitted in the Requested State of exactly the same crime that is charged in the Requesting State.  It is not enough that the same facts were involved.  This article will not preclude extradition in situations in which the fugitive is charged with different offenses in both countries arising out of the same basic transaction***.  Thus, if the person sought is accused by one Contracting State of illegally smuggling narcotics into that country, and is charged by the other Contracting State with conspiring to illegally export the same shipment of drugs, an acquittal or conviction in one Contracting State does not insulate that person from extradition because different crimes are involved.

(Dkt. 26-5 at 16 (emphasis added; footnote omitted) (as paginated on the Court's electronic docket)).  The Analysis, which is entitled to "great weight" and "substantial deference," see Abbott, 560 U.S. at 15 ("[T]he Executive Branch's interpretation of a treaty 'is entitled to great weight.'" (citation omitted)); Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); Zhenli Ye Gon, 774 F.3d at 215 ("State Department treaty

interpretations are entitled to 'substantial deference' from the courts." (citation omitted)), supports application of an elements-based test.[30]  See Trabelsi, 845 F.3d at 1190 ("The legislative history surrounding the Extradition Treaty's ratification . . . supports interpreting the Treaty to apply to offenses, not conduct" since the Senate Committee on Foreign Relations Executive Report "explains that '[t]his paragraph permits extradition . . . if the person sought is charged in each Contracting State *with different offenses arising out of the same basic transaction.*'" (citation omitted; italics in original)); Zhenli Ye Gon, 774 F.3d at 215 ("[T]he State Department has interpreted . . . 'offense'-based Non Bis In Idem provisions in other treaties to call for a *Blockburger* analysis."); Elcock, 80 F. Supp. 2d at 83 ("[T]he Department of State has clearly expressed its view that 'offense'–based double jeopardy provisions . . . apply only where the elements of the crimes charged in the domestic prosecution and the extradition request are the same, regardless of whether the underlying facts are the same[.]").

Finally, as noted above, the Court is required to construe extradition treaties liberally.  Factor, 290 U.S. at 293; Manta, 518 F.3d at 1144.  "The more liberal interpretation typically favors . . . extradition inasmuch as the purpose of an extradition treaty is to facilitate extradition."  In re Gambino, 421 F. Supp. 2d at 310; Factor, 290 U.S. at 293-94; see also Cornejo v. Cnty. of San Diego, 504 F.3d 853, 860 n.12 (9th Cir. 2007) ("[T]he terms of a treaty are by canon and international convention construed in light of the treaty's object and purpose[.]"); Hosaka, 305 F.3d at 996 ("Where the text of a treaty is ambiguous, we may look to the purposes of the treaty to aid our interpretation."); Martinez v. United States, 828 F.3d 451, 463 (6th Cir.) (en banc) ("[A]mbiguity in an extradition treaty must be construed in favor of the 'rights' the 'parties' may claim under it.  The parties

---

[30]Rana asserts that the Analysis is "merely ipse dixit from unidentified DOJ and DOS employees" that "deserves no deference from this Court."  (Surreply at 7-8; see also EHT at 24-25).  Rana cites no authority for this assertion, which is contrary to the cases discussed herein.

to the treaty are countries, and the right the treaty creates is the right of one country to demand the extradition of fugitives in the other country – 'to facilitate extradition between the parties to the treaty.'. . . *Factor* requires courts to 'interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories.'  The point of an extradition treaty after all is to facilitate extradition, as any country surely would agree at the time of signing." (citations omitted)), <u>cert. denied</u>, 137 S. Ct. 243 (2016).  In this case, "because *Blockburger* affords a narrower protection. . . , it will permit extradition more readily than any other viable interpretation of Article [6], and, as such, is to be preferred under the 'familiar rule' of liberal treaty construction[.]"[31]  <u>Elcock</u>, 80 F.

---

[31]Rana argues that international law and Indian law support the conclusion that "Article 6 intends 'offense' to be defined in terms of conduct rather than elements."  (Opposition at 14).  Rana bases this argument on a document entitled Expert Report by Paul Garlick, QC.  (<u>Id.</u> at 14 & Exh. B).  Rana notes that:

> Mr. Garlick opines that "in accordance with the rules applicable to the interpretation of extradition treaties, Article 6 should be interpreted as meaning prosecuted by the requested state for the same conduct."  Turning to Indian law, Mr. Garlick declares that "the intention of the Government of India when negotiating the terms of The Treaty must have been that the word 'offense' in Article 6 of The Treaty should be interpreted as referring to the underlying conduct, rather than the elements of the alleged extradition offense."  Mr. Garlick concludes:  "For all the reasons stated above, it is my opinion that as a matter of international extradition law, the word 'offense' in Article 6 of The Treaty refers to the conduct underlying the alleged extradition crimes in the request for extradition and not to the elements of the alleged extradition crimes."

(<u>Id.</u> at 14 quoting Exh. B, ¶¶ 5, 73-74).  Rana concludes that Garlick's opinion "further undermines the government's reliance on *Blockburger*."  (<u>Id.</u> at 14).  The Court is not persuaded. Among other things, Garlick attacks the Government's interpretation of Article 6(1) in this matter, contending it is "not tenable" given the interpretation of offense in Article 2.  (<u>Id.</u>, Exh. B, ¶¶ 6-11).  In so doing, Garlick does not address, among other things, the use of the term "acts" in Article 6(2) or the different purposes behind Articles 2 and 6.  In any event, the Court has rejected this argument above and need not repeat the analysis here.  Additionally, Garlick asserts that it is improper for the Court to rely on the Senate Executive Report (including the Analysis of

(continued...)

34

1    Supp. 2d at 83.

2          For these reasons, the Court agrees with the Government that application of

3    an elements-based test is appropriate here, and that <u>Blockburger</u> supplies the

4    appropriate standard. <u>Zhenli Ye Gon</u>, 774 F.3d at 217; <u>Elcock</u>, 80 F. Supp. 2d at

5    83.

6          Nevertheless, Rana claims the Court should ignore <u>Blockburger</u> because

7    under United States double jeopardy law, <u>Blockburger</u> is inapplicable in

8    determining whether two conspiracies charged in successive prosecutions

9    constitute the same offense for double jeopardy purposes.  (Opposition at 4-10).

10   Instead, Rana asserts that the Court should apply a multi-factor test, known in the

11   Ninth Circuit as the <u>Arnold</u>[32] test, that "focuses on the underlying conduct."

12   (Opposition at 4-10).  "[U]nder the <u>Arnold</u> test, '[the Court] consider[s] five

13   factors:  (1) the differences in the periods of time covered by the alleged

14   conspiracies; (2) the places where the conspiracies were alleged to occur; (3) the

15   persons charged as coconspirators; (4) the overt acts alleged to have been

16   committed; and (5) the statutes alleged to have been violated.'" <u>United States v.</u>

17   <u>Ziskin</u>, 360 F.3d 934, 944 (9th cir. 2003) (citation omitted); <u>United States v.</u>

18

19          [31](...continued)

20   the Treaty) despite the various authorities the Court cited indicating that the Report and Analysis
     are entitled to great weight and substantial deference.  (<u>Id.</u>, Exh. B, ¶ 26).  Ironically, Garlick

21   makes this argument shortly after citing a separate portion of the Senate Executive Report to

22   "affirm[] that the test for dual criminality is the conduct test. . . ."  (<u>Id.</u>, Exh. B, ¶¶ 24-25).
     Moreover, Garlick's analysis of Indian law relies heavily on a dissenting opinion (<u>Id.</u>, Exh. B,

23   ¶¶ 58, 66), and is disputed by the analyses of Dayan Krishnan, Senior Advocate Special Public
     Prosecutor, National Investigation Agency, who identifies multiple Indian authorities

24   contradicting Garlick's analysis and concludes that "[t]he fundamental premise of Mr. Garlick's
     opinion, that Indian law accepts the 'conduct test' is factually . . . incorrect" and that "it has been

25   the consistent view of the courts in India that the 'elements test' should be adopted and not the

26   'conduct test' as suggested by Mr. Garlick."  (Dkt. Nos. 79-1, 66-7).

27          [32]<u>See</u> <u>Arnold v. United States</u>, 336 F.2d 347, 350 (9th Cir. 1964), <u>cert. denied</u>, 380 U.S.

28   982 (1965).

1   Smith, 424 F.3d 992, 1000 (9th Cir. 2005), cert. denied, 547 U.S. 1008 (2006) &

2   547 U.S. 1073 (2006).  The Court disagrees.  As discussed herein, the Court's

3   decision to apply an elements-based test is based on its analysis of the Treaty's

4   text and purpose as well as the executive branch's analysis of the Treaty – not

5   United States double jeopardy law, see Elcock, 80 F. Supp. 2d at 83 ("The

6   Blockburger test is not adopted here because it is the current domestic law of the

7   United States, nor under any claim that it represented the full extent of double

8   jeopardy law at the time the Treaty was signed.  Rather, in the absence of any

9   precise objective meaning of non bis in idem in international law or any relevant

10  travaux preparatoires, Blockburger is adopted out of deference to the Executive

11  Branch's interpretation of like provisions in other extradition treaties and its

12  consistency with the principle of liberal construction in favor of extradition."),

13  which if applied in toto would not benefit Rana in any event.  See Commonwealth

14  of Puerto Rico v. Sanchez Valle, 136 S. Ct. 1863, 1870 (2016) ("[T]wo

15  prosecutions, this Court has long held, are not for the same offense if brought by

16  different sovereigns – even when those actions target the identical criminal

17  conduct through equivalent criminal laws.  As we have put the point:  '[W]hen the

18  same act transgresses the laws of two sovereigns, it cannot be truly averred that

19  the offender has been twice punished for the same offence; but only that by one act

20  he has committed two offences.'  The Double Jeopardy Clause thus drops out of

21  the picture when the 'entities that seek successively to prosecute a defendant for

22  the same course of conduct [are] separate sovereigns.'" (citations omitted));

23  Elcock, 80 F. Supp. 2d at 75 ("The Fifth Amendment's protection against double

24  jeopardy extends only to successive prosecutions brought by the same sovereign.

25  As a result, the Double Jeopardy Clause of the Constitution does not prevent

26  extradition from the United States for the purpose of a foreign prosecution

27  following prosecution in the United States for the same offense." (citations

28  omitted)).  Moreover, the Ninth Circuit applies the Arnold test "in cases where

36

1  multiple conspiracies were charged, either consecutively or simultaneously, under

2  the same conspiracy statute[,]" United States v. Montgomery, 150 F.3d 983, 990

3  (9th Cir.), cert. denied, 525 U.S. 917 (1998) & 525 U.S. 989 (1998); United States

4  v. Luong, 393 F.3d 913, 916 (9th Cir. 2004), cert. denied, 544 U.S. 1006 (2005) &

5  544 U.S. 1009 (2005); see also Albernaz v. United States, 450 U.S. 333, 344 n.3

6  (1981) (rejecting contention of petitioners, who were convicted of conspiracy to

7  import marijuana in violation of 21 U.S.C. § 963 and conspiracy to distribute

8  marijuana in violation of 21 U.S.C. § 846, that a single conspiracy which violates

9  both § 846 and § 963 constitutes the "same offense" for double jeopardy purposes,

10  stating "the established test for determining whether two offenses are the 'same

11  offense' is the rule set forth in *Blockburger*. . . .  As has been previously discussed,

12  conspiracy to import [marijuana] in violation of § 963 and conspiracy to distribute

13  [marijuana] in violation of § 846 clearly meet the *Blockburger* standard.  It is well

14  settled that a single transaction can give rise to distinct offenses under separate

15  statutes without violating the Double Jeopardy Clause.  This is true even though

16  the 'single transaction' is an agreement or conspiracy."), which is clearly not the

17  case here.

18       Application of the Blockburger test yields the conclusion that Article 6 of

19  the Treaty does not bar Rana's extradition to India.  Indeed, since Rana "does not

20  contest that under a *Blockburge*r analysis, the [Indian] offenses . . . do not

21  constitute the same 'offense' as the American [conspiracy] charge[s,]" the Court

22  holds that Article 6 of the Treaty does not bar [Rana's] extradition." Zhenli Ye

23  Gon, 774 F.3d at 217; Blockburger, 284 U.S. at 304; Elcock, 80 F. Supp. 2d at 84-

24  85; (see also EHT at 8) (Rana's counsel agreeing that if court adopts elements

25  approach, Article 6 does not bar prosecution).

26       **B.**    **Probable Cause**

27       The Court cannot certify Rana's extradition unless there is probable cause to

28  believe he committed the offenses for which extradition is sought.  Santos, 830

F.3d at 991; see also Treaty, Article 9(3)(c) (An extradition request must be supported by "such information as would justify the committal for trial of the person if the offense has been committed in the Requested State."); Santos, 830 F.3d at 1006 (The Court's "'function in an extradition hearing is . . . to ensure that our judicial standard of probable cause is met by the Requesting Nation.'" (citation omitted)); Barapind v. Enomoto, 400 F.3d 744, 747 (9th Cir. 2005) (en banc) (per curiam) ("Certification of extradition is lawful only when the requesting nation has demonstrated probable cause to believe the accused person is guilty of committing the charged crimes."); Quinn v. Robinson, 783 F.2d 776, 783 (9th Cir.) ("In addition, there must be evidence that would justify committing the accused for trial under the law of the nation from whom extradition is requested if the offense had been committed within the territory of that nation. United States courts have interpreted this provision in similar treaties as requiring a showing by the requesting party that there is probable cause to believe that the accused has committed the charged offense." (citations omitted)), cert. denied, 479 U.S. 882 (1986).  The probable cause standard requires the Court to determine "'whether there [is] any evidence warranting the finding that there [is] a reasonable ground to believe the accused guilty.'" Mirchandani v. United States, 836 F.2d 1223, 1226 (9th Cir. 1988) (quoting Fernandez v. Phillips, 268 U.S. 311, 312 (1925)); see also Emami v. U.S. Dist. Court for N. Dist. of Cal., 834 F.2d 1444, 1452 (9th Cir. 1987) ("An extradition proceeding is not a trial; the relevant determination is confined to whether a prima facie case of guilt exists that is sufficient to make it proper to hold the extraditee for trial.").  In making this determination, the Court "does not weigh conflicting evidence and make factual determinations but, rather, determines only whether there is competent evidence to support the belief that the accused has committed the charged offense." Quinn, 783 F.2d at 815; see also Santos, 830 F.3d at 991-92 (The "'function of the committing magistrate is to determine whether there is competent evidence to

justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction.'" (quoting Collins v. Loisel, 259 U.S. 309, 316 (1922)); Barapind, 400 F.3d at 750 ("[E]xtradition courts 'do[] not weigh conflicting evidence' in making their probable cause determinations[.]" (citation omitted)).

"Given the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply." Santos, 830 F.3d at 992; Fed. R. Evid. 1103(d)(3) ("These rules – except for those on privilege – do not apply to the following . . . extradition or rendition[.]"); Fed. R. Crim. P. 1(a)(5)(A) (Federal Rules of Criminal Procedure do not govern extradition proceedings); Matter of Requested Extradition of Smyth, 61 F.3d 711, 720-21 (9th Cir. 1995) ("[T]he rules of evidence and civil procedure that govern federal court proceedings heard under the authority of Article III of the United States Constitution do not apply in extradition hearings that are conducted under the authority of a treaty enacted pursuant to Article II."), amended by, 73 F.3d 887 (9th Cir. 1995), cert. denied, 518 U.S. 1022 (1996).  "Instead, 18 U.S.C. § 3190 provides that evidence may be admitted as long as the evidence is authenticated and would 'be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped.'"   Santos, 830 F.3d at 992 (quoting 18 U.S.C. § 3190);[33] see also Manta, 518 F.3d at 1146 ("The usual rules

---

[33]In its entirety, Section 3190 states that:

Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

18 U.S.C. § 3190.

1   of evidence do not apply in extradition hearings and, unless the relevant treaty
2   provides otherwise, the only requirement for evidence is that it has been
3   authenticated."); Oen Yin-Choy v. Robinson, 858 F.2d 1400, 1406 (9th Cir. 1988)
4   ("[A]uthentication is the only requirement for admissibility of evidence under
5   general United States extradition law."), cert. denied, 490 U.S. 1106 (1989).  This
6   means, among other things, that "unsworn hearsay statements contained in
7   properly authenticated documents can constitute competent evidence to support a
8   certificate of extradition."  Artukovic v. Rison, 784 F.2d 1354, 1356 (9th Cir.
9   1986); see also Then v. Melendez, 92 F.3d 851, 855 (9th Cir. 1996) ("[H]earsay
10  evidence is admissible to support a probable cause determination in an extradition
11  hearing[.]"); Emami, 834 F.2d at 1451 ("[I]t has been repeatedly held that hearsay
12  evidence that would be inadmissible for other purposes is admissible in extradition
13  proceedings."); Quinn, 783 F.2d at 815-16 ("Barring hearsay from extradition
14  proceedings would thwart one of the objectives of bilateral extradition treaties by
15  requiring the requesting nation to send its citizens to the extraditing country to
16  confront the accused."); Zanazanian, 729 F.2d at 627 (multiple hearsay can be
17  competent evidence in an extradition matter).

18      Rana argues that the Government has failed to establish probable cause to
19  believe that Rana committed the offenses in issue because the Government's
20  showing almost entirely rests on the uncorroborated and incredible trial testimony
21  of Headley in the NDIL Case.  Rana does not otherwise argue that the
22  Government's probable cause showing is deficient.  (See EHT at 7).  He asserts
23  that the government's probable cause theory is supported by "two essential pillars"
24  – first, "Headley told Rana he was working with Lashkar, including in preparation
25  for the Mumbai attack"; and second "Rana furthered Headley's efforts on
26  Lashkar's behalf by, for example, opening the Mumbai office of Immigration Law
27  Center to provide cover for Headley's surveillance of potential attack sites and
28  helping Headley obtain a business visa for India through the submission of false

documents" – and probable cause is lacking because both pillars rely on "Headley's uncorroborated and at times demonstrably false testimony."[34] (Objections at 15-22; EHT at 7).

The Government counters that this Court cannot consider Headley's credibility because "credibility determinations are outside the scope of an extradition proceeding." (Govt. Mem. at 19-20; Reply at 36-41; see also EHT 79-80). To support this argument, the Government quotes Santos for the proposition that "an individual contesting extradition may not . . . call into question the credibility of the government's offer of proof." (Govt. Mem. at 19-20; EHT at 79). However, the Government's citation omits an important portion of this quotation. The complete citation states "an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof." Santos, 830 F.3d at 993. This line is part of the Santos Court's broader discussion of "explanatory" and "contradictory" evidence, which notes that "[t]he Supreme Court has drawn a distinction between evidence 'properly admitted in behalf of the [accused] and that improperly admitted.' Evidence that may be admitted is evidence that 'explain[s] matters referred to by the witnesses for the government,' while 'evidence in defense' that merely 'contradict[s] the testimony for the prosecution' may be

---

[34]Rana also argues that several aspects of the government's second pillar are demonstrably incorrect. (Objections at 17-21). But these contentions primarily involve alternate interpretations of the evidence – such as Rana's contention that the Dubai warning suggests that Rana was unaware of Headley's plans (id. at 20) – that do not negate probable cause. For instance, Rana challenges the assertion that the Mumbai office did no business. (Id. at 17-18). However, there is evidence to support this statement. (See Parasor Aff. ¶¶ 64, 71(c) (noting that the individual hired as the Mumbai office's secretary "has stated that no immigration work had ever taken place from [the Mumbai] office"). Moreover, the Mumbai office could have served as a front for Headley's activities regardless of whether some, minimal or no work was performed in the Mumbai office. Accordingly, these arguments do not demonstrate a lack of probable cause.

excluded[.]" Id. at 992 (citations omitted); see also Barapind, 400 F.3d at 750 ("[E]xtradition courts "do[ ] not weigh conflicting evidence" in making their probable cause determinations[.]" (quoting Quinn, 783 F.2d at 815)).  Here, however, the distinction has limited relevance since Rana did not submit the evidence in issue.  Instead, the Government provided the entirety of Headley's testimony in the NDIL Case in support of the extradition request.  Accordingly, the Court rejects the contention that it cannot consider this evidence in determining whether there is probable cause to support the extradition request. See Quinn, 783 F.2d at 815 ("The credibility of witnesses and the weight to be accorded their testimony is solely within the province of the extradition magistrate."); United States v. Kin-Hong, 110 F.3d 103, 120 (1st. Cir. 1997) ("Inherent in the probable cause standard is the necessity of a determination that the evidence is both sufficiently reliable and of sufficient weight to warrant the conclusion."); Matter of Extradition of Santos, 228 F. Supp. 3d 1034, 1054 (C.D. Cal. 2017) ("Although an extradition court is not authorized to conduct a mini-trial, it still must determine the competency of evidence – a determination which involves assessing the credibility of the government's evidence."); In re Extradition of Singh, 124 F.R.D. 571, 577 (D. N.J. 1987) ("[W]hen a court in an extradition proceeding is presented with evidence through affidavits, the court may conclude, on review of the affidavits submitted, that there are insufficient indicia of reliability or credibility to establish probable cause."); Matter of Extradition of Ameen, 2021 WL 1564520, *12 (E.D. Cal. 2021) ("[I]mplicit in the purpose of [extradition] probable cause proceedings is the court's ability to reject witness testimony for want of reliability.  The court does not determine guilt or innocence, true, but it must assure itself that the standards for probable cause under United States law are satisfied.").

There is no doubt that Headley lied to investigators when first arrested.  He testified that he initially lied in an attempt to shield the people he cares about – his

wife, his uncle, his brother, and Rana, who was his best friend – from the consequences of his actions.  (RT 641-43, 1053-54, 1067, 1070).  Indeed, Headley only implicated Rana after he learned Rana had been arrested.  (RT 1074).  Headley also lied about the extent of his connections with one of the named co-conspirators, an individual who was "very influential . . . in al Qaeda."[35] (RT 400-01, 1053).  Nevertheless, Headley's testimony is not the only evidence the Government presented to support its case.[36]  As detailed in Part II, in addition to Headley's trial testimony, the Government supported its probable cause

_____

[35]Rana highlights other purported Headley falsehoods (see Opposition at 16 n.8), such as Headley lying to his first wife about his second wife (see RT 1126-30), but they do not alter the Court's analysis.

[36]As noted above, Rana was partially acquitted in the NDIL Case.  He does not assert that the partial acquittal means there is a lack of probable cause to support his extradition.  (EHT at 75).  Nevertheless, he does repeatedly assert that the jury rejected Headley's testimony.  (See, e.g., Objections at 16, 21).  But this is not necessarily so.  Headley testified against Rana on all three charges against him in the NDIL Case, and the jury, which was instructed to view Headley's testimony "with caution and great care[,]" convicted Rana of two of the three charges. (NDIL Dkt. No. 284 at 15).  In any event, an "'acquittal is not a finding of any fact.  An acquittal can only be an acknowledgment that the government failed to prove an essential element of the offense beyond a reasonable doubt.'"  United States v. Watts, 519 U.S. 148, 155 (1997) (per curiam) (citation omitted); Santamaria v. Horsley, 133 F.3d 1242, 1246 (9th Cir.) (en banc), concurrence amend by, 138 F.3d 1242 (9th Cir.), cert. denied, 525 U.S. 823 (1998) & 525 U.S. 824 (1998); see also Gomez v. Cnty. of Los Angeles, 2011 WL 13269747, *4 (C.D. Cal. 2017) ("An acquittal on a criminal charge may merely reflect the failure of the prosecution to sustain its burden of proving the charges true beyond a reasonable doubt.  Obviously, this is a higher standard than probable cause. . . .").  At Rana's sentencing hearing, the district judge who presided over the NDIL Case recognized as much, commenting:

> Now, there's sort of an unsaid feeling here that the evidence was questionable as to Mr. Rana's conduct, whether he was guilty, because Headley was shown to be a very manipulative person who would certainly use the ability to lie in order to carry out any activity he wanted and that perhaps the jury was wrong in finding Mr. Rana guilty.  [¶]  I think the jury, certainly you can show that they bent over backwards to be fair because there was certainly evidence . . . to certainly support . . . Count 9, which was the Mumbai []count.  And they very clearly determined that, by listening to all the evidence and viewing Mr. Headley – who testified for I think seven days, I think five of which were involved in the Mumbai matter – that they were very able to distinguish between what was perhaps preponderance of the evidence as opposed to beyond a reasonable doubt.

(Dkt. No. 16-5 at 65).

presentation with, among other things:  an affidavit from the Superintendent of Police in charge of the investigation in India summarizing the evidence supporting India's extradition request;[37] documentary evidence, including witness statements, copies of leases and related documents, and emails between Rana, Headley and other co-conspirators; and recordings of discussions between Rana and Headley.[38]

The Ninth Circuit addressed a similar issue in Man-Seok Choe v. Torres, 525 F.3d 733 (9th Cir. 2008), cert. denied, 555 U.S. 1139 (2009).  In that case, the evidence supporting probable cause included "the Korean prosecutor's summary of testimony from Choe's accomplice, (Ki Choon Ho, who implicate[d] Choe" in the charged offense.  Man-Seok Choe, 525 F.3d at 739.  Choe asserted there was no probable cause supporting his extradition for the charged offense and, in so doing, attacked Ho's credibility, arguing that "Ho had every reason to shift blame

---

[37]"[I]f the evidence submitted in the extradition papers is certified and authenticated in accordance with the admissibility requirements of . . . the Treaty and 18 U.S.C. § 3190 — which is not disputed here — the magistrate judge is authorized to consider it."  Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir. 2008) (footnotes omitted), cert. denied, 555 U.S. 1139 (2009); see also Collins, 259 U.S. at 317 ("[U]nsworn statements of absent witnesses may be acted upon by the committing magistrate, although they could not have been received by him under the law of the state on a preliminary examination."); Zanazanian, 729 F.2d at 627 (police reports summarizing witness statements are competent evidence); Emami, 834 F.3d at 1450-52 (hearsay evidence summarized in prosecutor's affidavit was competent evidence).

[38]Rana argues, among other things, that "[n]o documents or witness corroborates Headley's claim to have told Rana about his activities on Lashkar's behalf."  (Objections at 22).  The Court disagrees.  Among other things, the September 7, 2009 conversation demonstrates Rana was aware of Headley's surveillance activities.  (RT 555-59).  The Court also notes that in an interview with the FBI, Rana apparently "admitted knowing that Headley had trained with Lashkar."  (RT 1559; see also EHT at 114 (Rana's counsel acknowledged Rana's post-arrest statement that Headley told Rana that Headley was involved with Lashkar); NDIL Case Dkt. No. 254-3)).  While this admission is not part of the evidence presented to support the extradition request, it seems reasonable to conclude that Superintendent of Police Parasor – who wrote a detailed affidavit supporting the extradition request that makes clear the NDIL Case was one of the sources of evidence relied upon in developing the Indian charges against Rana – was aware of this admission when he stated that "Rana knew that [Headley] was a member of [Lashkar], that [Headley] was carrying out surveillance for [Lashkar] in India, [and] that [Headley] was going to Pakistan after every trip to India to hand over the videos to [Lashkar]."  (Parasor Aff. ¶ 42).

1    to him to reduce her own culpability, and that her statements aren't supported by

2    any other witness." Id. at 740.  However, the Ninth Circuit, after briefly

3    highlighting other evidence supporting the probable cause determination, rejected

4    Choe's contention, stating "Ho's lack of credibility is merely a weakness in

5    Korea's case; it does not 'completely obliterate[]' the evidence of probable cause."

6    Id. at 739-40 (quoting Barapind, 400 F.3d at 749).

7        Applying Man-Seok Choe, the Court reaches the same result here.  Given

8    the evidence presented in support of India's extradition request, as detailed above,

9    the issues regarding Headley's credibility do not "completely obliterate the

10   evidence of probable cause" and, therefore, are "merely a weakness" to be

11   considered at trial in India.  Id. at 739-40; Barapind, 400 F.3d at 749-50; see also

12   Matter of Yordanov, 2017 WL 216693, *13 (C.D. Cal.) ("The credibility of the

13   witnesses against Yordanov presents a matter for trial in Bulgaria because the

14   reasons suggested by Yordanov to doubt the credibility of these witnesses do not

15   'completely obliterate the evidence of probable cause.'" (citation omitted)), habeas

16   corpus denied, 250 F. Supp. 3d 540 (C.D. Cal. 2017), appeal dismissed, 2018 WL

17   1989645 (9th Cir. 2018).

18       Accordingly, the Court finds there is probable cause to believe Rana

19   committed the charged offenses as to which extradition has been sought and

20   should be extradited to India under the extradition Treaty between the United

21   States and India.[39]

22   ///

23   ///

24

25

26   [39]Since Rana does not challenge the Government's showing of probable cause except to
     the extent predicated on Headley's testimony as discussed above (see, e.g., EHT at 7), and since
27   the Court finds that the competent evidence detailed herein is sufficient to establish probable
     cause to support each element of each such charge, the Court need not and does not individually
28   discuss each charge/element and detail the corresponding specific supporting evidence.

## V.    CERTIFICATION AND ORDER

Based upon the foregoing and the Court's consideration of the entire record in this matter:

1.      The undersigned judicial officer is authorized to conduct extradition proceedings and this Court has subject matter jurisdiction over the case.  <u>See</u> 18 U.S.C. § 3184, Local Rule 72-1; General Order No. 05-07.

2.      The undersigned judicial officer and this Court have personal jurisdiction over Rana who was found and arrested and is presently in custody in the Central District of California.  <u>See</u> 18 U.S.C. § 3184.

3.      The Treaty is currently in full force and effect was in force and effect at all times relevant to this matter.  <u>See</u> Heinemann Decl. ¶ 2 & Attachment (Treaty).

4.      India has issued an arrest warrant and charged Rana with the following offenses on which the United States is proceeding:  (a) conspiracy to wage war, to commit murder, to commit forgery for the purpose of cheating, to use as genuine a forged document or electronic record, and to commit a terrorist act in violation of IPC § 120B, read with IPC §§ 121, 302, 468, 471 and UAPA § 16; (b)  waging war, in violation of IPC § 121; (c) conspiracy to wage war, in violation of IPC § 121A; (d) murder, in violation of IPC § 302; (e) committing a terrorist act, in violation of UAPA § 16; and (f) conspiracy to commit a terrorist act, in violation of UAPA § 18.  <u>See</u> Heinemann Decl. ¶ 5; Parasor Aff. ¶¶ 12-13 & Attachments.  The foregoing charged offenses constitute extraditable offenses within the meaning and scope of the Treaty and over which India has jurisdiction. <u>See</u> Treaty, Art. 2.[40]

---

[40]Article 2 of the Treaty provides:

l.  An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty, including imprisonment, for a period of more than one year or by a more severe penalty.

(continued...)

5.      The United States and India have submitted documents that were properly authenticated and certified in accordance with Title 18, United States Code, section 3190, including the pertinent text of the crimes with which Rana has been charged.  See Dkt. No. 66.

6.      Sufficient competent evidence – detailed above – has been presented to establish probable cause that Rana – the individual appearing before the undersigned judicial officer – is the individual who has been charged in India and whose extradition has been sought by India in this action, and that Rana committed the aforementioned offenses for which extradition has been sought.

---

[40](...continued)

2.  An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, aiding or abetting, counselling or procuring the commission of or being an accessory before or after the fact to, any offense described in paragraph 1.

3.  For the purposes of this Article, an offense shall be an extraditable offense:

   (a) whether or not the laws in the Contracting States place the offense within the same category of offenses or describe the offense by the same terminology;

   (b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court; or

   (c) whether or not it relates to taxation or revenue or is one of a purely fiscal character.

4.  Extradition shall be granted for an extraditable offense regardless of where the act or acts constituting the offense were committed.

5.  If extradition has been granted for an extraditable offense, it shall also be granted for any other offense specified in the request, even if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

47

7.      The requested extradition is not barred under Article 6 of the Treaty (the <u>non</u> <u>bis</u> <u>in</u> <u>idem</u> provision) or otherwise.

8.      Based on the foregoing, the Court concludes that Rana is extraditable for the offenses for which extradition has been requested and on which the United States is proceeding and hereby CERTIFIES this finding to the United States Secretary of State as required under Title 18, United States Code, section 3184.

IT IS THEREFORE ORDERED that Tahawwur Hussain Rana be and remain committed to the custody of the United States Marshal pending a final decision on extradition and surrender by the Secretary of State to India for trial of the offenses as to which extradition has been granted pursuant to Title 18, United States Code, section 3186 and the Treaty.

IT IS FURTHER ORDERED that the Clerk of the Court forthwith deliver to the assigned Assistant United States Attorney a certified copy of this Certification of Extraditability and Order of Commitment and forward without delay certified copies of the same to the Secretary of the State, Department of State, to the attention of the Office of the Legal Adviser and the Director, Office of International Affairs, Criminal Division, U.S. Department of Justice , Washington, D.C., for appropriate disposition.

DATED:  May 16, 2023

_____/s/_____

Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

48